## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **ANSELL HEALTHCARE PRODUCTS LLC,** | **Civil Action No.:** |
| Plaintiff, | **1:15-cv-00915-RGA** |
| v. | |
| **RECKITT BENCKISER LLC,** | **REDACTED PUBLIC VERSION** |
| Defendant. | |

### JOINT CLAIM CONSTRUCTION BRIEF

Colm F. Connolly (No. 3151)
David W. Marston Jr. (No. 3972)
Jody C. Barillare (No. 5107)
MORGAN, LEWIS & BOCKIUS LLP
The Nemours Building
1007 North Orange Street, Suite 501
Wilmington, Delaware 19801
(302) 574-3000
colm.connolly@morganlewis.com
david.marston@morganlewis.com
jody.barillare@morganlewis.com

Thomas B. Kenworthy (admitted pro hac vice)
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, Pennsylvania 19103-2921
(215) 963-5000
thomas.kenworthy@morganlewis.com

Raymond R. Moser, Jr. (admitted pro hac vice)
MOSER TABOADA
1030 Broad Street, Suite 203
Shrewsbury, New Jersey 07702
(732) 935-7100
rmoser@mtiplaw.com

*Attorneys for Plaintiff*
*Ansell Healthcare Products LLC*

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

Adam W. Poff (No. 3990)
Pilar G. Kraman (No. 5199)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
(302) 571-6600
apoff@ycst.com
pkraman@ycst.com

*Of Counsel:*

Douglas J. Nash (admitted pro hac vice)
John T. Gutkoski (admitted pro hac vice)
BARCLAY DAMON, LLP
Barclay Damon Tower
125 East Jefferson Street
Syracuse, New York 13202
(315) 425-2700

*Attorneys for Defendant*
*Reckitt Benckiser LLC*

**DATED: February 6, 2017**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................... vii

I.     THE PARTIES' GENERAL COMMENTS ...................................................1

       A.     Ansell's General Comments In Reply ...............................................1

       B.     RB's  Response To Ansell's General Comments ...............................2

       C.     Ansell's Statement About The Federal Circuit's
              Latest Pronouncement On Indefiniteness ..........................................6

       D.     RB's Response To Ansell's Discussion Of *Sonix* Decision ..............8

II.    DISPUTED CONSTRUCTIONS .................................................................9


**CLAIM TERM NO. 1:  "SYNTHETIC POLYISOPRENE PARTICLES
THAT ARE PRE-VULCANIZED"** ...............................................................9

Ansell's Opening Position ..............................................................................9

RB's Answering Position...............................................................................10

Ansell's Reply Position.................................................................................19

RB's Sur-Reply Position...............................................................................23


**CLAIM TERM NO. 2:  "THE INTRA-POLYISOPRENE PARTICLE
CROSSLINKS AND THE INTER-POLYISOPRENE PARTICLE
CROSSLINKS ARE SUBSTANTIALLY UNIFORM"** ...........................26

Ansell's Opening Position ............................................................................26

RB's Answering Position...............................................................................27

Ansell's Reply Position.................................................................................35

RB's Sur-Reply Position...............................................................................37

Page

**CLAIM TERM NO. 3: "WHEREIN THE INTRA-POLYISOPRENE PARTICLE CROSSLINKS AND THE INTER-POLYISOPRENE PARTICLE CROSSLINKS ARE SUBSTANTIALLY UNIFORMLY DISTRIBUTED AMONG AND BETWEEN THE SYNTHETIC POLYISOPRENE PARTICLES"** ...................................................................38

Ansell's Opening Position ..............................................................................38

RB's Answering Position................................................................................38

Ansell's Reply Position...................................................................................39

**CLAIM TERM NO. 4: "SUBSTANTIALLY CONCHOIDAL FRACTURE"** ..............................................................................................39

Ansell's Opening Position ..............................................................................40

RB's Answering Position................................................................................40

Ansell's Reply Position...................................................................................43

RB's Sur-Reply Position.................................................................................44

**CLAIM TERM NO. 5: "ABSENCE OF INTRA-POLYISOPRENE AND INTER-POLYISOPRENE PARTICLE FEATURES"; "ABSENCE OF SCANNING ELECTRON MICROSCOPE-VIEWABLE INTRA-POLYISOPRENE AND INTER-POLYISOPRENE PARTICLE FEATURES"** ...................................................................................................44

Ansell's Opening Position ..............................................................................44

RB's Answering Position................................................................................45

Ansell's Reply Position...................................................................................46

**Page**

**CLAIM TERM NO. 6:** **"UNIFORMITY OF ISOPRENE DOUBLE BONDS"** ........................................................................................47

Ansell's Opening Position .......................................................................47

RB's Answering Position..........................................................................47

Ansell's Reply Position............................................................................48

**CLAIM TERM NO. 7:** **"PASSES THROUGH BOTH INTER-PARTICLE REGIONS AND INTRA-PARTICLE REGIONS NONPREFERENTIALLY"**.......................................................................48

Ansell's Opening Position .......................................................................48

RB's Answering Position..........................................................................49

Ansell's Reply Position............................................................................49

**CLAIM TERM NO. 8:** **"SAID SYNTHETIC POLYISOPRENE PARTICLES BONDED TO EACH OTHER THROUGH INTRA-POLYISOPRENE PARTICLE CROSSLINKS AND INTER-POLYISOPRENE PARTICLE CROSSLINKS"** .......................................50

Ansell's Opening Position .......................................................................50

RB's Answering Position..........................................................................51

Ansell's Reply Position............................................................................52

**CLAIM TERM NO. 9:** **"OSMIUM TETROXIDE STAINING"** ...............................53

Ansell's Opening Position .......................................................................53

RB's Answering Position..........................................................................53

Ansell's Reply Position............................................................................54

RB's Sur-Reply Position...........................................................................55

**Page**

**CLAIM TERM NO. 10**:  **"WHEREIN THE INTRA-POLYISOPRENE PARTICLE CROSSLINKS AND THE INTER-POLYISOPRENE PARTICLE CROSSLINKS ARE SUCH THAT THE MOLECULAR WEIGHT IS LESS THAN ABOUT [X] G/MOL BETWEEN THE CROSSLINKS"** ................................................................................................55

Ansell's Opening Position ................................................................56

RB's Answering Position ................................................................56

Ansell's Reply Position ................................................................58

RB's Sur-Reply Position ................................................................60

ANSELL'S CONCLUSION ................................................................61

RB'S CONCLUSION ................................................................61

JOINT APPENDIX TO JOINT CLAIM CONSTRUCTION BRIEF

U.S. Patent No 8,087,412 ................................................ App. I

U.S. Patent No 8,464,719 ................................................ App. II

U.S. Patent No 9,074,027 ................................................App. III

U.S. Patent No 9,074,029 ................................................ App. IV

Declaration Of William D. Potter, Ph.D. dated December 30, 2016 ........................App. V

Exhibit A     -     UK Patent Application GB 2,436,566

Exhibit B     -     Excerpts of the October 13, 2016 Deposition of Dave Narasimhan, Ph.D.

Exhibit C     -     Excerpts of the November 9, 2016 Deposition of David M. Lucas, Ph.D.

Exhibit D     -     April 15, 2016 response of Ansell to EPO office action dated December 4, 2015, with attachments in connection with European Application No. 09 739 504.0

Exhibit E        -        EPO office action dated October 7, 2011 in connection with
                         European Application No. 09 739 504.0

Exhibit F        -        February 22, 2012 response of Ansell to EPO Office
                         Action dated October 25, 2011 in connection with
                         European Application No. 09 739 504.0

Exhibit G        -        CV of William D. Potter, Ph.D.

Excerpts of November 9, 2016 Deposition of David M. Lucas, Ph.D.  ................. App. VI

Excerpts of January 10, 2017 Deposition of William D. Potter, Ph.D.  ................ App. VII

Potter Deposition Exhibit 11 (Joint Report of Dr. William D. Potter and
Dr. Ho Chee-Chong in Case No. 1180 of 2014 in the Federal Court
of Australia, District Registry:  New South Wales) .............................................App. VIII

CV of Dave Narasimhan, Ph.D. ........................................................................... App. IX

Potter Deposition Exhibit 7 (Excerpts of Affidavit of William D. Potter,
Ph.D. dated March 3, 2016 and Annexure WDP-2 thereto in Case
No. 1180 of 2014 in the Federal Court of Australia, District Registry:
New South Wales) .................................................................................................App. X

Potter Deposition Exhibit 19 (Affidavit of Dr. Ho Chee-Chong,
dated June 28, 2016 in Case No. 1180 of 2014 in the Federal
Court of Australia, District Registry:  New South Wales) ..................................... App. XI

Declaration Of Thomas B. Kenworthy dated November 30, 2016 ....................... App. XII

Exhibit 1        -        Ansell's Further Amended Statement of Claim in
                         Case No. 1180 of 2014 in the Federal Court of
                         Australia, District Registry:  New South Wales

Exhibit 2        -        Respondents' Defense to Further Amended Statement
                         of Claim in Case No. 1180 of 2014 in the Federal Court
                         of Australia, District Registry:  New South Wales

Exhibit 3        -        Defendant Reckitt Benckiser LLC's Objections And
                         Responses To Plaintiff's First Set Of Requests For
                         Admission (Nos. 1-12)

*Meda Pharmaceuticals, Inc. v. Teva Pharmaceuticals, Inc.*,
N. 15-785-LPS (D. Del. Nov. 14, 2016) ...............................................................App. XIII

Potter Deposition Exhibit 15 (U.S. Patent No. 4, 243,567 to W. D. Potter) .........App. XIV

Potter Deposition Exhibit 16 (U.S. Patent No. 5,132,129 to W. D. Potter et al.) ....................................................................................................App. XV

Potter Deposition Exhibit 17 (U.S. Patent Application Publication No. 2009/0028811, W. D. Potter named inventor) ......................................................App. XVI

Potter Deposition Exhibit 18 (U.S. Patent Application Publication No. 2016/0145401, W. D. Potter et al., named inventors) .........................................App. XVII

*Roche Diagnostics Operations, Inc. v. Abbott Diabetes Care*, No. 07-753-JJF (D. Del. Sept. 15, 2007) ................................................................App. XVIII

Potter Deposition Exhibit 6 (Australian Patent AU 2009241426) .......................App. XIX

EPO December 2, 2016 communication informing of intent to grant patent, and Ansell's January 5, 2017 response thereto in connection with European Application No. 09 739 504.0 ......................................................App. XX

## TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Absolute Software, Inc. v. Stealth Signal, Inc.*,
    659 F.3d 1121 (Fed. Cir. 2011) ...............................................................22

*Amgen, Inc. v. Chugai Pharmaceutical, Co., Ltd.*,
    927 F.2d 1200 (Fed. Cir. 1991) .........................................................36, 58

*Apple, Inc. v. Ameranth, Inc.*,
    842 F.3d 1229 (Fed. Cir. 2016) ...............................................................50

*Cayenne Medical, Inc. v. Medshape, Inc.*,
    2016 WL 2606793 (D. Ariz. May 6, 2016) ....................................1, 3, 35, 39, 41

*Core Wireless Licensing, S.a.r.l. v. Apple Inc.*,
    No. 15-cv-05008-PSG, 2016 WL 3124614 (N.D. Cal. Jun. 3, 2016) ...................35, 39, 41

*Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*,
    868 F.2d 1251 (Fed. Cir. 1989) ...............................................................15

*Datamize, LLC v. Plumtree Software, Inc.*,
    417 F.3d 1342 (Fed. Cir. 2005) .........................................................5, 6, 7

*Day Int'l, Inc. v. Reeves Bros., Inc.*,
    260 F.3d 1343 (Fed. Cir. 2001) .........................................................11, 21

*Dow Chemical Co. v. NOVA Chemicals Corp. (Canada)*,
    803 F.3d 620 (Fed. Cir. 2015) ....................................................34, 37, 39, 44

*Ecolab, Inc. v. Envirochem, Inc.*,
    264 F. 3d 1358 (Fed. Cir. 2001) ...................................................26, 36, 56, 59

*EMC Corp. v. Pure Storage, Inc.*,
    77 F.Supp.3d 402 (D. Del. 2015) .............................................................26

*Every Penny Counts, Inc. v. American Express Co.*,
    563 F.3d 1378 (Fed. Cir. 2009) ...................................................45, 46, 49

**Page(s)**

*Geodynamics, Inc. v. Dynaenergetics US, Inc.,*
    No. 2:15-CV-1546-RSP, 2016 WL 6217181 (E.D. Tex. Oct. 24, 2016) ..............35, 39, 41

*Gillette Co. v. Energizer Holdings, Inc.,*
    405 F.3d 1367 (Fed. Cir. 2005).................................................................................4

*GPNE Corp. v. Apple Inc.,*
    830 F.3d 1365 (Fed. Cir. 2016) ...............................................................................16

*Interdigital Communications, Inc. v. ZTE Corp.,*
    No. 13-00009,-00010-RGA, 2014 WL 1620733 (D. Del. Apr. 22, 2014) ...............................26

*Interval Licensing LLC v. AOL, Inc.,*
    766 F.3d 1364 (Fed. Cir. 2014) .......................................................................... passim

*Iris Connex, LLC v. Acer Am. Corp.,*
    No. 2:15-cv-1909-JRG, 2016 WL 4596043 (E.D. Tex. Sept. 2, 2016)........................................4

*Jonsson v. The Stanley Works,*
    903 F.2d 812 (Fed. Cir. 1990)...................................................................................3

*LNP Engineering Plastics, Inc. v. Miller Waste Mills, Inc.,*
    275 F.3d 1347 (Fed. Cir. 1999) ...........................................................................26, 27

*Meda Pharmaceuticals Inc. v. Teva Pharmaceuticals, Inc.,*
    No. 15-785-LPS (D. Del. Nov. 14, 2016) ...................................................................22

*Moments Pharmaceuticals, Inc. v. Teva Pharmaceuticals USA Inc.,*
    809 F.3d 1366 (Fed. Cir. 2015) ...............................................................................26

*Nautilus, Inc. v. BioSig Instruments, Inc.,*
    134 S. Ct. 2120 (2014).................................................................................... passim

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.,*
    521 F.3d 1351 (Fed. Cir. 2008) ......................................................................46, 49, 51

*On Demand Machine Corp. v. Ingram Indus., Inc.,*
    442 F.3d 1331 (Fed. Cir. 2006) ...............................................................................13

*Ortho-McNeil Pharmaceutical, Inc. v. Coraco Pharmaceutical Labs, Ltd.,*
    476 F.3d 1321 (Fed. Cir. 2007) ...............................................................................60

**Page(s)**

*Pacing Techs., LLC v. Garmin Int'l, Inc.*,
  778 F.3d 1021 (Fed. Cir. 2016) ....................................................................25

*Personalized Media Commc'ns, LLC v. Int'l Trade Comm'n*,
  161 F.3d 696 (Fed. Cir. 1998) ....................................................................14

*Pfizer, Inc. v. Ranbaxy Labs, Ltd.*,
  457 F.3d 1284 (Fed. Cir. 2006)....................................................................2

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005)................................................................2, 51

*Poly-Am., L.P. v. API Indus., Inc.*,
  839 F.3d 1131 (Fed. Cir. 2016) ..........................................................11, 20, 25

*Reckitt Benckiser Pharmaceuticals Inc. v. Watson Laboratories, Inc.*,
  No. 13-1674-RGA, 2016 WL 3186659 (D. Del. June 3, 2016) .........................37

*Renishaw PLC v. Marposs Societa' per Azioni*,
  158 F.3d 1243 (Fed. Cir. 1998) ....................................................................14

*Rheox, Inc. v. Entact, Inc.*,
  276 F.3d 1319 (Fed. Cir. 2002) ..............................................................11, 21

*Roche Diagnostics Operations, Inc. v. Abbott Diabetes Care*,
  No. 07-753-JJF (D. Del. Sept. 15, 2007) .......................................................59

*S3 Inc. v. NVIDIA Corp.*,
  259 F.3d 1364 (Fed. Cir. 2001) ....................................................................14

*SciMed Life Sys. v. Advanced Cardiovascular Sys.*,
  242 F.3d 1337 (Fed. Cir. 2001) ....................................................................25

*SmithKlineBeecham Corp. v. Apotex Grp.*,
  439 F.3d 1312 (Fed. Cir. 2016) ....................................................................23

*Solomon v. Kimberly-Clarke Corp.*,
  216 F.3d 1372 (Fed. Cir. 2001) ..................................................................1, 3

*Sonix Technology Co., Ltd. v. Publications Int'l, Ltd.*,
  ___ F.3d ___, 2017 WL 56321 (Fed. Cir. Jan. 5, 2017) ............................ passim

**Page(s)**

*Synthes (USA) v. Smith & Nephew, Inc.,*
  No. 03-cv-0084, 2008 WL 343114 (E.D. Pa. Feb. 4, 2008) ................................................58, 61

*Technology Innovations LLC v. Amazon.com,*
  35 F. Supp. 3d 613 (D. Del. 2014) .......................................................................................26

*Teva Pharm. USA, Inc. v. Sandoz, Inc.,*
  789 F.3d 1335 (Fed. Cir. 2015) ...............................................................................14, 34, 39

*U.S. Surgical Corp. v. Ethicon, Inc.,*
  103 F.3d 1554 (Fed. Cir. 1997) ............................................................................................51

*Vanguard Prods. Corp. v. Parker Hannifin Corp.,*
  234 F.3d 1370 (Fed. Cir. 2000) ...........................................................................................23

*Verizon Servs. Corp. v. Vonage Holdings Corp.,*
  503 F.3d 1295 (Fed. Cir. 2007) .....................................................................................16, 17

*Verve, LLC v. Crane Cams, Inc.,*
  311 F.3d 1111 (Fed. Cir. 2003) ............................................................................................7

*Voice Techs. Group, Inc. v. VMC Sys.,*
  164 F.3d 605 (Fed. Cir. 1999)...............................................................................................3


**RULES**

Fed. R. Civ. P. 16...................................................................................................................22

Fed. R. Evid. 801(c) ...............................................................................................................37

Fed. R. Evid. 802 ...................................................................................................................37


**STATUTES**

28 U.S.C. § 1746 ....................................................................................................................37

35 U.S.C. § 112 ....................................................................................................1, 3, 14, 15

**OTHER**

"Where Does the Scope in Substance Fall – Claim Construction
in Australia" -- http://www.spruson.com/scope-substance-fall-
claim-construction-australia/ ............................................................................................5

In accordance with paragraph 10 of the Scheduling Order (D.I. 18), as amended, Plaintiff Ansell Healthcare Products LLC ("Ansell") and Defendant Reckitt Benckiser LLC ("RB") respectfully submit this Joint Claim Construction Brief.  A Joint Appendix hereto is being filed separately.  The Patents-in-Suit are U.S. Patent Nos. 8,087,412 ("the '412 Patent") (App. I hereto), 8,464,719 ("the '719 Patent") (App. II hereto), 9,074,027 ("the '027 Patent) (App. III hereto), and 9,074,029 ("the '029 Patent") (App. IV hereto).

## I.   THE PARTIES' GENERAL COMMENTS

### A.   Ansell's General Comments In Reply

RB's answering brief on claim construction/indefiniteness relies heavily on the declaration of William D. Potter that reads more like a lawyer's brief than the declaration of an expert based on scientific principles.  Dr. Potter's declaration, in turn, improperly relies on excerpts of the depositions of two of the inventors, when the Federal Circuit has made clear that "[i]t is particularly inappropriate to consider inventor testimony obtained in the context of litigation in assessing validity under Section 112, paragraph 2, in view of the absence of probative value of such testimony." *Solomon v. Kimberly-Clarke Corp.*, 216 F.3d 1372, 1379 (Fed. Cir. 2001); *see also Cayenne Medical, Inc. v. Medshape, Inc.*, 2016 WL 2606793, at *4 (D. Ariz. May 6, 2016) (a case cited by RB).  Additionally, RB ignores the fact that the U.S. Patent Office has found that all of the challenged terms have satisfied the definiteness requirements of 35 U.S.C. § 112, ¶ 2, giving rise to a presumption of validity.  Indeed, Dr. Potter and RB rely instead on a preliminary rejection by the European Patent Office applying different standards.  Reliance on such actions by a foreign patent office is inappropriate.[1]  Even statements

---

[1]      Much greater reliance and deference should be placed on the actions of the United States Patent Office in the context of the Patents-in-Suit.  Moreover, other than the EPO's concern with

of a patentee "made during prosecution of foreign counterparts to the [patents-in-suit] are *irrelevant* to claim construction because they were made in response to patentability requirements unique to [another jurisdiction's] law." *Pfizer, Inc. v. Ranbaxy Labs, Ltd.*, 457 F.3d 1284, 1298 (Fed. Cir. 2006).

RB fails to address any of the cases cited by Ansell, and the cases that it does cite are inapt. Moreover, as discussed in the next section, a highly relevant decision of the Federal Circuit was handed down *after* RB served its brief. Finally, RB fails to address the very significant fact that RB's corporate affiliates were sufficiently able to understand several of the challenged terms to actually admit in litigation in Australia that those features are present in the accused Durex RealFeel® synthetic polyisoprene condoms.

### B.    RB's Response To Ansell's General Comments

Ansell's reply brief begins with a few general criticisms directed toward Dr. Potter's declaration and RB's arguments. While observing first that Ansell did **not** dispute **anything** in Dr. Potter's declaration, RB responds as follows.

**Inventor Testimony:** While critical of Dr. Potter's references to inventor testimony, Ansell itself relies on inventor testimony to support its proposed construction of the term "synthetic polyisoprene particles that are pre-vulcanized". (*See* Ansell Reply, p. 19.) Regardless, there is no blanket prohibition against considering inventor testimony in the context of claim construction or indefiniteness. In fact, as long as the testimony does not go to the subjective intent of the inventor in using a particular term, inventor testimony is undoubtedly relevant and helpful extrinsic evidence that the Court (and thus experts) can consider. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1317-19 (Fed. Cir. 2005).

---

respect to the use of the word "substantially," the actions of the foreign patent offices vis-à-vis the claim terms in issue also support Ansell, not RB.

Here, the testimony was **not** directed to the inventors' subjective intent, but instead was focused on: (a) what was known in the art at the time of the invention; (b) a high-level explanation of the allegedly novel features of the invention; (c) how to utilize the various figures in the patents; (d) how the inventors documented their invention; (e) what method a person of ordinary skill in the art would have used to determine whether something was within the scope of their invention; and (f) whether that method would have been objective. (*See* Declaration of William D. Potter, Ph.D. ("Potter Decl.") (App. V hereto) ¶¶ 40, 41, 45, 52, 53, 54, 56, 59, 60, 63, 64, 74, 75, 77, 78, 92, 93.) That is appropriate extrinsic evidence, and it was entirely proper for Dr. Potter to have considered it in relation to his own views. *See Voice Techs. Group, Inc. v. VMC Sys.*, 164 F.3d 605, 615 (Fed. Cir. 1999) ("An inventor is a competent witness to explain the invention and what was intended to be conveyed by the specification and covered by the claims. The testimony of the inventor may also provide background information, including explanation of the problems that existed at the time the invention was made and the inventor's solution to these problems."); *Jonsson v. The Stanley Works*, 903 F.2d 812, 821 (Fed. Cir. 1990) (ruling that district court's reliance on an inventor's deposition testimony that was **contrary to patent holder's** litigation-induced interpretation was proper).[2]

**U.S. Prosecution History:** Ansell argues that "the U.S. Patent Office has found that all of the challenged terms have satisfied the definiteness requirements of 35 U.S.C. § 112, ¶ 2,

---

[2]     Ansell's reliance on *Solomon*, 216 F.3d 1372, is misplaced. That case did **not** address the extent to which inventor testimony can be considered in the context of indefiniteness. Rather, *Solomon* addressed the use of testimony about what the inventor subjectively thought he invented in the context of the court determining whether the claims set forth "the subject matter which the applicant regards as his invention," which is different than, and in addition to, the definiteness requirement under pre-AIA Section 112, second paragraph. The decision in *Cayenne Med.*, 2016 WL 2606983, relies on *Solomon* but fails to address this distinction, and is otherwise inapposite because, in that case, the patent owner tried to use inventor testimony to explain what the inventors subjectively meant by using a particular claim term. Here, the testimony has nothing to do with subjective intent.

giving rise to a presumption of validity." There was no such finding.  Beyond having generally allowed the claims, there is no evidence that the U.S. patent examiner ever considered the definiteness of the challenged terms.  And, if, as Ansell suggests, the mere grant of a patent is dispositive as to definiteness, no claim would ever be found by a court to be indefinite.

**European Prosecution History:**  Although Ansell complains about RB's reference to the prosecution of the European counterpart to the Patents-in-Suit, the Federal Circuit has endorsed the use of statements made in foreign prosecutions where they constituted "blatant admissions" by the applicant directed at the relevant claims.  *See Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1374 (Fed. Cir. 2005); *see also Iris Connex, LLC v. Acer Am. Corp.*, No. 2:15-cv-1909-JRG, 2016 WL 4596043, at *16 n.9 (E.D. Tex. Sept. 2, 2016) ("Use of the more detailed statements made by the applicant during the European prosecution directed to overcome a similar rejection is particularly appropriate here.  The European application and the [U.S.] patent have the same specification, descend from the same PCT International Application, and the European claim and proposed amendment is nearly identical to same of the patent-in-suit.  Under such circumstances, such statements have probative value relevant to the present claim construction inquiry.").

Such is the case here, where: (a) the specifications are the same and descend from the same application; (b) the claim language at issue is virtually identical; (c) the European patent office rejected the term "substantially uniform" as lacking clarity (which is analogous to indefiniteness under U.S. law); (d) Ansell acknowledged the clarity problem and attempted to solve it by eliminating the word "substantially" from the claims; and (e) Ansell admitted (contrary to what it now argues) that "[a]ccording to the present invention" the claimed uniformity between crosslinks depends on and "is achieved by **monitoring and controlling** the

- 4 -

pre-vulcanization . . . ." (*See* Office Action Response dated 04/15/2016, pp. 6, 7, Potter Decl., Ex. D; EU Office Action dated 10/07/2011, p. 3, Potter Decl., Ex. E; EU Office Action Response dated 02/22/2012, p. 1-2, Potter Decl., Ex. F.).

**Australian Case:**  Despite objecting to the statements it made during the European prosecution because the applicable legal standard is different, Ansell nonetheless heavily relies on statements concerning infringement made in the litigation involving its Australian counterpart patent.  RB was **not** a party to that case and did **not** make the statements.  Further, the claim construction standard in Australia is different than in the U.S., making any statements concerning infringement in Australia irrelevant here because they depend on claim construction.[3]  Moreover, Ansell failed to mention that despite the statements, the issue of definiteness was preserved and remains in dispute in Australia, and, it appears from the available public record, that the statements were made for tactical reasons early in the case and without expert consultation in an effort to streamline the proceedings, as opposed to having been based on an informed understanding as to the objective scope of the claims.

But, at bottom, none of this matters because the statements concerning infringement are irrelevant regardless where they were made or who made them.  Infringement is **not** the same question as indefiniteness, and "indefiniteness does not depend on the difficulty [or ease] experienced by a particular person in comparing the claims with the prior art or the claims with allegedly infringing products or acts."  *See Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d

---

[3]    *See* "Where Does the Scope in Substance Fall – Claim Construction in Australia" – http://www.spruson.com/scope-substance-fall-claim-construction-australia/ (article written by Ansell's Australian law firm indicating that the "scope of a claim may vary" depending on which law is applied because in Australia, unless the claims are ambiguous, they are given their plain-English meaning, whereas in the U.S., absent a disclaimer or deliberate redefinition by the inventor, claims are always given their ordinary meaning as understood by a person of ordinary skill in the art).

1342, 1354 (Fed. Cir. 2005); *see also Sonix Technology Co. Ltd. v. Publications Int'l, Ltd.*, ___

F.3d ___, 2017 WL 56321 (Fed. Cir. Jan. 5, 2017) (Ansell's lead case on reply making clear that

"[n]either does the fact that an expert has applied a contested claim term without difficulty

render a claim immune from an indefiniteness challenge.").

### C.   Ansell's Statement About The Federal Circuit's Latest Pronouncement On Indefiniteness

The Federal Circuit's most recent pronouncement on the issue of indefiniteness is in

*Sonix*, ___ F.3d ___, 2017 WL 56321.  As noted by the *Sonix* Court:

> "Section 112 requires that a patent specification 'conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.' The Supreme Court has read this provision to require that 'a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty.' *Nautilus*, 134 S. Ct. at 2129. Indefiniteness must be proven by clear and convincing evidence. *See Teva II*, 789 F.3d at 1345.
>
> The § 112 ¶ 2 requirement strikes a 'delicate balance' between the 'inherent limitations of language' and providing 'clear notice of what is claimed.' *Nautilus*, 134 S. Ct. at 2129 (internal citations omitted). Even so, the Supreme Court has recognized that 'absolute precision is unattainable." *Id.* '[T]he certainty which the law requires in patents is not greater than is reasonable, having regard to their subject-matter." *Id.* (quoting *Minerals Separation, Ltd. v. Hyde*, 242 U.S. 261, 270 (1916) (internal quotation marks omitted)).
>
> Because language is limited, we have rejected the proposition that claims involving terms of degree are inherently indefinite. *Interval Licensing*, 766 F.3d at 1370. Thus, 'a patentee need not define his invention with mathematical precision in order to comply with the definiteness requirement." *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 424 F.3d 1374, 1384 (Fed. Cir. 2005) (citation omitted). Indeed, '[c]laim language employing terms of degree has long been found definite where it provided enough certainty to one of skill in the art when read in the context of the invention.' *Interval Licensing*, 766 F.3d at 1370 (citing *Eibel Process Co. v. Minns. & Ont. Paper Co.*, 261 U.S. 45, 65-66 (1923))."

2017 WL 56321 at *5.  The necessary clear and convincing evidence must establish that persons skilled in the field of the invention would not be able to understand the scope of the invention based on the description in the specification and the knowledge in the art.  Patents are not "required to be written as a comprehensive tutorial and treatise for the generalist." *See Verve, LLC v. Crane Cams, Inc.*, 311 F.3d 1111, 1119 (Fed. Cir. 2003).

The *Sonix* Court further explained that the types of limitations that were "purely subjective" so as to render a claim indefinite were those that "turned on a person's taste or opinion." *Sonix*, 2017 WL 56321 at *6.  The Court gave examples of such "purely subjective" limitations that rendered claims indefinite: "aesthetically pleasing" and "in an unobstructive manner that does not distract a user," which were respectively held to render the claims indefinite in *Datamize*, 417 F.3d at 1349-54, and *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1368-74 (Fed. Cir. 2014).  *Sonix*, 2017 WL 56321 at *6.  The *Sonix* Court held, on the other hand, that the term "visually negligible" is not a purely subjective term because it "involves what can be seen by the normal human eye.  This provides an objective baseline through which to interpret the claims." *Id.*

The "substantially uniform crosslinks" limitations involved in this case are far more analogous to the "visually negligible" limitation in *Sonix* than to the "aesthetically pleasing" and "in an unobstrusive manner" limitations in *Datamize* and *Interval Licensing*.  The non-precedential district court decision from other jurisdictions upon which RB relies, do not involve analogous claim language, were all decided before the Federal Circuit's *Sonix* decision, and do not provide persuasive authority for this case.

-7-

**D.**     **RB's Response To Ansell's Discussion Of _Sonix_ Decision**

Ansell devotes almost two pages of its reply to a detailed discussion of the Federal Circuit's recent _Sonix_ decision.   Ansell's focus is misplaced.   That case did **not** in any way change or even significantly develop the law of indefiniteness, and it concerned a **different** patent, in a **different** technical field, with a **different** prosecution history, a **different** specification, and **different** disputed claim terms.   The Federal Circuit itself made clear the limited scope of its holding when it explained:

> Our holding in this case does **not** mean that the existence of examples in the written description will always render a claim definite, or that listing requirements always provide sufficient certainty.   Neither does the fact that an expert has applied a contested claim term without difficulty render a claim immune from an indefiniteness challenge.   **As always, whether a claim is indefinite must be judged "in light of the specification and prosecution history" of the patent in which it appears**.   We simply hold that "visually negligible" is not a purely subjective term and that, **on this record**, the written description and prosecution history provide sufficient support to inform with reasonable certainty those skilled in the art of the scope of the invention.

_Sonix_, 2017 WL 56321 at *8 (internal citation omitted) (emphasis added).

In this case, claim terms such as "substantially uniform" crosslinks, "substantially uniformly distributed" crosslinks, a "substantially conchoidal fracture" and a molecular weight of "less than about X g/mol" are indefinite **not** because they use terms of degree that are inherently indefinite, but rather because, despite having used terms of degree in the claims, the inventors failed to provide any **objective guideposts** in the specification or otherwise that would have allowed a person of ordinary skill in the art at the time of the invention to determine the objective scope of the claims to a reasonable degree of certainty.   _See Nautilus, Inc. v. BioSig Instruments, Inc._, 134 S. Ct. 2120, 2128 (2014).   In stark contrast, such objective guideposts were present throughout the patent in the _Sonix_ case.

## II.   DISPUTED CONSTRUCTIONS

**CLAIM TERM NO. 1:** **"SYNTHETIC POLYISOPRENE PARTICLES THAT ARE PRE-VULCANIZED"** (**'412 patent, claims 1, 2, 3, 4, 8 and 9; '719 patent, claims 1, 8, 10, 11, 16 and 17).**

**Ansell's Proposed Construction:**  Synthetic polyisoprene particles that have had some amount of cross-linking prior to the dipping of a former into the latex emulsion.

**RB's Proposed Construction:**  This term is indefinite.  It is unclear what would constitute a sufficient level of pre-vulcanization to produce "substantially uniform crosslinks" and/or the other claimed features.  Moreover, it is unclear how a person of ordinary skill in the art could make an objective determination as to whether a sufficient level of pre-vulcanization has been achieved.  It also is unclear whether the inventors were using a specialized definition of "pre-vulcanized" that they failed to adequately disclose in the specification.  Thus, when this term is read in light of the specification delineating the patent, and the prosecution history, it fails to inform, with reasonable certainty, those skilled in the art about the scope of the invention.

Were the Court to determine that the term is definite, then it should be construed as "Particles subjected to a pre-vulcanization process that, among other things, applies a temperature that is in excess of 22 degrees Celsius."

**Ansell's Opening Position:**

Ansell does not believe that there is any serious dispute that in the context of dip-formed latex articles such as are the subject of the patents-in-suit, the term "pre-vulcanized" means "cross-linking prior to the dipping of a former into the latex emulsion."  Indeed, RB does not specifically define "pre-vulcanized" at all in its alternative proposed construction, but uses the very term "pre-vulcanization."  RB's indefiniteness argument is grounded on two flawed premises.  First, RB suggests that this claim term requires a certain **level** of pre-vulcanization, but nothing in the claim language supports such a requirement.  RB then posits that the claim language is indefinite because it is unclear how a person of ordinary skill could make an objective determination as to whether such a sufficient **unrequired level** of pre-vulcanization has been achieved.  This claim term is by no means indefinite.

**RB's Answering Position:**

All of the asserted claims in the '412 and '719 Patents expressly require "synthetic polyisoprene particles that are pre-vulcanized." Generally speaking, pre-vulcanization is the application of heat to a sulphur-treated latex emulsion that causes sulphur crosslinks to form inside individual particles of rubber or their synthetic equivalents. (*See* Potter Decl. (App. V hereto) at ¶¶ 37-40.) These types of crosslinks are called **intra**-particle crosslinks, and any amount of pre-vulcanization will result in at least some them forming inside the particles. (*See id.*, at ¶ 39.) As such, Ansell's proposed construction essentially is that any degree of pre-vulcanization will do. Yet, the exact opposite is true based on the teaching in the specification in the Patents-in-Suit.

As an initial mater, the inventors of the Patents-in-Suit went out of their way to **disclaim** and **disavow** a certain degree of pre-vulcanization as being insufficient for the purposes of **their** invention. Specifically, the inventors disclaimed and disavowed the degree of pre-vulcanization (and hence the degree of intra-particle crosslinking) disclosed and claimed in UK patent application GB 2,436,566 (the "GB Patent"), which was incorporated by reference into the specification of the Patents-in-Suit. (*See* '412 Patent, Col. 4, lines 11-24; Col. 17, lines 24-28.)[4] The inventors of the Patents-in-Suit went so far as to say that the GB Patent "**teaches away from pre-vulcanization**" as they used that term in the Patents-in-Suit. (*Id.*, at Col. 4, lines 22-24 (emphasis added).)

The GB Patent is owned by one of RB's corporate affiliates and discloses the method by which the accused products in this case are made. It teaches minimizing (*i.e.*, controlling) the

---

[4]     The Patents-in-Suit share the same specification. Except where a particular issue relates to a different patent, representative citations to the Patents-in-Suit will be made with reference to the '412 Patent, which is first of the Patents-in-Suit to issue.

degree of pre-vulcanization but not eliminating it altogether, by using a "low temperature" that the GB Patent explicitly defines as "several degrees °C below ambient or room temperature (25°C)," or about 22°C. (*See* GB Patent, Claim 1 and p. 5, lines 14-21, Potter Decl., Ex. A.) Thus, Ansell's proposed construction is wrong for at least the reason that the limitation "synthetic polyisoprene particles that are pre-vulcanized" cannot be construed to include the degree of pre-vulcanization taught by the GB Patent – *i.e.*, the degree achieved at about 22°C or less – which was disavowed by the inventors in the Patents-in-Suit. *See Day Int'l, Inc. v. Reeves Bros., Inc.*, 260 F.3d 1343, 1349 (Fed. Cir. 2001) (holding that the patentee had disavowed curing done at the higher conventional curing temperatures, because of representations to the patent examiner that the prior art curing temperatures were too high and because of the numerous references to a "low temperature cure" or "low temperature vulcanization"); *Poly-Am., L.P. v. API Indus., Inc.*, 839 F.3d 1131, 1136 (Fed. Cir. 2016) ("While disavowal must be clear and unequivocal, it need not be explicit.  For example, an inventor may disavow claims lacking a particular feature when the specification distinguishes or disparages prior art based on the absence of that feature."); *Rheox, Inc. v. Entact, Inc.*, 276 F.3d 1319, 1326-27 (Fed. Cir. 2002) (excluding even a preferred embodiment disclosed in the specification from the scope of the claims where the inventors disclaimed that claim scope by distinguishing their invention from the prior art by amending the claims).

More importantly, the specification in the Patents-in-Suit repeatedly teaches that the degree of pre-vulcanization is critical to the invention working.  Indeed, as explained by the inventors, "the invention relates to producing synthetic polyisoprene articles and method therefor with improved inter particle and intra particle bond using **controlled pre-vulcanized particles** of synthetic latex that is dip formed into a thin latex article from an aqueous latex emulsion."

(*See* '412 Patent, Col. 1, lines 16-20 (emphasis added).) As noted above, pre-vulcanization is largely responsible for the crosslinking that occurs in the **intra**-particle regions inside the particles, whereas the Patents-in-Suit suggest that post-vulcanization (referred to in the claims as curing) is responsible for the formation of crosslinks between the particles, or **inter**-particle crosslinks. (*See* '412 Patent, Col. 10, lines 47-51; Col. 12, lines 57-64; Potter Decl., ¶ 39.) As such, in order to get the desired film properties, and hence the desired physical properties of the finished article, the Patents-in-Suit teach that the claimed invention requires **monitoring and controlling** of the degree of pre-vulcanization and then **balancing** that with the level of post-vulcanization so that the film in the finished article has a uniform balance of pre-vulcanization intra-particle crosslinks and post-vulcanization inter-particle crosslinks.[5] (*See e.g.*, '412 Patent, Abstract, Col. 4, line 66 to Col. 5, line 2, Col. 6, lines 9-13, Col. 9, lines 11-30, Col. 12, lines 57-64; Potter Decl., ¶¶ 34-60.)

Consistent with what they taught in their specification, the inventors also explained to the European Patent Office in connection with the prosecution of their counterpart European application that:

> According to the present invention, the intra-polyisoprene particle crosslinks and the inter-polyisoprene particle crosslinks are uniform. This uniformity is achieved by **monitoring and controlling** the pre-vulcanization and controlling the post-vulcanization," and "[a]pplicants have found out that **controlling the pre-vulcanization** as described in the present invention, and controlling the post-vulcanization as usual, the claimed uniformity between intra-polyisoprene particle crosslinks and inter-particle crosslinks is obtained. Due to the uniformity obtained, excellent tensile properties are achieved.

---

[5]    As one of the named inventors (Dr. David Lucas) testified, ██████████████████
████████████████████████████████████████████ (*See* Lucas Dep. Tr., p. 77, lines 11-15 (emphasis added), Potter Decl., Ex. C.)

(*See, e.g.*, Office Action Response dated 04/15/2016, pp. 6, 7 (emphasis in original), Potter Decl., Ex. D.)

With respect to control, and as foreshadowed by the GB Patent, the Patents-in-Suit teach that the degree of pre-vulcanization is primarily a function of temperature over time. (*See, e.g.*, '412 Patent, Col. 6, lines 5-9, Col. 10, lines 57-63.) As for monitoring (*i.e.*, knowing when pre-vulcanization has resulted in sufficient intra-particle crosslinking), the Patents-in-Suit teach that "the **present invention** provides a surfactant-stabilized, **pre-vulcanized**, synthetic polyisoprene latex composition having a **isopropanol index rating of 3.0**. The isopropanol index test **measures the extent of pre-vulcanization** of synthetic latex particles . . ." and "[t]he pre-vulcanization is **monitored** to assure that the synthetic latex emulsion is ready for dipping of polyisoprene condoms." (*See, e.g., id.*, at Col. 9, lines 11-30 (emphasis added).)

Monitoring and controlling the level of pre-vulcanization, and then balancing that degree with the degree of post-vulcanization, according to the Patents-in-Suit, results in a film structure having various physical characteristics, such as the claimed substantially uniform inter-particle and intra-particle crosslinks. (*See id.*, at Col. 6, lines 55-63, Col. 16, line 43 to Col. 17, line 12.) In other words, the degree of pre-vulcanization, and hence the amount of intra-particle crosslinking that occurs during pre-vulcanization, is of critical importance to the invention working as intended by the inventors, and, therefore, that degree limits the claimed invention. *See On Demand Machine Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331, 1344 (Fed. Cir. 2006) ("Although we agree with the district court that each term standing alone can be construed as having varying degrees of breadth, each term must be construed to implement the invention described in the specification . . . . Care must be taken lest word-by-word definition, removed from the context of the invention, leads to an overall result that departs significantly from the

- 13 -

patented invention."); *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998) ("Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim," and "[a] claim construction is persuasive, not because it follows a certain rule, but because it defines terms in the context of the whole patent.").

Despite the importance of the degree of pre-vulcanization to defining and implementing the claimed invention, nowhere do the claims at issue ever indicate what that degree should be. This renders the scope of the claims indefinite because the limitation "synthetic polyisoprene particles that are pre-vulcanized" is open-ended and unclear. It is a functional limitation that indicates a sufficient level of intra-particle crosslinking has occurred to get the desired film properties. Yet, it is entirely unclear what would constitute a sufficient level of pre-vulcanization to produce "substantially uniform crosslinks" and the other claimed features, and it is unclear how a person of ordinary skill in the art could make an **objective** determination as to whether a sufficient level of pre-vulcanization has been achieved.

Indefiniteness is a question of law. *See Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1341 (Fed. Cir. 2015); *see also S3 Inc. v. NVIDIA Corp.*, 259 F.3d 1364, 1367 (Fed. Cir. 2001) ("The question of whether the claims meet the statutory requirements of § 112 ¶ 2 is a matter of construction of the claims, and receives plenary review on appeal."); *Personalized Media Commc'ns, LLC v. Int'l Trade Comm'n*, 161 F.3d 696, 705 (Fed. Cir. 1998) ("A determination of claim indefiniteness is a legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims."). The requirement is statutory – *i.e.*, 35 U.S.C. §112 ¶ 2 provides that a patent must "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as [the]

invention."[6]  This means that the claims perform a notice function, similar to the metes and bounds in a deed to land. *See, e.g., Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1257-58 (Fed. Cir. 1989) ("A claim in a patent provides the metes and bounds of the right which the patent confers on the patentee to exclude others from making, using, or selling the protected invention.").  As with a deed to land, patent claims must tell the public, with reasonable certainty, what subject matter is, and is not, covered by the claims. *See Nautilus*, 134 S. Ct. at 2129.

Thus, a claim is indefinite under § 112 (and has failed to "particularly point out and distinctly claim" the invented subject matter) if its language, "read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Id.*  The standard "mandates clarity" in patent claims. *Id.*  "[T]he definiteness inquiry trains on the understanding of a skilled artisan at the time of the patent application, not that of a court viewing matters *post hoc.*" *Id.* at 2130.  "In assessing definiteness, claims are to be read [by a person of ordinary skill] in light of the patent's specification and prosecution history." *Id.* at 2128.  "Definiteness is measured from the viewpoint of a person skilled in [the] art *at the time the patent was filed.*" *Id.* (internal citations omitted, emphasis in original).  As a result, to be valid under the definiteness requirement, "the claims, when read in light of the specification and the prosecution history, must provide **objective boundaries**" such that those skilled in the art are informed about the scope of the

---

[6]      35 U.S.C. § 112 was amended in 2012 by the America Invents Act (AIA). The AIA applies to patents with effective filing dates on or after September 16, 2012.  Because the Patents-in-Suit claim to have effective filing dates before then, RB refers to Pre-AIA 35 U.S.C. §112 throughout this motion.  Nevertheless, the differences between Pre-AIA §112, ¶ 2 and Post-AIA § 112(b) are inconsequential for the purposes of this motion.

invention with "reasonable certainty." *See Interval Licensing*, 766 F.3d at 1371 (emphasis added).

Applied here, there is no question that the limitation "synthetic polyisoprene particles that are pre-vulcanized" is indefinite. First, it is clear that the degree of pre-vulcanization taught by the GB Patent is not enough. The inventors in the Patents-in-Suit said so in the specification. (*See* '412 Patent, Col. 4, lines 11-24; Col. 17, lines 24-28.) But how much pre-vulcanization above what is taught by the GB Patent is enough? Despite the fact that monitoring and controlling the level of pre-vulcanization is critical to the invention working as intended by the inventors, the Patents-in-Suit are completely silent on this key question. This renders the scope uncertain. And, because the degree of pre-vulcanization (**intra**-particle crosslinks) has to be **balanced** with the degree of post-vulcanization (**inter**-particle crosslinks) just the right amount of both types of vulcanization is needed to get the desired results – *i.e.*, substantially uniform intra-particle **and** inter-particle crosslinks. Thus, there must be some upper limit of pre-vulcanization after which there is too much pre-vulcanization otherwise the desired balance will be off and the crosslinks will not be uniform. But how much is too much? Again, the Patents-in-Suit do not say despite the inventors teaching of the criticality of monitoring and controlling the level of pre-vulcanization and balancing it with the degree of post-vulcanization.

This lack of clarity is made all the more problematic by the fact that the specification limits the "**present invention**" to materials having "**a isopropanol index rating of 3.0.**" (*See, e.g., id.*, at Col. 9, lines 11-30 (emphasis added)); *GPNE Corp. v. Apple Inc.*, 830 F.3d 1365, 1371 (Fed. Cir. 2016) ("'When a patent . . . describes the features of the '**present invention**' as a whole, this description **limits** the scope of the invention") (emphasis added) (quoting *Verizon*

- 16 -

*Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007)).  As the Patents-

in-Suit explain:

> The isopropanol index test **measures the extent of pre-vulcanization** of synthetic latex particles in an aqueous latex emulsion by combining equal volumes of latex and isopropanol at room temperature and allowing the mixture to stand for 3 min. The isopropanol coagulates the latex, and the resulting consistency is numerically rated.  The consistency of the coagulum indicates the degree of pre-vulcanization of the latex.  As the latex becomes more pre-vulcanized, the coagulum loses **more of its tackiness** and becomes **more crumbly**.  A rating of 2.5 indicates that **small lumps form**, whereas a rating of 3.0 indicates that the **lumps are non-tacky**, a rating of 3.5 indicates that, not only are the lumps non-tacky, the lumps **disintegrate easily**, and a rating of 4.0 indicates that dry crumbs form, evidencing a high degree of pre-vulcanization of the synthetic latex particles.  The pre-vulcanization is **monitored** to assure that the synthetic latex emulsion is ready for dipping of polyisoprene condoms.

(*See, e.g.*, '412 Patent, Col. 9, lines 11-30 (emphasis added).)

By limiting the scope of their invention to this test, the inventors relegated their invention

to one that can only be confirmed through the use of a test that depends on the subjective tactile

and visual perception of the person conducting the test as to how **tacky** or **crumbly** the material

feels, and whether **small** lumps form and disintegrate **easily**.  (*See, e.g., id.,* at Col. 9, lines 11-

30; Potter Decl., ¶¶ 45, 62-68).  In other words, a subjective test that can vary depending on the

subjective sensibilities of the person conducting the test.  ████████████████████████████

████████████████████████████████████████████ (*See* Lucas Dep. Tr., p.

181, line 9 to p. 186 line 12, Potter Decl., Ex. C; Narasimhan Dep. Tr., p. 222, line 18 to p. 223,

line 15, Potter Decl., Ex. B.)  Indeed, when asked if it is a subjective test Dr. Narasimhan, ████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████ *(See*

Narasimhan Dep. Tr., p. 223, lines 14-15, p. 221, lines 3-12, Potter Decl., Ex. B.)  In other

words, it is all guesswork and there no way to objectively know the answer.

Thus, the failure to expressly define "pre-vulcanization" or at least to explicitly claim the

degree of pre-vulcanization required, and the corresponding failure to disclose any objective way

for a person of ordinary skill in the art to determine when that degree of pre-vulcanization has

been achieved, renders the claims indefinite.  There is no way for a person of ordinary skill in the

art to know what degree of pre-vulcanization is within or without the scope of the claims, and the

inventors limited their "present invention" to the use of a subjective test to make that

determination.  This claim limitation does not inform, with reasonable certainty, those skilled in

the art about the scope of the invention, and is therefore the claims in which is appears are

indefinite as a matter of law.[7]  (*See* Potter Decl., ¶¶ 62-68); *see Nautilus*, 134 S. Ct. at 2129; *see*

*also Interval Licensing*, 766 F.3d at 1371-73 ("As we have explained, a term of degree fails to

---

[7]      With respect to the asserted claims in the '027 and '029 Patents that do not **expressly**
require "synthetic polyisoprene particles that are pre-vulcanized," it should be noted that the
"**present invention**" disclosed in all four of the Patents-in-Suit is "**predicated**" on the use of
pre-vulcanization to generate intra-particle crosslinks, and then balancing that with the degree of
post-vulcanization or curing to generate inter-particle crosslinks and the other claimed film
properties of the latex article. (*See, e.g.*, '027 Patent, Col. 8, lines 36-41; Col. 9, lines 11-13, 39-
50; Col. 10, lines 55-59; Col. 1, lines 20-24). There is no disclosure in the Patents-in-Suit of any
way to arrive at the various film properties of the "**present invention**" without pre-vulcanization.
Thus, either the claims in the '027 and '029 Patents also must be construed by the Court to
require "synthetic polyisoprene particles that are pre-vulcanized," or they are invalid under the
enablement and/or written description requirements.  Depending on the Court's treatment of
these claims during claim construction, RB will raise this issue later, at the appropriate stage of
the case.

provide sufficient notice of its scope if it depends 'on the unpredictable vagaries of any one person's opinion.'").[8]

**Ansell's Reply Position:**

As the lead inventor Dr. Lucas[9] testified,  Lucas Dep. Tr. (App. VI hereto) at 159:5-7. RB's expert has testified that he "agreed that the term 'pre-vulcanisation' has a special technical meaning in the field of natural rubber and synthetic latex barrier article manufacturing." Potter Dep. Tr. (App. VII hereto) at 78:2-13. As to that meaning, RB's expert, Dr. Potter, has testified as follows:

> "Pre-vulcanisation means that intra-polyisoprene particle crosslinks have been formed during the pre-vulcanisation stage in the manufacturing process. At this stage, all the crosslinks are within the particles which remain dispersed in the water phase."

*Id.* at 79:14-80:5 & Potter Ex. 11 (App. VIII hereto) at ¶ 16.

---

[8]    If the Court disagrees, the construction of this limitation should at least take account of the disavowal of the degree of pre-vulcanization taught by the GB Patent, such that it should be limited to "particles subjected to a pre-vulcanization process that, among other things, applies a temperature that is in excess of 22 degrees Celsius." This would not resolve the ambiguity with the objective ceiling for pre-vulcanization, but it is at least consistent with the floor set by the inventors' disavowal of the degree of pre-vulcanization taught in the GB Patent.

[9]    RB's expert, Dr. Potter, has acknowledged the convention in U.S. patent practice that the lead inventor is named first. Potter Dep. Tr. (App. VII hereto) at 62:1-4. RB makes much of the statement by Dr. Narasimhan that ███████████████████ Dr. Lucas, however, has made clear that ████████████████████████████ Lucas Dep. Tr. (App. VI hereto) at 64:1-2. In fact, both Dr. Lucas and Dr. Narasimhan have testified ███████ ████████████████████████████████████████ *Id.* at 44:16-18; 54:15-55:2. ████████████████████████████ *Id.* at 55:3-17. Although Dr. Narasimhan, as a patent agent, was involved in the drafting of the patents, there are some concepts in the patent that he didn't fully understand. He is not an expert in rubber chemistry. *Id.* at 179:23-180:23. Indeed, from a review of his CV (App. IX hereto), it is apparent that Dr. Narasimhan is not a person of ordinary skill as defined by Dr. Potter at paragraph 61 of his Declaration.

> "Crosslinking prior to dipping causes crosslinks to form within discrete rubber particles and the crosslinks are known as intra-particle crosslinks. This process is known as pre-vulcanization."

*Id.* at 81:24-82:14 & Potter Ex. 7 (App. X hereto) at 30, ¶ 29.

> "During a pre-vulcanisation reaction, cross-linking only occurs between polyisoprene chains contained within the same rubber particles, i.e., "intra particle cross-linking".   No cross-linking occurs between polyisoprene chains that are contained in different rubber particles.  This is because the distance between the rubber particles in the latex phase is too great to enable such cross-linking to occur.

*Id.* at 83:2-84:5 & Potter Ex. 19 (App. XI hereto) at ¶ 32.

Dr. Potter has further testified that:

> "[a]s of May 2008, a skilled person would be able to tell if a latex has been pre-vulcanised by conducting one of the routine industry tests e.g. the chloroform test, a swelling test or the PRM test."

*Id.* at 80:24-81:8 & Ex. 11 (App. VIII hereto) at ¶ 16.

RB's argument that "pre-vulcanization" should be construed as a "process that . . . applies a temperature that is in excess of 22 degrees Celsius" is unsupported by the claim language, unsupported by the specification and unsupported by Dr. Potter's testimony.   RB's disavowal argument is not well grounded.   RB cites *Poly-Am.*, 839 F.3d 1131 to support its "disavowal" argument.   *Poly-Am.* makes clear, however, that "the standard for disavowal is exacting, requiring clear and unequivocal evidence that the claimed invention includes or does not include a particular feature *   *   * Ambiguous language cannot support disavowal." 839 F.3d at 1136.   Moreover, *Poly-Am.* involved a physical feature, not a process limitation.   There is unquestionably no unambiguous language that Ansell disavowed a degree of pre-vulcanization

"achieved at about 22° C or less."[10]   To the contrary, the specification expressly contemplates pre-vulcanization "in the range of 20° C to 30° C," Specification, col. 6, lines 8-9, and that range is expressly claimed in claim 25 of the '412 Patent.

As Ansell never disavowed prevulcanization at less than 22° C, this case is not at all analogous to *Day Int'l*, 260 F.3d 1343, wherein the Court found "that arguments made by the patentee during the prosecution of the [subject] patent limited the scope of the invention to processes which involve an initial curing at 'low temperatures,' namely at 110-170 degrees F." *Id.* at 1348.  *Rheox*, 276 F.3d 1319, is completely inapposite as it involved a circumstance in which the claim in issue had been amended so as to exclude a preferred embodiment. *Id.* at 1326.

RB, for the first time in its answering claim construction brief, makes an argument regarding a statement in the specification that the invention "provides a surfactant-stabilized, pre-vulcanized, synthetic polyisoprene latex composition having an isopropanol index rating of

---

10      Ansell did not "disavow" the amount of "pre-vulcanization" disclosed in the GB566 patent application. Rather, Ansell merely   noted in the specification that GB566 "discloses minimizing pre-vulcanization of polyisoprene latex." Specification, col. 4, lines 11-12.  This statement is clearly supported by GB566 wherein the inventors noted that:

> "[I]n all previously described processes, some degree of prevulcanisation is introduced into the latex. * * * We have found that the drawbacks of the prior art processes outlined above can, surprisingly, be overcome or substantially reduced by controlling the amount of prevulcanization of the latex to very low levels. We have found this can be achieved by cooling the latex to a temperature such that very little, or substantially no, prevulcanisation occurs."

Potter Declaration (App. V hereto), Ex. A at 4:24-5:16.  The presence of pre-vulcanized particles is not the sole limitation of any asserted claim in this case.

3.0"[11] This is not a limitation found in any of the asserted **claims** of the Patents-in-Suit, and neither in its identification of claim terms and proposed construction (which RB was required to serve by October 14, 2016) nor in the Joint Claim Chart filed on November 16, 2016 (D.I. 99), did RB propose either directly or in the alternative that any claim term be construed to have this limitation.[12]   Nor has RB moved for leave to belatedly assert any such untimely proposed construction (which motion would have to satisfy Fed. Rule Civ. P. 16, *see Meda Pharmaceuticals Inc. v. Teva Pharmaceuticals, Inc.*, No. 15-785-LPS (D. Del. Nov. 14, 2016) (App. XIII hereto) at 2.[13]   Additionally, as RB has now recognized with respect to Claim Term No. 8, RB's arguments regarding the level of pre-vulcanization needed to produce "substantially

---

[11]   The isopropanol index text is described in detail in the specification of the patents-in-suit. Specification, col. 9, lines 14-30. RB's expert Dr. Potter has affirmed that "[t]he isopropanol index test as described in the patent is very similar to the industry standard chloroform test that is very widely used by [Dr. Potter] and others to assess the degree of pre-vulcanization of natural rubber latex. Although [Dr. Potter has] not used the isopropanol index test, [Dr. Potter] understand[s] that it is a modification of the standard chloroform test (isopropanol is less toxic than chloroform) and gives very similar results. The description of the index ratings are very similar for both tests (the patent provides descriptions for fractional indices, e.g. 3.5, whereas the chloroform test commonly uses integer indices). The test provides a direct measure of pre-vulcanization and is routinely performed by manufacturers of dip-formed latex articles because it is a quick and inexpensive test to perform." Potter Dep. Tr. (App. VII hereto) at 25:17-27:18 and Potter Ex. 7 (App. X hereto) at ¶ 30. The use of the isopropanol index test is also an express limitation of unasserted claim 26 of the '412 Patent.

[12]   Ansell notes that RB did propose in the alternative, in both documents, that this limitation should be construed as "[p]articles subject to a pre-vulcanization process, that among other things, applies a temperature that is in excess of 22 degrees Celsius."

[13]   Moreover, the Federal Circuit has made clear that the use of the phrase "present invention" or "this invention" does not limit the scope of the entire invention "where the references to a certain limitation as being the 'invention' are not uniform, or where other portions of the intrinsic evidence do not support applying the limitation to the entire patent." *Absolute Software, Inc. v. Stealth Signal, Inc.*, 659 F.3d 1121, 1136-37 (Fed. Cir. 2011). Claim 26 of the '412 Patent includes a limitation whereby the degree of prevulcanization is required to be verified by an isopropanol index test, but even that claim does not require an isopropanol index value of 3.0.

uniform cross-links" is an enablement argument going to the sufficiency of the disclosure in the specification, not an indefiniteness argument. Enablement defenses are for the jury at trial, not a matter of claim construction.

RB also makes another first-time argument, by footnote only, to the effect that some unspecified claim term of the asserted claims of the '027 and '029 Patents "must be construed by the Court to require 'synthetic polyisoprene particles that are pre-vulcanized.' " This contention by footnote *need* not be addressed in this reply. First, the Federal Circuit has made clear that "arguments raised in footnotes are not preserved." *SmithKlineBeecham Corp. v. Apotex Grp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2016). Second, it is not a claim construction timely proposed by RB.[14]

Ansell respectfully submits that the term "synthetic polyisoprene particles that are prevulcanized" is not indefinite and should be construed as "synthetic polyisoprene articles that have had some amount of cross-linking prior to dipping."

**RB's Sur-Reply Position:**

Ansell simply ignored RB's indefiniteness arguments concerning this term, instead electing to focus its entire reply on why it disagrees with RB's alternative construction. Thus, while Ansell's proposed construction is that any degree of pre-vulcanization will do, if the Court disagrees and thinks understanding the degree is critical, Ansell has offered no defense to the charge that the term is indefinite.

Ansell is demonstrably wrong about this. The Patents-in-Suit repeatedly teach that the degree of pre-vulcanization is critical to the invention working, and that **monitoring and**

---

[14]   Moreover, "the method of manufacture, even where cited as advantageous, does not of itself convert product claims into claims limited to a particular process . . . . " *Vanguard Prods. Corp. v. Parker Hannifin Corp.*, 234 F.3d 1370, 1372 (Fed. Cir. 2000).

**controlling** the degree of pre-vulcanization and then **balancing** that with the level of post-vulcanization is precisely what creates a film in the finished article with the claimed features, including substantially uniform crosslinks. (*See* '412 Patent, Abstract; Col. 1, lines 16-20; Col. 4, line 66 to Col. 5, line 2, Col. 6, lines 9-13, Col. 9, lines 11-30, Col. 12, lines 57-64.) That is to say, if there is too little pre-vulcanization the patents teach "crosslinking predominantly occurs in the periphery of the synthetic polyisoprene particles, resulting in weak particles." (*Id.* at Col. 12, lines 57-60.) If there is too much pre-vulcanization it will result "in over crosslinking of the intra-particle regions, which, in turn, results in a latex product with poor stretch properties." (*Id.* at Col. 12, lines 60-64; *see also* Office Action Response dated 04/15/2016, pp. 5-6, Potter Decl., Ex. D (discussing Figures in Tangiboriboonrat reference and indicating that too much pre-vulcanization results in over crosslinking of intra-particle region, "non-uniformity of intra-particle crosslinks and inter-particle crosslinks" and "hardening" particles that "is to be avoided according to the present invention.").)

Thus, while it is clear that not just any degree of pre-vulcanization will do, the asserted claims never indicate what the degree should be. As a result, this claim limitation is indefinite because it leaves one to guess about where its scope begins and ends, thus failing to inform, with reasonable certainty, those skilled in the art about the scope of the invention.[15] *See Nautilus*, 134 S. Ct. at 2129; *Interval Licensing*, 766 F.3d at 1371-73.

---

[15]     With respect to the isopropanol index test, Ansell misapprehends RB's argument. RB does **not** contend that the asserted claims are limited to any particular score on that test. RB's point is that the lack of definiteness with respect to the required degree of pre-vulcanization "**is made all the more problematic**" by the fact that the only method the inventors disclosed to measure the degree is the isopropanol index test, which everyone agrees depends on the subjective judgment of the person conducting it. (*See* Lucas Dep. Tr., p. 181, line 9 to p. 186 line 12, Potter Decl., Ex. C; Narasimhan Dep. Tr., p. 222, line 18 to p. 223, lines 14-15, Potter Decl., Ex. B.)

If the Court disagrees, then at least there should be no question that the inventors disavowed the degree of pre-vulcanization taught in the GB Patent. While Ansell argues that it "**merely noted**" that the GB Patent teaches minimizing pre-vulcanization, it left out the most important part. (*See* Ansell Reply, p. 21 n. 10.) That is, the part where the inventors explicitly and unambiguously stated in the Patents-in-Suit that the GB Patent "**teaches away** from pre-vulcanization prior to dipping of latex articles." (*See* '412 Patent, Col. 4, lines 22-24 (emphasis added).) Short of using the word disavow, which is not required under the law, it would be hard to imagine a clearer way for an inventor to disavow something than to say it "teaches away" from the very thing he or she thinks was invented. *See Poly-Am.*, 839 F.3d at 1136 (disavowal "need not be explicit.").

The GB Patent "**teaches away**" from pre-vulcanization by using a "low temperature" that it explicitly defines as "several degrees °C below ambient or room temperature (25°C)," or about 22°C. Thus, the term "synthetic polyisoprene particles that are pre-vulcanized" in the Patents-in-Suit at least has to be construed so as to exclude the very low degree of pre-vulcanization taught by the GB Patent and disavowed by the Ansell inventors – *i.e.*, the degree achieved at about 22°C or less. This is so even if such a construction would exclude a small portion of the 20°C to 30°C range disclosed in the Patents-in-Suit because excluding an embodiment "is not a reason to ignore the specification's clear and unmistakable disavowal." *See Pacing Techs., LLC v. Garmin Int'l, Inc.*, 778 F.3d 1021, 1026 (Fed. Cir. 2016); *see also SciMed Life Sys. v. Advanced Cardiovascular Sys.*, 242 F.3d 1337, 1344 (Fed. Cir. 2001) (excluding embodiment that was otherwise disclaimed in the specification).

**CLAIM TERM NO. 2:** "**THE INTRA-POLYISOPRENE PARTICLE CROSSLINKS AND THE INTER-POLYISOPRENE PARTICLE CROSSLINKS ARE SUBSTANTIALLY UNIFORM**" ('412 patent, claims 1, 2, 3, 4, 8 and 9; '719 patent, claims 1, 8, 10, 11, 16 and 17).

**Ansell's Proposed Construction:**  Plain meaning with the word "substantially" meaning "to a large extent, but not necessarily completely."

**RB's Proposed Construction:**  This term is indefinite.  It is unclear what would constitute a sufficient level of uniformity to meet the claim language, and it is unclear how a person of ordinary skill in the art could make an objective determination as to whether a sufficient level of uniformity has been achieved.  Rather, when this term is read in light of the specification delineating the patent, and the prosecution history, it is clear that determining what is and is not "substantially uniform" is an entirely subjective exercise such that, the term fails to inform, with reasonable certainty, those skilled in the art about the scope of the invention.

**Ansell's Opening Position:**

In patent law, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary meaning. *Moments Pharmaceuticals, Inc. v. Teva Pharmaceuticals USA Inc.*, 809 F.3d 1366 (Fed. Cir. 2015).  This Court has on many occasions adopted plain and ordinary meaning as the proper construction of disputed claim terms. *See, e.g., EMC Corp. v. Pure Storage, Inc.*, 77 F.Supp.3d 402 (D. Del. 2015); *Interdigital Communications, Inc. v. ZTE Corp.*, No. 13-00009, -00010-RGA, 2014 WL 1620733 (D. Del. Apr. 22, 2014).  Indeed, "[i]n the absence of an express intent to import different meaning to claim terms, the terms are ***presumed*** to have their ordinary meaning." *Technology Innovations LLC v. Amazon.com*, 35 F.Supp.3d 613, 617 (D. Del. 2014) (Emphasis added).  There is nothing in the specification of the patents-in-suit that reflects an express intent to import meaning to this term other than the plain and ordinary meaning.  The term "substantially" is commonly used in patent claims to "avoid a strict numerical boundary to the specified parameter.' " *Ecolab, Inc. v. Envirochem, Inc.*, 264 F. 3d 1358, 1367 (Fed. Cir. 2001).  Thus, the term "substantially" is properly construed as "to a large extent, but not necessarily completely." *See LNP Engineering Plastics, Inc. v. Miller Waste*

*Mills, Inc.*, 275 F.3d 1347, 1354 (Fed. Cir. 1999) ("the meaning of the word 'substantially' is 'largely but not wholly that which is specified.' ").

As to purported indefiniteness, RB's affiliates have admitted that this claimed feature is present in the accused Durex RealFeel condoms. *See* Declaration of Thomas B. Kenworthy ("Kenworthy Claim Construction Decl.") (App. XII hereto) at ¶ 5. Such an admission, particularly when made against one's interests, negates any possible contention that clear and convincing evidence establishes that a skilled artisan would not understand the term and its scope.

**RB's Answering Position:**

All of the asserted claims in the '412 and '719 Patents require that "the intra-polyisoprene particle crosslinks and the inter-polyisoprene particle crosslinks are substantially uniform." This limitation is indefinite because it is unclear what would constitute a sufficient level of uniformity to meet the claim language, and it is unclear how a person of ordinary skill in the art could make an **objective** determination as to whether a sufficient level of uniformity has been achieved. Rather, when this limitation is read in light of the specification and the prosecution history, it is clear that determining what is and is not "substantially uniform" is an entirely **subjective** exercise such that, the limitation fails to inform, with reasonable certainty, those skilled in the art about the scope of the invention.

The Patents-in-Suit teach that the result of monitoring and controlling the degree of pre-vulcanization, and then balancing that with the degree of post-vulcanization is a film structure that, when stained with osmium tetroxide and viewed under high magnification resembles the image in Figure 1, which is shown below. (*See* '412 Patent, Col. 6, lines 55-63, Col. 16, line 43 to Col. 17, line 12.)



According to the Patents-in-Suit, Figure 1:

> [S]hows a transmission electron micrograph of a pre-vulcanized and post-vulcanized synthetic polyisoprene condom latex taken from the middle portion of the condom thickness. The sample was prepared using the following procedure. Sample regions of the condom sample were taken and extracted in cold acetone overnight to remove any low molecular weight materials that may subsequently interfere with the styrene polymerization process. The samples were then dried for approximately 48 hrs at below 40° C. to remove any solvent traces. The extracted films were then swollen overnight in styrene solution containing 1 wt % benzoyl peroxide initiator and 2 wt % dibutylphthalate plasticizer to aid sectioning. The swollen films were then placed in capsules with excess styrene solution and heated at 70° C. until the styrene had fully polymerized. The styrene-swollen, polymerized samples were sectioned by ultramicrotomy at room temperature. By leaving some polystyrene attached to the surfaces of each condom, it was possible to prepare ultra-thin sections that contained the entire width of each condom. The sections were carefully relaxed by exposure to low levels of xylene vapor and transferred to Transmission Electron Microscopy (TEM) grids. The sections were then stained in osmium tetroxide vapor for one hour and examined by TEM.

(*Id.*, at Col. 16, lines 43-64.)

- 28 -

The Patents-in-Suit suggest that Figure 1 evidences a uniform distribution (*i.e.*, the same number) of both **intra**-particle crosslinks (inside the particle) and **inter**-particle crosslinks (between the particles) because the degree of dark staining is purportedly uniform throughout the figure. (*Id.*, at Col. 6, lines 55-63, Col. 16, line 43 to Col. 17, line 12.)   That is, as explained in the Patents-in-Suit:

> Osmium tetroxide reacts with carbon-carbon double bonds and, therefore, it imparts a dark stain to polymers containing unsaturated groups, while leaving the polystyrene unstained. The figure shows at 10 the original synthetic polyisoprene particles showing uniform distribution of cross-link networks.   The intersection of these particles is shown at 11, and it shows a similar distribution of cross-link networks indicated by uniformity of dark stains, indicating that the synthetic polyisoprene latex film is cross-linked at the synthetic polyisoprene particle level and at intersections. The polystyrene remnants are seen at 13.

(*Id.*, at Col. 16, line 64 to Col. 17, line 9.)   The Patents-in-Suit further suggest that "[t]he article has intra-particle and inter-particle crosslinking and under transmission electron microscopy (TEM) a uniform distribution of dark stains with a deviation of less than about 5% from one location to other within the TEM micrograph." (*Id.*, at Col. 17, lines 18-22.)

These assertions lack **objective** clarity in several respects.   First, the entire image in Figure 1 covers an incredibly small section of the sample film and measures roughly 3 microns by 5 microns.   By way of comparison, the thickness of a human hair is about 50 microns.   It is hard to understand what the inventors believe can be determined objectively about the overall film structure and/or the uniformity of crosslinks in the entire article by looking at such an incredibly small sample area within the overall film. (*See* Potter Decl., ¶ 51.)

Second, crosslinks are not visible in Figure 1.   They are simply too small to be seen even under high magnification, and the dark staining in the image is not of the crosslinks, but rather the carbon-carbon double bonds within the polyisoprene chains.   This was confirmed by both Dr.

- 29 -

Narasimhan, the named inventor who ███████████████████████ in the Patents-in-Suit

and drafted the specification, as well as his co-inventor, Dr. Lucas.  (*See* Narasimhan Dep. Tr., p.

47, line 21 to p. 48, line 8, p. 154, lines 3-22, Potter Decl., Ex. B; Lucas Dep. Tr., p. 112, line 20

to p. 113, line 7, p. 129, lines 17-24, Potter Decl., Ex. C.)  And, ████████████████████

████████████████████████████████████████████████████████████

█████████  (*See* Lucas Dep. Tr., p. 130, lines 1-12, Potter Decl., Ex. C; Potter Decl., ¶ 52.)  This

further begs the question as to how and why the inventors of the Patents-in-Suit think that any

objective observations about crosslink uniformity can be made using Figure 1, which, as noted,

does not show or stain the crosslinks.  (*See* Potter Decl., ¶ 52.)  The Patents-in-Suit certainly

provide no objective standard.

     Third, while the Patents-in-Suit suggest a deviation of less than "**about**" 5% from one

location to other within the TEM micrograph as a possible guidepost to using Figure 1 to

evaluate uniformity, the use of the term "**about**" reduces even this possible guidepost to only a

rough undefined approximation, and Dr. Narasimhan ████████████████████████

█████████████████████  (*See* Narasimhan Dep. Tr., p. 211, line 17 to p. 213, line 17,

Potter Decl., Ex. B.)  Thus, for example, it is unknown whether 5.5% would be close enough to

less than "**about**" 5% such that it would be "substantially" uniform within the meaning of the

claims?  Same for 6% or 7%.  The Patents-in-Suit do not attempt to provide an answer, and

therefore even the "**about**" 5% figure in the specification leaves the issue of "substantial"

uniformity undefined and open to subjective interpretation.  Indeed, as Dr. Narasimhan ████████

████████████████████████████████████████████████████████████

█████████  (*See id.*, at p. 215, line 20 to p. 216, line 5.)  As such, using a TEM like the one in

Figure 1 to try to evaluate the level of uniformity is a wholly subjective exercise that renders the

- 30 -

scope of the claims uncertain.  (*See id.*, at p. 183, line 18 to p. 184, line 1; *see also* p. 209, lines

9-16 

Moreover, Dr. Narasimhan

(*See id.*, at p. 186, lines 5-24, p. 209, line 20 to p. 210, line 18; Potter Decl., ¶ 53.)

Fourth, Figure 1 shows a number of "white blobs" or light colored voids, an example of

which is identified as item 13.  These white blobs are areas in the **inter**-particle region of very

low crosslinks density through which the polystyrene was able to push through during

production of the sample.  (*See* Lucas Dep. Tr., p. 118, line 8 to p. 120, line 6, Potter Decl., Ex.

C.)  There are at least 15 white blobs visible in Figure 1, and each of them represents an area in

which the number of crosslinks in the **inter**-particle region is significantly **lower than** within the

**intra**-particle regions inside the individual particles.  (*See id.*)  Dr. Lucas

(*See id.*, at p. 124, lines 14-16.)  In other words, the

white blobs or voids are areas in which the number of crosslinks within the **inter**-particle region

is **not** uniform with the number of crosslinks within the **intra**-particle region.  This further begs

the question as to how Figure 1 and similar images could possibly evidence (objectively or

otherwise) substantially uniform inter-particle and intra-particle crosslinks, and the presence of

the white blobs leaves open the question of how many such areas of "non-uniformity" are

permitted before both types of crosslinks are no longer considered uniform.  The Patents-in-Suit

do not say, which renders the scope of the claims unclear.  (*See* Potter Decl., ¶¶ 54, 73.)

Fifth, as can be seen from the figure in Paragraph 55 in Dr. Potter's Declaration, the

purported uniformity of the dark staining that is visible within Figure 1 varies depending on the

- 31 -

contrast and brightness levels used in the image.  That is, the darker the overall image appears the more uniform the staining visually appears.  Yet, the Patent-in-Suit do not disclose what level of contrast or brightness should be used.  (*See* Narasimhan Dep. Tr., p. 215, lines 11-19.)  The significance of this issue is apparent when you look at the image in Figure 1 as it was originally provided to the inventors by their testing lab.  (*See* Potter Decl., ¶ 56.)  That version of the image is significantly lighter in contrast and brightness levels than the version of the image in the Patents-in-Suit, making it appear very different in terms of the uniformity of shading (*i.e.*, less uniform) from the version of the image that was actually filed with the Patents-in-Suit.  Precisely how or why Ansell manipulated this image in connection with the fling of the patents is unclear, but Dr. Lucas ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████  (*See* Lucas Dep. Tr., p. 138, line 5 to p. 147, line 2, Potter Decl., Ex. C; Potter Decl., ¶¶ 55-56.)

Given these issues, Ansell may suggest using other figures in the Patents-in-Suit as alternative ways to evaluate substantial uniformity of the crosslinks, and in particular Figure 2 (conchoidal fractures at liquid nitrogen temperature) and Figure 5 (absence of particle features at room temperature).  (*See* Potter Decl., ¶¶ 57-59; '412 Patent, Col. 6, line 64 to Col. 7, line 9; Col. 7, lines 40 to 61.)  Yet, the Patents-in-Suit do not indicate that these figures show "substantially uniform" crosslinks, or that crosslinks can been seen in the images.  Rather, the discussion about Figure 2 fails to even mention crosslinks, whereas the discussion of Figure 5 asserts that the supposed lack of particle features visible in the image means that the inter-particle and intra-particle regions were either "approximately equal strength **or** were crosslinked nearly equally." (*See id.* (emphasis added).)

- 32 -

Like with Figure 1, using these types of figures to **objectively** determine anything about the uniformity of the crosslinks is **not** possible.  With respect to Figure 5, the most the Patents-in-Suit suggests is that the explanation for the purported lack of visible particle features can be narrowed down to one of two possibilities, either "approximately equal strength" inter and intra particle regions, "**or**" "nearly" equal crosslinking in those regions.  Even if "nearly" equal crosslinking was somehow the same thing as "substantially uniform" crosslinking, which is far from clear from the inventors' description in the specification, and even it were clear where the scope of "nearly" begins and ends, the fact that it is described in the specification as an **either or** explanation means that nothing certain about the uniformity of the crosslinking can be determined from looking at those types of figure.  Further, with respect to both types of figures, Dr. Narasimhan ███████████████████████████████████████████ (*See* Narasimhan Dep. Tr., p. 270, line 1 to p. 271, line 11, Potter Decl., Ex. B; Potter Decl., ¶¶ 59, 77.)  He even ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ██████████████████████████████████████████[16] (*See* Narasimhan Dep. Tr., p. 234, lines 15-19; Potter Decl., ¶¶ 59, 77.)

Moreover, even if using such figures were helpful and were not subjective, the fact that there could be multiple ways to test for substantial uniformity is another reason why the scope of the claims at issue is unclear.  The Patents-in-Suit do not indicate what test to use, and using different tests could lead to inconsistent results, and neither the claims nor the specification indicate which test should be preferred.  (*See* Potter Decl., ¶ 78).  The Federal Circuit has held

---

[16]     Perhaps recognizing the problems with these figures, in its infringement contentions, and in terms of testing, Ansell relied **solely** on a TEM image of an osmium tetroxide stained sample like the one shown in Figure 1 for "substantially uniform" and similar limitations, and did **not** suggest that images like those in Figure 2 or Figure 5 should or even could be used.

that, under the *Nautilus* standard, this alone can render a claim indefinite. *See e.g., Dow Chemical Co. v. NOVA Chemicals Corp. (Canada)*, 803 F.3d 620, 630-35 (Fed. Cir. 2015) (the claim term "slope of strain hardening" was indefinite under the *Nautilus* standard because there multiple methods to measure the parameter, the methods could give different results, and the specification did not provide guidance as to which method should be used); *Teva*, 789 F.3d at 1341-45 (finding indefiniteness under the *Nautilus* standard because there were at least three ways to measure and report "molecular weight," each method would produce different results, and the patent did not give guidance as to which specific method should be used).

At bottom, there simply is no way to **objectively** understand the boundary where substantially uniform begins and where it ends. It is entirely open-ended and a prisoner to the subjective whim of whomever is making the call. That is the epitome of indefiniteness. *See, e.g., Interval Licensing*, 766 F.3d at 1371-73 ("As we have explained, a term of degree fails to provide sufficient notice of its scope if it depends 'on the unpredictable vagaries of any one person's opinion.'").

This problem is exacerbated by the fact that not only is assessing the claim term "uniform" subjective in the context of the Patents-in-Suit, but its requirement is further modified by the inherently subjective term "substantially," which introduces an additional level of uncertainty as the to the scope of the claims.[17] That is, it is entirely unclear how uniform it would have to be in order to qualify as "substantially" uniform, or how non-uniform it would have to be before it ceased to be "substantially" uniform. That is the very definition of an

---

[17]    It is noteworthy that during the prosecution of the European counterpart to the Patents-in-Suit, the European patent office rejected the claims that included the term "substantially uniform" as lacking clarity (which is analogous to indefiniteness under U.S. patent law), and the inventors attempted to overcome that rejection by deleting the term "substantially" from the proposed claims. (*See* EU Office Action dated 10/07/2011, p. 3, Potter Decl., Ex. E; EU Office Action Response dated 02/22/2012, p. 1-2, Potter Decl., Ex. F.)

indefinite claim limitation. *See, e.g., Geodynamics, Inc. v. Dynaenergetics US, Inc.*, No. 2:15-CV-1546-RSP, 2016 WL 6217181, *15-*16 (E.D. Tex. Oct. 24, 2016) (term "substantially equal to the total depth of penetration" was indefinite because the specification did not provide any guidance as to what was "substantially equal" and what was not where the only relevant instances of the limitation described scenarios that were "equal" and not something that was "substantially equal"); *Core Wireless Licensing, S.a.r.l. v. Apple Inc.*, No. 15-cv-05008-PSG, 2016 WL 3124614, *12 (N.D. Cal. Jun. 3, 2016) (term "substantially impair the quality" in a limitation reciting "of a sufficiently low number so as not to substantially impair the quality of the user information" was indefinite since the intrinsic evidence left it too uncertain as to when something was "substantially impaired" and when it was not); *Cayenne Med.*, 2016 WL 2606983 at *3-*6 (finding the term "substantially different construction" indefinite because "[t]here is nothing in the intrinsic evidence that would allow one skilled in the art to determine, with reasonable certainty, when the magnitude of change in the 'construction' of the first and second member is no longer insubstantial but rather has become 'substantially' different.").

For all of the reasons above, this claim limitation does not inform, with reasonable certainty, those skilled in the art about the scope of the invention, and is indefinite. *See id.*; *Nautilus*, 134 S. Ct. at 2129.

**Ansell's Reply Position:**

RB's expert, Dr. Potter, has testified that he agrees with Ansell's expert, Dr. Ho, that "a skilled person working in the field would have interpreted the expression 'wherein the intra-polyisoprene particle crosslinks and the inter-polyisoprene particle crosslinks are substantially uniform in said synthetic polyisoprene latex article' to mean that the number of crosslinks per unit area in the intra-particle regions (inside particles) is 'substantially' uniform with the number

of crosslinks per unit area in the inter-particle regions (i.e., those regions at the particle boundaries where crosslinks have formed between the polyisoprene chains in adjacent particles)." Potter Dep. Tr. (App. VII hereto) at 89:4-90:4 & Potter Ex. 11 (App. VIII hereto) at ¶ 17.

Not only has RB's expert agreed as to how a person of ordinary skill in the art *would have* understood the term "the intra-polyisoprene particle crosslinks and the inter-polyisoprene particle crosslinks are substantially uniform," and therefore necessarily *could have* understood the term, but notwithstanding Ansell's clear reliance on this point in its opening claim construction brief, RB completely fails to address the fact that its affiliated corporate entities also necessarily understood the scope of this claim feature when they judicially admitted that it was present in the accused Durex RealFeel condoms. This is powerful evidence countering RB's indefiniteness arguments. While the facts that the PTO and RB's affiliates were able to apply this term will not render a claim immune from an indefiniteness argument, "they nevertheless provide evidence that a skilled artisan did understand the scope of th[e] invention with reasonable certainty." *Sonix*, 2017 WL 56321 at *8; *see also, Amgen, Inc. v. Chugai Pharmaceutical, Co., Ltd.*, 927 F.2d 1200, 1217 (Fed. Cir. 1991) (the fact that the patentee's own business partner itself questioned whether the specific activity value of its own product was within the claim coverage was evidence of indefiniteness).

This term is not indefinite and, in Ansell's view, does not need construction except as to the word "substantially." *See Ecolab, Inc. v. Envirochem, Inc.*, 264 F.3d 1358, 1367 (Fed. Cir. 2001). Should the Court believe that further construction is required, the construction should be consistent with that agreed to by the parties' experts.

**RB's Sur-Reply Position:**

Improperly harkening back to the "insolubly ambiguous" standard rejected by the Supreme Court in *Nautilus*, Ansell's reply is that this term must be definite because Dr. Potter expressed the view that a person of ordinary skill in the art would have had some understanding as to what the words meant.[18] That is decidedly not the test. *See Dow Chem.*, 803 F.3d at 634 (reversing its own earlier decision under the "insolubly ambiguous" standard that had found a claim term directed to the slope of a coefficient definite because experts and persons of ordinary skill in the art had an understanding as to the meaning of the term and thus could envision ways to measure it, holding that "[u]nder *Nautilus* this is no longer sufficient" since it is no longer enough that some meaning can be ascribed to the term).   What matters is whether the term informs, with reasonable certainty, those skilled in the art about the scope of the invention. *Id.* And, here, Ansell failed to rebut a single argument made by RB or a single fact asserted by Dr. Potter that proves that, regardless of what the words may mean, **determining** what is and is not "substantially uniform" or "substantially uniformly distributed" (*i.e.*, determining the scope) is a **subjective** exercise such that the limitation fails to inform, with reasonable certainty, those skilled in the art about the scope of the invention and is indefinite. (*See* Potter Decl., ¶¶ 46-57, 69-79.)

---

[18] Ansell's attempt to backdoor into evidence in this case various witness statements from the Australian case (including statements from its own expert, Dr. Ho) should be rejected as inadmissible hearsay that does not otherwise comply with the requirements for declarations signed outside of the United States. *See Reckitt Benckiser Pharmaceuticals Inc. v. Watson Laboratories, Inc.*, No. 13-1674-RGA, 2016 WL 3186659, at *8, n.8 (D. Del. June 3, 2016); Fed. R. Evid. 801(c), 802; 28 U.S.C. § 1746. The Court should refuse to consider those statements, which include the documents at App. VIII, App. X and App. XI hereto.

**CLAIM TERM NO. 3:** "**WHEREIN THE INTRA-POLYISOPRENE PARTICLE CROSSLINKS AND THE INTER-POLYISOPRENE PARTICLE CROSSLINKS ARE SUBSTANTIALLY UNIFORMLY DISTRIBUTED AMONG AND BETWEEN THE SYNTHETIC POLYISOPRENE PARTICLES.**" ('029 patent, claims 1, 2, 3, 7, 8, 11, 16 and 17).

**Ansell's Proposed Construction:**  Plain meaning with the word "substantially" meaning "to a large extent, but not necessarily completely."

**RB's Proposed Construction:**   This term is indefinite.   Based on the specification, pre-vulcanization is required to achieve intra-particle crosslinks.  However, pre-vulcanization is not expressly required, and thus it is unclear how to produce the claimed features.  It also is unclear what would constitute a sufficient level of uniformity to meet the claim language, and it is unclear how a person of ordinary skill in the art could make an objective determination as to whether a sufficient level of uniformity has been achieved.   Indeed, it is clear that such a determination would be an entirely subjective exercise.   Thus, when this term is read in light of the specification delineating the patent, and the prosecution history, it fails to inform, with reasonable certainty, those skilled in the art about the scope of the invention.

**Ansell's Opening Position:**

The discussion with respect to Claim Term No. 2 is equally applicable here.

**RB's Answering Position:**

Claim 1 in the '029 Patent requires that "the intra-polyisoprene particle crosslinks and the inter-polyisoprene particle crosslinks are substantially uniformly distributed among and between the synthetic polyisoprene particles."

For all the reasons stated above for the preceding limitation, there simply is no way to objectively determine whether this limitation is met.   It requires a visual inspection of an osmium tetroxide treated sample (such as is shown in Figure 1) and the **subjective** determination as to whether the staining in the sample is uniform from one location to the next. To the extent Ansell suggests using a similar visual inspection of SEM images (such as is shown in Figures 2 and 5), for the reasons stated above, that would be equally **subjective** and would not reveal anything about the uniformity of the crosslinks.   (*See* Potter Decl., ¶¶ 46-59, 69-79.)  In addition, the fact that there are potentially multiple ways to make the determination

that could have different results also renders the limitation indefinite under the *Nautilus* standard. (*See* Potter Decl., ¶ 78); *see, e.g., Dow Chem.*, 803 F.3d at 630-35; *Teva*, 789 F.3d at 1341-45. Finally, as with the prior limitation, the use of the modifier "substantially" in this limitation renders the scope of the claim open-ended and subject to the subjective whim of the person of ordinary skill in the art trying making the determination given that the specification provides absolutely no objective guideposts as to what is and is not "substantially" uniformly distributed. (*See* Potter Decl., ¶ 75); *see, e.g., Interval Licensing*, 766 F.3d at 1371-73; *Geodynamics*, 2016 WL 6217181 at *15-*16; *Core Wireless*, 2016 WL 3124614 at *12; *Cayenne Med.*, 2016 WL 2606983 at *3-*6. Thus, when this limitation is read in light of the specification and the prosecution history, it fails to inform, with reasonable certainty, those skilled in the art about the scope of the invention. (*See* Potter Decl., ¶ 79); *see Nautilus*, 134 S. Ct. at 2129.

**Ansell's Reply Position:**

The discussion with respect to Claim Term No. 2 is equally applicable here.

**CLAIM TERM NO. 4:  "SUBSTANTIALLY CONCHOIDAL FRACTURE" ('412 patent, claim 3; '719 patent, claims 1, 8, 10, 11, 16 and 17; '029 patent, claims 2, 3 and 8).**

**Ansell's Proposed Construction:**  A fracture that appears to a large extent, but not necessarily completely, shell-like.

**RB's Proposed Construction:**  This term is indefinite. It is unclear what would constitute a sufficiently conchoidal fracture to meet the claim language, and it is unclear how a person of ordinary skill in the art could make an objective determination as to whether a sufficiently conchoidal fracture has been achieved. Rather, when this term is read in light of the specification delineating the patent, and the prosecution history, it is clear that determining what is and is not a "substantially conchoidal fracture" is an entirely subjective exercise such that, the term fails to inform, with reasonable certainty, those skilled in the art about the scope of the invention.

**Ansell's Opening Position:**

The term "conchoidal" in the context of a fracture is defined within the specification[19] as "shell-like." *See* Specification, col. 7, lines 3-4. The discussion of the term "substantially" in connection with Claim Term No. 2 is equally applicable here.

Again, compelling evidence of the ability of a skilled artisan to understand the meaning of this claim term is the fact that RB's affiliates have admitted in the parallel Australian proceedings that this feature is present in the accused Durex RealFeel condoms. *See* Kenworthy Claim Construction Decl. (App. XII hereto), at ¶ 6.

**RB's Answering Position:**

Claim 3 in the '412 Patent, Claim 1 in the '719 Patent, and Claims 2, 3 and 8 in the '029 Patent require that a SEM image of a sample of the claimed article exhibit a "substantially conchoidal fracture" when fractured at liquid nitrogen temperature. This limitation is indefinite because it is unclear what would constitute a sufficiently conchoidal fracture to meet the claim language, and it is unclear how a person of ordinary skill in the art could make an objective determination as to whether a sufficiently conchoidal fracture has been achieved. Rather, when this limitation is read in light of the specification and the prosecution history, determining what is and is not a "substantially conchoidal fracture" is an entirely subjective exercise such that, the limitation fails to inform, with reasonable certainty, those skilled in the art about the scope of the invention.

As an initial matter, the dictionary defines "conchoidal" as "[o]f, relating to, or being a surface characterized by smooth, shell-like convexities and concavities, as on fractured

---

[19]     The specifications of the four Patents-in-Suit are identical.   Accordingly, for convenience, unless otherwise stated, cites to the "Specification" are to that of the '412 Patent and are representative with respect to the corresponding portions of the other three patents.

obsidian." (*See, e.g.*, Definition of "conchoidal" at http://www.thefreedictionary.com/conchoidal.) Ansell's proposed construction of "shell-like" seems to be generally in accord with this definition. However, what exactly does it mean to be shell-like? Ansell does not say, and neither do the Patents-in-Suit.

Moreover, as with the previously-discussed limitation "substantially uniform," the inclusion of the term "substantially" in this limitation introduces a level of degree in the claim that makes it impossible for a person of ordinary skill in the art to understand the metes and bounds of the claim. That is, even if one could reconcile the meaning of shell-like, how shell-like would the fracture surface have to be in order for it to be "substantially" conchoidal? And how un-shell-like would a fracture surface have to be for it to cease to be "substantially" conchoidal within the meaning of the claims? The Patents-in-Suit do not answer these questions and offer no objective guideposts to allow a person of ordinary skill in the art to make that determination. *See, e.g.*, *Geodynamics*, 2016 WL 6217181 at *15-*16; *Core Wireless,* 2016 WL 3124614 at *12; *Cayenne Med.*, 2016 WL 2606983 at *3-*6.

In any event, a person of ordinary skill in the art reading this limitation in the context of the disclosure in the specification would understand it to be referring to a fracture surface that looks similar to the fracture surface in Figure 2 (image on the **left** below). But determining whether or not such an image evidences a fracture surface that is substantially conchoidal depends solely on the unrestrained subjective opinion of the person evaluating the figure. (*See* Narasimhan Dep. Tr., p. 270, line 1 to p. 271, line 11, Potter Decl., Ex. B.) For example, the figure below to the **right** is from Ansell's infringement contentions in this case.

**Fig. 2**





These figures look nothing alike. (*See* Potter Decl., ¶ 89.) Figure 2 on the **left** has a

clean fracture surface that exhibits smooth curved breaks in the material, the image on the **right**

shows the opposite. Moreover, the surface that is identified as being conchoidal in the image on

the **right** only extends over a small portion of the fracture surface. So the question is, does the

figure on the **right** show a substantially conchoidal fracture surface? While it is common in

infringement cases for the parties to disagree about whether the accused products are within the

scope of the claim, here we cannot even get to that question because, based on the language of

the claim and the teaching in the specification, there is no way to objectively determine claim

scope – *i.e.*, what is and is not "substantially conchoidal." It is wholly dependent on the

subjective opinion of the person looking at the figures, and there are no guideposts in the

Patents-in-Suit that would allow a person of ordinary skill in the art to determine the objective

limits of the claim. *See, e.g., Interval Licensing*, 766 F.3d at 1371-73. For these reasons, this

claim limitation does not inform, with reasonable certainty, those skilled in the art about the

scope of the invention, and the claims are indefinite. (*See* Potter Decl., ¶¶ 84-90); *see Nautilus*,

134 S. Ct. at 2129; *Interval Licensing*, 766 F.3d at 1371-73.

- 42 -

**Ansell's Reply Position:**

RB's expert, Dr. Potter, has testified that he agrees with Ansell's expert, Dr. Ho, that "[b]efore May 2008, a skilled person working in the field would have understood the expression 'substantially conchoidal' to mean a surface that resembles the curves of a sea shell such as a mussel shell surface (conchoidal is derived from the Greek word for a mussel which is 'konchoeides'). In relation to the fracture surface described in claim [3] of the Ansell Patent, a person working in the field would expect to see shell like features, i.e. elevations and depressions shaped like the inside of a mussel shell." Potter Dep. Tr. (App. VII hereto) at 98:16-99:12 & Potter Ex. 11 (App. VIII hereto) at 18.

As with Claim Term No. 2, RB's expert, Dr. Potter, has agreed as to how a person of ordinary skill in the art *would* have understood the term "substantially conchoidal fracture," and therefore necessarily *could* have understood the term.   Also, as with Claim Term No. 2, notwithstanding Ansell's clear reliance on this point in its opening claim construction brief, RB again completely fails to address the fact that its affiliated corporate entities also necessarily understood the scope of this claim feature when they judicially admitted this limitation was present in the accused Durex RealFeel condoms. This is powerful evidence countering RB's indefiniteness arguments. *See Sonix*, 2017 WL 56321 at *8.

Ansell respectfully submits that the term "substantially conchoidal fracture" is not indefinite, and should be construed to mean "a fracture that is to a large extent, but not necessarily completely, shell-like."   Should the Court believe that further construction is required, the construction should be consistent with that agreed to by the parties' experts.

**RB's Sur-Reply Position:**

Ansell's reply is, again, that this term must be definite because Dr. Potter expressed a view that a person of ordinary skill in the art would have had some understanding as to what the words meant. That is **not** the test. *See Dow Chem.*, 803 F.3d at 634. The test is whether the term informs, with reasonable certainty, those skilled in the art about the scope of the invention. *Id.* In this case, even if the Court were to adopt Ansell's construction – "a fracture surface that is to a large extent, but not necessarily completely, shell-like" – the unrebutted evidence is that the scope would still be indefinite because it depends entirely on the subjective opinion of a person looking at a photograph as to whether they personally think the surface is "to a large extent" "shell-like" (whatever that means).   (*See* Potter Decl., ¶¶ 84-90.)

**CLAIM TERM NO. 5:** **"ABSENCE OF INTRA-POLYISOPRENE AND INTER-POLYISOPRENE PARTICLE FEATURES"** ('412 patent, claim 4); **"ABSENCE OF SCANNING ELECTRON MICROSCOPE-VIEWABLE INTRA-POLYISOPRENE AND INTER-POLYISOPRENE PARTICLE FEATURES."** ('719 patent, claims 1, 8, 10, 11, 16 and 17; '029 patent, claims 2, 3 and 11).

**Ansell's Proposed Construction:** "No particle features are visible in a SEM micrograph of sufficient magnification to allow such particles to be seen."

**RB's Proposed Construction:** "No particle features are visible in a SEM micrograph of sufficient magnification to allow such particles to be seen because the entire fracture surface propagated with no preference for either the intra particle region or the inter particle regions."

**Ansell's Opening Position:**

The only difference between the parties' proposed constructions is that RB wishes to add language regarding the **reason** for the absence of the particle features when such reason is not called for by the claim language. This is a classic example of an attempt to improperly import language from the specification into the claim.

**RB's Answering Position:**

Claim 4 in the '412 Patent requires an "absence of intra-polyisoprene and inter-polyisoprene particle features" in a fracture surface of an article fractured at room temperature, and Claim 1 in the '719 Patent, and Claims 2, 3 and 11 in the '029 Patent require an "absence of scanning electron microscope-viewable intra-polyisoprene and inter-polyisoprene particle features" in a fracture surface of an article fractured at room temperature. Both parties agree that these limitations mean that no particle features are visible in a SEM micrograph of sufficient magnification to allow such particles to be seen.

However, RB's position is that the construction also should define precisely what the claims mean when they refer to an absence of particle features. That meaning should not be controversial based on the unambiguous teaching in the specification, which provides in reference to the SEM in Figure 5 that "[t]he fracture surface as shown in this figure shows a fracture surface that was very nearly planar with no features indicating intra particle or inter particle regions. This absence of intra-polyisoprene particle and inter-polyisoprene particle features **means that the fracture surface propagated with no preference for either the intra particle region or the inter particle regions** . . . ." ('412 Patent, Col. 7, lines 48-51 (emphasis added).)

Thus, telling the jury that this limitation **means** that the entire fracture surface propagated with no preference for either the intra-particle region or the inter-particle regions will tell them what the need to look for when comparing the claims to the prior art and the accused products. In the absence such a construction, the parties would be left to argue that point to the jury – *i.e.*, what is meant by an absence of particle features. Where that is the case, as it is here, the Court must resolve the dispute because it is a matter of claim scope. *See, e.g., Every Penny Counts,*

*Inc. v. American Express Co.*, 563 F.3d 1378, 1383 (Fed. Cir. 2009) ("[T]he court's obligation is to ensure that questions of the scope of the patent claims are not left to the jury. . . [i]n order to fulfill this obligation, the court must see to it that disputes concerning the scope of the patent claims are fully resolved."); *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361-63 (Fed. Cir. 2008) (reversing district court's decision not to construe disputed term because it left the parties free to argue claim construction to the jury). RB's proposed construction resolves this dispute, Ansell's does not.

**Ansell's Reply Position:**

RB argues that the construction of this limitation must include the reason for the absence of the particle features because this "will tell [the jury] what the[y] need to look for when comparing the claim to the prior art and the accused products." What the jury will need to look for is the presence or absence of particle features in a SEM micrograph of sufficient magnification to allow particles to be seen. The reason for the absence of such particles is neither a requirement of the limitation nor something the jury will have to determine.

The cases cited by RB, *Every Penny Counts*, 563 F.3d at 1383, and *O2 Micro*, 521 F.3d at 1361-63, involving situations where the district courts had not given any constructions despite competing proposed constructions by the parties, are completely inapt. By refusing to include in its construction the extraneous language that RB wishes to include, the Court will neither have failed to perform its duty of construing the claims nor be permitting the parties to argue claim construction to the jury.

**CLAIM TERM NO. 6:** "UNIFORMITY OF ISOPRENE DOUBLE BONDS" ('412 patent, claim 8; '719 patent, claim 16).

**Ansell's Proposed Construction:**  Plain meaning

**RB's Proposed Construction:**  This term is indefinite.  It is unclear what would constitute a sufficient level of uniformity to meet the claim language, and it is unclear how a person of ordinary skill in the art could make an objective determination as to whether a sufficient level of uniformity has been achieved.  Rather, when this term is read in light of the specification delineating the patent, and the prosecution history, it is clear that determining what is and is not uniform is an entirely subjective exercise such that the term fails to inform, with reasonable certainty, those skilled in the art about the scope of the invention.

**Ansell's Opening Position:**

The discussion with respect to Claim Term No. 2 applies equally here.  Uniformity of isoprene double bonds is indicative of cross-link uniformity.  *See* Specification, col. 16, line 66 to col. 17, line 12.

**RB's Answering Position:**

Claim 8 in the '412 Patent and Claim 16 in the '719 Patent require that film have a "uniformity of isoprene double bonds."  As with the "substantially uniform" limitation discussed above, this limitation is indefinite because it is unclear what would constitute a sufficient level of uniformity to meet the claim language, and it is unclear how a person of ordinary skill in the art could make an objective determination as to whether a sufficient level of uniformity has been achieved.  There is no way to objectively determine whether this limitation is met.  It requires a visual inspection of an osmium tetroxide treated sample (such as Figure 1) and the **subjective** determination as to whether the staining in the sample is uniform from one location to the next.  The Patents-in-Suit offer no **objective** guideposts for making this determination, and thus the scope of the claims at issue is left entirely to the **subjective** judgment of the person looking at the TEM.  (*See* Potter Decl., ¶¶ 80-82.)  Thus, when this term is read in light of the specification and the prosecution history, it is clear that determining what is and is not uniform is an entirely

subjective exercise such that the term fails to inform, with reasonable certainty, those skilled in the art about the scope of the invention.

**Ansell Reply Position:**

The discussion with respect to Claim Term No. 2 applies equally here. Uniformity of isoprene double bonds is indicative of cross-link uniformity. *See* Specification, col. 16, line 66 to col. 17, line 12.

**CLAIM TERM NO. 7:** **"PASSES THROUGH BOTH INTER-PARTICLE REGIONS AND INTRA-PARTICLE REGIONS NONPREFERENTIALLY" ('412 patent, claim 9; '029 patent, claim 17).**

**Ansell's Proposed Construction:** Plain meaning

**RB's Proposed Construction:** "No part of the fracture surface forms around individual polyisoprene particles because the entire fracture surface propagates with no preference for either the intra particle region or the inter particle regions."

**Ansell's Opening Position:**

The words in this term are not given any meaning other than their plain and ordinary meaning in the Specification. RB's proposed construction includes the phrase "propagates with no preference for either the intra particle region or the inter particle region."[20] That language is a portion of the following statement from the Specification: "propagate[s] with no preference for either the intra particle region or the inter particle region indicating that both inter and intra particle regions were approximately equal strength or were crosslinked nearly equally." Specification, col. 7, lines 49-53. Ansell would have no objection to a construction using all of this language from the specification, but respectfully submits that the claim language itself is simpler and easier for a jury to understand. The first portion of RB's proposed construction,

---

[20]      RB includes the term "fracture surface" in its proposed construction, but that term is part of the claim, and not part of what RB claimed needed construction.

however, has no support in either the language of the claims or the specification, and should not

be included in the Court's construction.

**RB's Answering Position:**

Claim 1 in the '412 Patent and Claim 1 in the '719 Patent requires that a fracture surface

created at room temperature "passes through both inter-particle regions and intra-particle regions

nonpreferentially." A jury will have absolutely no idea what that means, and in particular what

"nonpreferentially" means. Thus, Ansell's construction of plain meaning, which would leave the

parties to argue what it means to the jury, should be rejected. *See, e.g., Every Penny Counts.,*

563 F.3d at 1383; *O2 Micro*, 521 F.3d at 1361-63.

Instead this limitation should be construed as "no part of the fracture surface forms

around individual polyisoprene particles because the entire fracture surface propagates with no

preference for either the intra particle region or the inter particle regions." This would resolve

the question of claim scope for the jury, and is entirely in keeping with the specification, which

provides in reference to the SEM in Figure 5 that "[t]he fracture surface as shown in this figure

shows a fracture surface that was very nearly planar with no features indicating intra particle or

inter particle regions. This absence of intra-polyisoprene particle and inter-polyisoprene particle

features means that the fracture surface propagated with no preference for either the intra particle

region or the inter particle regions . . . ." (*See* '412 Patent, Col. 7, lines 48-51.)

**Ansell's Reply Position:**

As Ansell noted in its opening brief, the words in this term are not given any meaning

other than their plain and ordinary meaning in the Specification. RB's proposed construction

includes the phrase "propagates with no preference for either the intra particle region or the inter

particle region."[21]  That language is a portion of the following statement from the Specification:

"propagate[s] with no preference for either the intra particle region or the inter particle region

indicating that both inter and intra particle regions were approximately equal strength or were

crosslinked nearly equally."  Specification, col. 7, lines 49-53.

As noted in its opening brief, Ansell would have no objection to a construction using *all*

of this language from the specification, but respectfully submits that the claim language itself is

simpler and easier for a jury to understand.   Ansell continues to have no objection to a

construction using all of this language.   The first portion of RB's proposed construction,

however, has no support in either the language of the claims or the specification, and should not

be included in the Court's construction.

**CLAIM TERM NO. 8:  "SAID SYNTHETIC POLYISOPRENE PARTICLES BONDED TO EACH OTHER THROUGH INTRA-POLYISOPRENE PARTICLE CROSSLINKS AND INTER-POLYISOPRENE PARTICLE CROSSLINKS" ('412 patent, claims 1, 2, 3, 4, 8, 9; '719 patent, claims 1, 8, 10, 11, 16 and 17; '027 patent, claims 1 and 5).**

**Ansell's Proposed Construction:**  Plain meaning

**RB's Original Proposed Construction:**  This term is indefinite.  Based on the specification, pre-vulcanization is required to achieve intra-particle crosslinks.  However, pre-vulcanization is not expressly required, and thus it is unclear how to produce the claimed features.  It is also unclear what level of crosslinking is required to produce the claimed features.  Thus, when this term is read in light of the specification delineating the patent, and the prosecution history, it fails to inform, with reasonable certainty, those skilled in the art about the scope of the invention.

**Ansell's Opening Position:**

In response to a Request for Admission in this case, RB has admitted that this element is

present in the accused Durex RealFeel condoms.  *See* Kenworthy Claim Construction Decl.

(App. XII hereto), at ¶¶ 7 & 8.  Accordingly, this term should require no construction at all.

---

[21]     RB includes the term "fracture surface" in its proposed construction, but that term is part of the claim, and not part of what RB claimed needed construction. "Construing a claim term to include features of that term already recited in the claims would make those expressly recited features redundant." *Apple, Inc. v. Ameranth, Inc.*, 842 F.3d 1229, 1237 (Fed. Cir. 2016).

"[D]istrict courts are not (and should not be) required to construe *every* limitation presented in a patent's asserted claims." *O2 Micro*, 521 F.3d at 1362. "Claim construction 'is not an obligatory exercise in redundancy.' " *Id.* quoting *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1565 (Fed. Cir. 1997). As for RB's indefiniteness contention, what more compelling evidence could there be that a skilled artisan would understand the meaning of this term, than the fact that against its own interest, an accused infringer necessarily could and did understand the term when it admitted the presence of that term in its accused product.

Additionally, RB's indefiniteness argument is based on a purported failure of this claim language to disclose "how to produce the claimed features." That is not the function of claims, however. "[T]he purposes of the *specification* are to teach and enable those of skill in the art to make and use the invention and to provide a best mode for doing so." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005) (Emphasis added). Any invalidity challenges that RB may have based on enablement or best mode are not for decision by the Court at the claim construction phase.

**RB's Answering Position:**

Considering this limitation further in light of Ansell's opening brief, RB agrees that it does not require construction. That said, the use of this limitation in Claim 1 of the '027 Patent renders the claim invalid for lack of enablement and/or written description. The "present invention" disclosed in the '027 Patent is "predicated" on the use of pre-vulcanization to generate intra-particle crosslinks, and then balancing that with the degree of post-vulcanization or curing to generate inter-particle crosslinks. (*See* '027 Patent, Col. 8, lines 36-41; Col. 9, lines 39-50; Col. 10, lines 55-59; Col. 1, lines 20-24.) Yet, unlike most of the other asserted claims in this case, Claim 1 in the '027 Patent does **not** expressly require pre-vulcanization, and Ansell has

not asked the Court to construe the claim to require it.  This is problematic because there is absolutely no disclosure in the '027 Patent of how the claimed crosslinks or the claimed molecular weight between crosslinks could be achieved without pre-vulcanization.  While RB is of the view that this could give rise to an indefiniteness problem for the claim (as articulated in the parties' Joint Claim Chart), having now had the benefit of Ansell's position on this limitation, RB will instead focus this issue in the context of enablement and/or written description at the appropriate time.

**Ansell's Reply Position:**

In response to a Request for Admission in this case, RB admitted that this element is present in the accused Durex RealFeel condoms.  *See* Kenworthy Claim Construction Decl. (App. XII hereto) at ¶¶ 7 & 8.  Accordingly, Ansell argued in its opening brief that this term should require no construction at all.  Ansell also argued that as for RB's  indefiniteness contention, what more compelling evidence could there be that a skilled artisan would understand the meaning of this term, than the fact that against its own interest, an accused infringer necessarily could and did understand the term when it admitted the presence of that term in its accused product.

Considering this limitation further in light of Ansell's opening brief, RB has now agreed that it does not require construction, and has withdrawn its indefiniteness challenge.

**CLAIM TERM NO. 9:**  **"OSMIUM TETROXIDE STAINING"** ('029 patent, claim 2).

**Ansell's Proposed Construction:**  Plain meaning

**RB's Proposed Construction:**  This term is indefinite.  When this term is read in light of the specification delineating the patent, and the prosecution history, it is clear that the "osmium tetroxide staining" test is an entirely subjective exercise such that, the term fails to inform, with reasonable certainty, those skilled in the art about the scope of the invention.

Were the Court to determine that the term is definite, then it should be construed as "A TEM micrograph of a styrene-swollen sample exposed to osmium tetroxide staining shows that the level of staining is the same throughout the entire micrograph."  RB has subsequently withdrawn this alternative proposed construction.

**Ansell's Opening Position:**

There is nothing indefinite about the language "osmium tetroxide staining" any more than there is with respect to the phrase "osmium tetroxide treated" in claim 8 of the '412 Patent which RB has not identified as needing construction.  Indeed, RB does not suggest that it should be given other than its plain meaning, when in its alternative proposed construction it uses the very term "osmium tetroxide staining" and simply imports from the specification extraneous language unsupported by the claim language or any express definition of the term "osmium tetroxide staining" in the specification.

**RB's Answering Position:**

Claim 2 in the '029 Patent explicitly provides that "substantial uniformity" can be determined by visually inspecting an TEM that has been prepared with "osmium tetroxide staining" such as is shown in Figure 1.  For all the reasons stated above, this claim limitation does not inform, with reasonable certainty, those skilled in the art about the scope of the invention, and therefore renders Claim 2 indefinite.  (*See* Potter Decl., ¶¶ 83, 46-56.)  That is, this limitation is indefinite because when it is read in light of the specification and the

prosecution history, it is clear that the "osmium tetroxide staining" test is an entirely **subjective** exercise.

Were the Court inclined to adopt a construction for this term, then it should adopt a construction that provides an objective basis for determining the scope of the claim. RB suggested in the Joint Claim Construction Chart that such a construction should be "[a] TEM micrograph of a styrene-swollen sample exposed to osmium tetroxide staining shows that the level of staining is the same throughout the entire micrograph." However, upon further reflection, and now having had the benefit of Dr. Potter's evaluation of this issue in his declaration, it is clear to RB that even its proposed construction depends on a subjective determination because the scope of the claim would be determined by a visual inspection of a stained TEM such as in Figure 1 and the subjective judgment of the person inspecting as to whether the staining is the "same" throughout, which could differ from person to person. This illustrates just how indefinite this limitation is.

Finally, Ansell's proposed construction of "plain meaning" should be rejected because there is no plain meaning for this limitation, and, even if there were, Ansell has not indicated what it thinks it is.

**Ansell's Reply Position:**

There is nothing indefinite about the language "osmium tetroxide staining" any more than there is with respect to the phrase "osmium tetroxide treated" in claim 8 of the '412 Patent which RB has not identified as needing construction. Indeed, RB does not suggest that it should be given other than its plain meaning, when in its alternative proposed construction it uses the very term "osmium tetroxide staining" and simply imports from the specification extraneous language

unsupported by the claim language or any express definition of the term "osmium tetroxide staining" in the specification.

None of RB's arguments go to either the meaning of this term or whether a person skilled in the art would understand what the term "osmium tetroxide staining" was. Not only is the term clearly described in the specification of the patents-in-suit, Specification, at col. 16, lines 43-69, but RB's expert himself has pointed to what he has characterized as the original in the art regarding the TEM/osmium tetroxide staining technique described in the specification. Potter Decl. (App. V hereto) ¶ 49 & fn. 4.

**RB's Sur-Reply Position:**

Ansell's reply is based on a false equivalence. Whether or not something has been treated with osmium tetroxide (as in Claim 8 of the '412 Patent) is objectively knowable, whereas, for all of the reasons already discussed with respect to the "substantially uniform" terms, "measuring" uniformity using the "osmium tetroxide staining" test (as required by Claim 2 of the '029 Patent) is subjective and indefinite. Moreover, Ansell failed to mention that RB did challenge the definiteness of Claim 8 of the '412 Patent for the exact same reason – *i.e.*, using an osmium tetroxide treated article to determine "uniformity of isoprene double bonds" is a subjective exercise and indefinite. (*See* Potter Decl., ¶¶ 46-57, 69-79, 80-83.)

**CLAIM TERM NO. 10:** **"WHEREIN THE INTRA-POLYISOPRENE PARTICLE CROSSLINKS AND THE INTER-POLYISOPRENE PARTICLE CROSSLINKS ARE SUCH THAT THE MOLECULAR WEIGHT IS LESS THAN ABOUT [X] G/MOL BETWEEN THE CROSSLINKS" ('027 patent, claims 1 and 5).**

**Ansell's Proposed Construction:** Wherein using the weight method as described in column 15, lines 1 through 37 of the '027 patent, the molecular weight of the material between both the intra-polyisoprene particle crosslinks and the inter-polyisoprene particle crosslinks is less than approximately [X] grams per mol.

**RB's Proposed Construction:** This term is indefinite. Both because of the use of the imprecise term "about" in the claim and the fact that the method described in the specification that is

supposed to be used to calculate molecular weight between crosslinks has an undisclosed margin of error that renders the calculation inaccurate, a person of ordinary skill in the art could not, to a reasonable degree of certainty, determine what is and is not less than "about" the claimed molecular weight.

**Ansell's Opening Position:**

RB does not suggest that the words in this claim term have other than their plain and ordinary meaning, nor does it dispute that the weight method of determining the molecular weight between crosslinks is identified and described in the specification at column 15, lines 1 through 37 of the '027 Patent. Rather, RB's sole indefiniteness arguments are based on the use of the term "about" and the fact that the specification does not expressly disclose the margin of error. Addressing the last point first, RB does not suggest that a person of ordinary skill in the art would not know the margin of error for the disclosed testing method. As to the use of the term "about," like the term "substantially," the term "about" is ubiquitous in patent claims and its use has been regularly sustained in the face of indefiniteness challenges. *Ecolab*, 264 F.3d at 1367. This claim term is not indefinite.

**RB's Answering Position:**

Claims 1 and 5 in the '027 Patent require that "the intra-polyisoprene particle crosslinks and the inter-polyisoprene particle crosslinks are such that the molecular weight is less than **about** [X] g/mol between the crosslinks." This limitation is indefinite at least because of the use of the imprecise term "about" in the claim and the fact that the method described in the specification that is supposed to be used to calculate molecular weight between crosslinks has an undisclosed margin of error that renders the calculation inaccurate and unreliable. As a result, a person of ordinary skill in the art could not, to a reasonable degree of certainty, determine what is and is not less than "about" the claimed molecular weight.

A person of ordinary skill in the art reading these claims in view of the disclosure in the specification would understand that the this claim limitation is directed to the molecular weight calculation disclosed in the '412 Patent at Col. 15, line 21 to Col. 16, line 41. Yet, for at least two reasons the scope of this limitation (and hence the claims within which it appears) is unclear as a matter of law.

First, as Dr. Lucas acknowledged during his deposition, ███████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████ (*See* Lucas Dep. Tr., p. 186, line 13 to p. 187, line 6; p. 195, line 20 to p. 198, line 19, Potter Decl., Ex. C.) Second, this lack of disclosure and inaccuracy is compounded by the fact that the claim limitation modifies the stated molecular weight with the term "about," which is a term of approximation that blurs the metes and bounds of the claim.

For example, Claim 1 of the '027 Patent requires that "the intra-polyisoprene particle crosslinks and inter-polyisoprene particle crosslinks are such that the molecular weight is less than about 8000 g/mol between the crosslinks." Since the test in the specification has an undisclosed margin of error and is not "super accurate," the claim limitation's use of the term "about" begs the question, how far above 8000 g/mol can the molecular weight be before it is too high to meet the claim limitation? Table 7 in the specification and the accompanying discussion both appear to suggest that the 8955 g/mol calculated for the prior art Durex product made in accordance with the GB Patent is too high. But, what about 8100, would that still be less than about 8000 g/mol? What about 8200 g/mol? Where is the cut-off? The Patents-in-Suit offer no guidance or objective guideposts to answer these questions in order to determine what is and is not less than "about" 8000 g/mol. (*See also* Lucas Dep. Tr., p. 201, lines 15-22 ███████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████ Potter Decl., Ex. C.)   And because there is no accepted

definition of "about" in this context in the art, the claim scope is not defined in a way to allow a

person of ordinary skill in the art to be able to objectively determine what is within the scope of

the claims and what is not within the scope of the claims. *See, e.g., Amgen v. Chugai*, 927 F.2d

at 1217-18 ("about" as used in a claim of "at least about 160,000 IU/AU" specific activity was

indefinite since it did not apprise as to how much below that 160,000 value was being claimed

and there was close prior art at the lower end of the claimed range); *Synthes (USA) v. Smith &*

*Nephew, Inc.*, No. 03-cv-0084, 2008 WL 343114, *15 (E.D. Pa. Feb. 4, 2008) (the limitation

"less than about 2%" was indefinite because a person of ordinary skill in the art would not know

the bounds of the limitation where the specification provide no guidance as to how much above

2% would qualify as "about 2%").

       For these reasons, this claim limitation does not inform, with reasonable certainty, those

skilled in the art about the scope of the invention.  (*See* Potter Decl., ¶¶ 60, 91-94); *see Nautilus*,

134 S. Ct. at 2129.

**Ansell Reply Position:**

       RB does not suggest that the words in this claim term have other than their plain and

ordinary meaning, nor does it dispute that the weight method of determining the molecular

weight between crosslinks is identified and described in the specification at column 15, lines 1

through 37 of the '027 Patent.  Rather, RB's sole indefiniteness arguments are based on the use

of the term "about" and the fact that the specification does not expressly disclose the margin of

error.  As to the use of the term "about," like the term "substantially," the term "about" is

ubiquitous in patent claims and its use has been regularly sustained in the face of indefiniteness challenges. *Ecolab*, 264 F.3d at 1367. Indeed, RB's expert, Dr. Potter, has used the term "about" or "approximately" in the claims of a number of his own patents and patent applications. See Potter Dep. Tr. (App. VII hereto) at 56:18-78:17 and Potter Exs. 15-18, (Apps. XIV-XVII hereto). When presented with the claim term "less than about," another judge from this district has found no construction required other than to construe "about" to mean "approximately." *See Roche Diagnostics Operations, Inc. v. Abbott Diabetes Care*, No. 07-753-JJF (D. Del. Sept. 15, 2007) (App. XVIII hereto) at 19-21, and attached Order ¶¶ 12-15). It is not disputed that "about" and "approximately" mean the same thing.

Ansell has no objection to the Court construing "about" to mean "approximately," but does not believe that such a construction is either necessary or helpful for the jury, and does not believe that any construction of the term "wherein the intra-polyisoprene particle crosslinks and the inter-polyisoprene particle crosslinks are such that the molecular weight is less than about [X] g/mol between the crosslinks" is required.

To the extent that the Court believes that the jury will require more specific guidance as to what the phrase "less than about X g/mol" means, one can look at claim 6 of the '412 Patent claiming a "molecular weight [that] is less than about 6800 g/mol between the crosslinks." As Dr. Potter testified at his deposition, Table 7 of the specification of the patents-in-suit discloses the molecular weight between the crosslinks of three synthetic polyisoprene condoms manufactured according to the subject invention, and all three of them are less than about 6800 grams. Potter Dep. Tr. (App. VII hereto) 101:16-102:23. Since the highest of those three examples is 6754, the specification discloses to the reader that "about [X] g/mol" must mean in the range of between X +/- 45 g/mol. Using these data points to inform the scope of an "about"

term is entirely appropriate.   *See, e.g., Ortho-McNeil Pharmaceutical, Inc. v. Coraco Pharmaceutical Labs, Ltd.*, 476 F.3d 1321, 1327-28 (Fed. Cir. 2007).   In the context of asserted claim 1 of the '027 Patent, "less than about 8000 g/mol" would thus mean less than 7955 g/mol, and in the context of claim 5 of the '027 Patent, "less than about 7500 g/mol" would mean less than 7455 g/mol.

Claims that included the limitation "that the molecular weight is less than about [X] g/mol between crosslinks" have been allowed by the U.S. Patent Office in both the '412 and '027 Patents, the Australian Patent Office, *see* Potter Dep. Ex. 6 (App. XIX hereto), and the European Patent Office (App. XX hereto).   Implicitly, those duly authorized administrative bodies have found that the language satisfies the respective indefiniteness/clarity requirements of those jurisdictions.   RB's indefiniteness argument should be rejected.

**RB's Sur-Reply Position:**

Ansell devotes half of its reply on this term arguing that Dr. Potter has used the term "about" in several of his own patents.   That is meaningless.   It is axiomatic that "whether a claim is indefinite must be judged 'in light of the specification and prosecution history' of the patent in which it appears," not based on what a different inventor may have said in a different patent in a different context.   *See Sonix*, 2017 WL 56321, at *8.

Ansell spends the remainder of its reply attempting to re-write the claims to avoid indefiniteness.   Yet, unlike the *Ortho-McNeil* case cited by Ansell, there are no data points in the Patents-in-Suit that come anywhere near the 8000 g/mol or 7500 g/mol in the asserted claims. The closest is 6754 g/mol for sample No. 3 that appears in Table 7, which is too low to shed any light on the objective scope of "about" 8000 g/mol or "about" 7500 g/mol.   Moreover, and this is how the Court can be sure Ansell is wrong, under Ansell's made-up "tolerance" calculation of

- 60 -

+/- 45 g/mol, the term "less than about 8000 g/mol" would **exclude** 7956 g/mol to 7999 g/mol. That makes no sense. Of course 7999 g/mol is less than about 8000 g/mol, but that's not the problem. The problem is that every person of skill in this art who has testified in this case thinks the test is inaccurate and unreliable. Thus, the use of the term "about" blurs the boundaries of the claim because it begs the question, what is "about" 8000 g/mol using such an inaccurate test? Would 8000 g/mol itself count? What about 8010 g/mol, or 8025 g/mol, or 8050 g/mol, or 8100 g/mol? There simply is no discernible cut-off because of the inaccuracy of the test and the lack of objective guideposts in the specification. The term is indefinite. (*See* Potter Decl., ¶¶ 60, 91-94); *see Nautilus*, 134 S. Ct. at 2129; *Synthes*, 2008 WL 343114, *15.

## ANSELL'S CONCLUSION

For all the foregoing reasons as contained in Ansell's briefing, Ansell respectfully requests that the Court reject RB's indefiniteness arguments and construe the 10 claim terms in accordance with the constructions proposed by Ansell.

## RB'S CONCLUSION

For the reasons set forth above, as well as in Dr. Potter's declaration, RB respectfully requests that the Court find Term Nos. 1-4, 6 and 9-10 indefinite, and construe Term Nos. 5 and 7 in the manner proposed by RB.

DATE:  February 6, 2017

/s/  Jody C. Barillare

_____
 Colm F. Connolly (I.D. No. 3151)
David W. Marston Jr. (I.D. No. 3972)
Jody C. Barillare (I.D. No. 5107)
MORGAN, LEWIS & BOCKIUS LLP
The Nemours Building
1007 North Orange Street, Suite 501
Wilmington, Delaware  19801
302.574.3000
colm.connolly@morganlewis.com
david.marston@morganlewis.com
jody.barillare@morganlewis.com

*and*

Thomas B. Kenworthy (admitted pro hac vice)
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, Pennsylvania  19103-2921
215.963-5000
thomas.kenworthy@morganlewis.com

*and*

Raymond R. Moser, Jr. (admitted pro hac vice)
MOSER TABOADA
1030 Broad Street, Suite 203
Shrewsbury, New Jersey  07702
rmoser@mtiplaw.com

*Attorneys for Plaintiff*
*Ansell Healthcare Products LLC*

/s/  Pilar G. Kraman

_____
Adam W. Poff (I.D. No. 3990)
Pilar G. Kraman (I.D. No. 5199)
YOUNG CONAWAY STARGATT
 & TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, Delaware  19801
302.576.3586
apoff@ycst.com
pkraman@ycst.com

*and*

Douglas J. Nash (admitted pro hac vice)
John T. Gutkoski (admitted pro hac vice)
BARCLAY DAMON, LLP
Barclay Damon Tower
125 East Jefferson Street
Syracuse, New York  13202
315.425.2700

*Attorneys for Defendant*
*Reckitt Benckiser LLC*