## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **ANSELL HEALTHCARE PRODUCTS LLC,** | **Civil Action No.:** |
| Plaintiff, | **1:15-cv-00915-RGA** |
| v. | |
| **RECKITT BENCKISER LLC,** | |
| Defendant. | **REDACTED PUBLIC VERSION** |

### JOINT APPENDIX TO JOINT CLAIM CONSTRUCTION BRIEF

Colm F. Connolly (No. 3151)
David W. Marston Jr. (No. 3972)
Jody C. Barillare (No. 5107)
MORGAN, LEWIS & BOCKIUS LLP
The Nemours Building
1007 North Orange Street, Suite 501
Wilmington, Delaware  19801
302.574.3000

colm.connolly@morganlewis.com
david.marston@morganlewis.com
jody.barillare@morganlewis.com

*Attorneys for Plaintiff*
*Ansell Healthcare Products LLC*

Adam W. Poff (No. 3990)
Pilar G. Kraman (No. 5199)
YOUNG CONAWAY STARGATT
  & TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, Delaware  19801
302.571.6600

apoff@ycst.com
pkraman@ycst.com

*Attorneys for Defendant*
*Reckitt Benckiser LLC*

Dated:  February 6, 2017

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ANSELL HEALTHCARE
PRODUCTS LLC,

             Plaintiff,

    v.

RECKITT BENCKISER LLC,

             Defendant.

)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 1:15-cv-00915-RGA

**CONTAINS INFORMATION
DESIGNATED AS "PROTECTED
INFORMATION" UNDER THE
PROTECTIVE ORDER**

### DECLARATION OF WILLIAM D. POTTER, Ph.D.

**WILLIAM D. POTTER** hereby declares as follows:

1.    I am over 18 years of age and have personal knowledge of the facts set forth herein.  If called to testify in this action the following would constitute a portion of my direct testimony.

2.    I have been asked by Reckitt Benckiser LLC to study U.S. Patent Nos. 8,087,412 (the "'412 Patent"), 8,464,719 (the "'719 Patent"), 9,074,027 (the "'027 Patent"), 9,074,029 (the "'029 Patent") (collectively the "Patents-in-Suit") and their prosecution histories at the United States Patent and Trademark Office ("PTO") and offer my views concerning whether the following claim limitations inform, with reasonable certainty, those skilled in the art about the scope of the invention:

    a.  "synthetic polyisoprene particles that are pre-vulcanized";

    b.  "the intra-polyisoprene particle crosslinks and inter-particle crosslinks are substantially uniform";

    c.  "wherein the intra-polyisoprene particle crosslinks and the inter-

polyisoprene particle crosslinks are substantially uniformly distributed among and between the synthetic polyisoprene particles";

d. "substantially conchoidal fracture";

e. "uniformity of isoprene double bonds";

f. "osmium tetroxide staining" in Claim 2 of the '029 Patent; and

g. "wherein the intra-polyisoprene particle crosslinks and inter-polyisoprene particle crosslinks are such that the molecular weight is less than about [X] g/mol between the crosslinks".

3.    In formulating my views, I also have reviewed the parties Joint Claim Construction Chart (including the accompanying exhibits) in this case, the sworn deposition testimony of two of the named inventors of the Patents-in-Suit, Dr. Dave Narasimhan and Dr. David Lucas, documents related to the prosecution of the European counterpart application to the Patents-in-Suit, and the opening claim construction brief served by Ansell Healthcare Products LLC in this case.

4.    I am being compensated for my services as an expert in this case at a billing rate of $300.00 per hour.  My *curriculum vitae* is attached hereto as Exhibit G.

### Summary of Conclusions

5.    In view of the eight claim limitations I have been asked to review, it is my opinion that determining the scope of the claims in the Patents-in-Suit would be an entirely subjective exercise that would require a person of ordinary skill in the art to make qualitative judgments while navigating a number of terms of approximation.  This renders the scope of the claims unclear to a person of ordinary skill the art.

6.    That is to say, and for the reasons set forth herein, it is my opinion that none of

those seven claim limitations inform, with reasonable certainty, those skilled in the art about the scope of the invention.

## Background, Education and Experience

7.     I am a polymer chemist and consult to companies in the healthcare and pharmaceutical industry, including manufacturers of natural rubber and synthetic latex products, such as medical gloves and barrier contraceptives, particularly in relation to matters concerned with new product development and new polymer materials.

8.     A copy of my curriculum vitae is attached hereto as Exhibit A.

9.     I graduated with a Bachelor of Science with Honors in Chemistry from Liverpool University in the UK in 1968.   In 1969, I was awarded by the University of Aston in Birmingham, UK, a Master of Science degree majoring in Polymer Science and Technology.  I continued at the University of Aston and completed my Ph.D. in 1972.

10.     In 1972, after completing my Ph.D., I was employed as a research chemist at Smith & Nephew.   During the period from 1972 to 1984, the Smith & Nephew research laboratory worked on projects including the development of plastic and elastomeric (rubbery) polymers for soft contact lenses, advanced surgical adhesives, wound dressing components, and advanced orthopedic products.  During my 12 years at Smith & Nephew, I received progressive appointments to the positions of project leader, laboratory head and research manager.

11.     In 1985, I was employed as Chief Research Manager, Chemicals, of London International Group a global company with headquarters in London manufacturing in the UK, and exporting to many countries around the world a range of rubber products including, barrier contraceptives, condoms and medical, industrial and household gloves.  Durex was adopted by London International Group as a condom brand in the early 20th century.  I was responsible for

managing all projects for the development of new materials for use in manufacturing the company's products.

12.     In 1988, I was appointed Director of Group Research and Development of London International Group and in that position, I was responsible for managing all research and development undertaken in the company, including new product development and the provision of technical support.  From 1993 to 1999, I was the Group Scientific Affairs Director and a member of the board of directors of London International Group plc.  I regularly visited the company's factories, initially most often in the UK, but then all over the world.

13.     During my period of employment with London International Group, the company manufactured condoms and rubber gloves at a factory in the United Kingdom (outside London), in New Jersey, South Carolina, and Alabama in the United States, Sarstedt in Germany, Bologna in Italy, and at a plant in Rubi, Spain.  London International Group also established a joint venture condom manufacturing operation in India with TTK Ltd and a joint venture operation in China with Qingdao Double Butterfly Group in the mid-1990s.  The UK factory was closed down in the early 1990s, around the time when the company established a factory in Thailand. In addition to managing the main research and development laboratory in Cambridge, UK, I was also responsible for managing a research and development unit in the United States and a process development and technology transfer group in Malaysia as well as overseeing quality improvement programs at all of the manufacturing sites.

14.     In about 1999, London International Group was acquired by Seton Scholl Healthcare plc (Seton Scholl), a company with English headquarters that manufactured a range of medical related products such as bandages, antiseptics, orthopedic footwear and over the counter medicines.

15.     Following the acquisition of London International Group by Seton Scholl in about 1999, I left the company and established my own consulting business which I have continued until today.   As I describe herein, I have consulted for a number of the leading condom manufacturers and inspected many condom manufacturing factories in various places across the world.

16.     In the early 2000s, many of the major condom manufacturers that had manufacturing facilities in Europe and the United States closed down those facilities and moved to manufacturing facilities in Asia, particularly Thailand and Malaysia.

17.     Between 2001 and 2012, I was the executive chairman of Futura Medical, which develops therapeutic products of dermal application, including vasodilators applied as gel within the teat of the condom.

18.     I have consulted on technical projects relating to materials, manufacturing processes and new product development for thin film latex barrier products for many leading companies around the world.   The leading condom manufacturers that I have consulted for include Ansell, Reckitt Benckiser, Church & Dwight, Qingdao Double Butterfly Group China, Sagami Europe and German manufacturer MAPA GmbH.   I have also visited and inspected condom manufacturing at many other factories including in Germany, Japan, Malaysia, India, Vietnam and the United States.

19.     Since the early 1990s, I have been extensively involved in work relating to international standards development and procurement specifications with respect to natural and synthetic rubber latex barrier articles.   Since that time, I have been involved with the European Committee for Standardization (CEN) and was the convener of the CEN technical committee that developed the European Standard for condoms (CEN/TC 205, WG8).

20.     Since 1989, I have been a member of the International Organization for Standardization (ISO) Technical Committee 157 for Non-Systemic Contraceptives and STI Barrier Prophylactics (ISO/TC 157).  I have been the convener of three working groups within the Committee, which develop standards in relation to particular aspects of barrier contraceptives.  Since becoming involved in the Committee in 1989, I have generally attended the committee meetings each year.  I attended the committee meetings held in Sydney in 1989 and 2013.  I also visited Sydney in the mid 1990s to attend an Asia Pacific region AIDS conference representing London International Group.

21.     Since about 1997, I have also been involved with the British Standard Institution (BSI).  I am currently the chairman of BSI Technical Committee CH/157, which is the committee responsible for mechanical (*i.e.*, non-drug) contraceptives.  I have also been a temporary adviser to the World Health Organization (WHO) and United Nations Population Fund (UNFPA) on numerous occasions, and was one of the lead authors who drafted the 2003 and subsequent editions of the WHO and UNFPA specification and procurement guideline documents for high volume purchase of male condoms, female condoms and intrauterine devices (IUDs).

22.     As I describe herein, I have been the convener of three working groups within the International Organization for Standardization (ISO) Technical Committee (TC) 157 for Non-Systemic Contraceptives and STI Barrier Prophylactics, which I refer to as TC 157. I was appointed as convener of the working group (WG) for stability assessment in relation to condom shelf life (WG 13) in the late 1990s, the working group for natural rubber latex condoms (WG 23) in or around 2005 and the working group for female condoms (WG 18) in 2015.  Within WG 23, I was the European Project Leader for the revision of the 2002 edition of the international

standard for natural rubber latex male condoms, ISO 4074.  I was also the Project Leader of the

second edition of ISO 4074 published in 2014 and the third edition published in 2015.

23.     The national standards bodies of approximately 50 countries are either

participating members or observing members of TC 157.  Participating members are actively

involved in the standards development work of TC 157 and are obliged to vote on questions

arising within TC 157.  Observing members have the right to attend meetings of TC 157, to

follow the work of TC 157 as observers and to submit comments, but they do not have voting

rights.

24.     I attended the TC 157 meetings, which are held annually in different cities around

the world, and have previously been held in Stockholm, New Delhi, Chicago, Colombo, Kuala

Lumpur, Cambridge, Athens, Tokyo, Jeju and Sydney.  Generally, around 100 to 120 people

representing a range of organizations, including national standards bodies, industry experts and

representatives of all the major condom manufacturers around the world, attend TC 157

meetings.  The TC 157 meeting is a coming together of experts in the industry and involve an

active exchange of technical information and discussion of technical developments in the latex

industry around the world.

25.     Between 2002 and 2014, the main international standard for condoms was ISO

4074:2002 titled "Natural Latex Rubber Condoms – Requirements and Test Methods", which

specifies the minimum requirements and test methods to test shelf life and other properties of

natural rubber latex condoms.  The last number in the title of the international standard reflects

the year in which the standard was last revised.  For example, ISO 4074:2002 is the earlier

version of ISO 4074:2014.

26.     Condoms made of synthetic materials began appearing in commercial markets in

the 1990s.  Initially these condoms were made from synthetic polyurethane materials, although development work was ongoing on a number of synthetic rubber-like polymers.  While I was at London International Group in the 1980s to 1990s, one of my responsibilities was to run the development project for a polyurethane condom, as well as development projects on other synthetic materials for condoms.

27.     When condoms made from synthetic polyisoprene were first developed in the early 2000s, discussions were held within TC 157 to determine whether they would be covered by ISO 4074 or a new standard.  The first meetings were held in October 2001 when it was agreed that a new standard modeled on ISO 4074 should be developed.  The general consensus was that ISO 4074 would continue to apply to condoms made from natural rubber latex and the new standard would apply to synthetic condoms.

28.     The consensus of the working group at the first meeting was that the new standard should be based on the French and Australian approaches and should include the following:

    a.  A requirement to demonstrate that the material is a barrier to virus and spermatozoa.

    b.  The completion of a risk assessment according to various standards.

    c.  The completion of preclinical testing in accordance with the relevant standard.

    d.  The completion of a clinical trial in accordance with WHO guidelines to determine breakage and slippage rates.

    e.  The establishment of minimum burst volume and pressure requirements based on the mean values of the actual batch of condoms submitted to the clinical trial.

29.     Following various meetings and discussions, ISO 23409:2011 titled "Male Condoms – requirements and test methods for condoms made from synthetic materials" was published in 2011. This standard addresses minimum standards for synthetic condoms.

30.     Condom manufacturing is an international field, and everyone in the field has access to the same journals, industry publications and conferences. As I have described above, there is also frequent interaction between those in the industry in different countries, including international conferences, international collaboration to prepare condom standards, contact between staff in major multinational condom manufacturers and engagement between condom manufacturers and independent consultants in various countries.

31.     I have attended various scientific conferences throughout the world throughout my career. For example, I attended the International Latex Conference in various cities including Frankfurt in Germany (in 2006), Amsterdam in the Netherlands (in 2010), and Kuala Lumpur in Malaysia (in 2012), as well as other conferences on polymer and rubber technology.

32.     The International Latex Conference is one of the main conferences for people working in the field of natural rubber and synthetic latex barrier article manufacturing, including condom manufacturing. That conference covers process and materials innovations for natural and synthetic latex and is attended by independent consultants, experts and company representatives from around the world, including engineers, chemists, scientists, quality control managers, research and development directors and production managers.

33.     I have also presented papers at several International Latex Conferences, including a paper titled "Estimating the Shelf Life of Medical Products Made from Natural & Synthetic Rubber Latex" in 2006, a paper titled "A Pilot Study to Investigate Methods of Assessing the Chemical Changes Occurring in Latex Condoms Aged Under Different Conditions" in 2010 and

a paper titled "ISO 4074, the International Standard for Latex Condoms, Past, Present and Future" in 2012.

## Background and Description of the Claimed Invention

34.     Condoms and gloves are made using a dipping process by which a liquid latex material is prepared and matured, and then a former in the shape of a condom or glove is dipped into the liquid latex material to form a gel that is then heated, dried and removed from the former using a stripping process.

35.     "Condoms and gloves are typically made from vulcanized natural rubber.  Natural rubber is produced in latex form by the Hevea brasiliensis tree and has unique characteristics. These characteristics make natural rubber particularly useful for the preparation of barrier protection products.   Among the unique characteristics of natural rubber is its high level of stereo-regularity, meaning that the polymer of which it is comprised is a chain consisting almost exclusively of cis-1,4 isoprene units.  Natural rubber latex is also a highly branched polymer with a high molecular weight and a wide molecular weight distribution.  These characteristics of the base latex result in vulcanized rubber film products having a unique combination of strength and elasticity.   However, natural polyisoprene also contains proteins that have been shown to produce dermal allergic reaction in some susceptible individuals." ('412 Patent, Col. 1, lines 24-38.)[1]

36.     Natural  rubber  particles  contain  a  naturally  occurring  polymer  called polyisoprene.  A polymer is a large molecule composed of many repeating subunits.  The subunit of polyisoprene is isoprene, which has five carbon atoms and eight hydrogen atoms.  Natural rubber also includes proteins that are known to cause allergic reactions in people when the

_____

[1] The Patents-in-Suit share the same specification.   Citations to the '412 Patent are thus representative.

rubber comes in contact with the skin. Thus, many years before the Patents-in-Suit were filed, "[s]ynthetic polyisoprene [was] developed to provide a material with the benefits of natural rubber and to eliminate the potential for protein allergy." (*Id.*, at Col. 1, lines 39-41.) In fact, as the Patents-in-Suit themselves make clear, there were a number of prior art patent and patent applications directed to the use synthetic polyisoprene in the manufacture of gloves and condoms, including UK patent application GB 2,436,566 (the "GB Patent"). (*See e.g., id.*, at Col. 3, line 30 to Col. 4, line 24.) The GB Patent, which attached hereto as Exhibit A, is owned, as I understand it, by a corporate affiliate of Reckitt Benckiser LLC, and, having previously studied the process documents, I know that the Durex condoms that are accused of infringement in this case are made in accordance with at least Claim 1 in the GB Patent.

37.     The term vulcanization derives from the name of Vulcan, the Greek god of fire and the hearth, and alludes to the use of high temperatures in the manufacture of articles from natural rubber in the early development of the rubber processing industry. Vulcanization, which has been ubiquitous in manufacturing ever since Charles Goodyear used the process to make tires out of rubber in the 1800s, is a chemical process controlled by time and temperature that converts natural rubber or related polymers into more durable materials by the addition of sulfur or other curatives or accelerators. These additives modify the polymer by forming crosslinks (bridges) between individual polymer chains as heat is applied. These crosslinks are what give rubber articles their elastic and resilient properties.

38.     "The use of vulcanizing or sulfur cross-linking agents in the manufacture of rubber articles is well-known," and certainly was well known prior to invention disclosed in the Patents-in-Suit. (*See id.*, at Col. 2, lines 10-11.) Typically, vulcanization occurs at two different stages during the manufacturing of dipped products using natural rubber latex. The first is when

the material is still in liquid latex form. This is called pre-vulcanization. The second is after the material has been put into the desired shape and is in gel form. This is called post-vulcanization, or curing.

39.     When rubber and sulphur are combined and heated, the sulphur combines with the polyisoprene chains in the rubber particles to form relatively stable sulphur links between the carbon atoms in the polyisoprene chains, called sulphur crosslinks. It is well understood, and was before the Patents-in-Suit were filed, that pre-vulcanization causes crosslinks to form inside the individual rubber or polyisoprene particles. These are called intra-particle crosslinks, and any amount of pre-vulcanization will cause at least some of them to form. In contrast, post-vulcanization causes bonds to form between the individual particles in addition to causing additional crosslinks to form inside the particles. This process was also well known before the Patents-in-Suit were filed, although the exact nature of the bonds between the particles is still not fully understood today, and is a matter of some debate within the art. The Patents-in-Suit theorize that those bonds are what it calls inter-particle crosslinks, or sulphur crosslinks that form between adjacent polyisoprene particles. While I disagree with this theory, for the purpose of this declaration I have made the assumption that it is correct.

40.     Thus, the Patents-in-Suit disclose applying the known method of making natural rubber articles to synthetic polyisoprene along with the inventors' theory as to the film characteristics of the polyisoprene articles that result from following that method – *i.e.*, "the invention relates to producing synthetic polyisoprene articles and method therefor with improved inter particle and intra particle bond using controlled pre-vulcanized particles of synthetic latex that is dip formed into a thin latex article from an aqueous latex emulsion." (*Id.*, at Col. 1, lines 16-20.) The Patents-in-Suit were not even the first time that method was applied to synthetic

- 12 -

polyisoprene.   As one of the named inventors (Dr. Dave Narasimhan) acknowledged, ▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (*See* Narasimhan Dep. Tr., p. 172, lines 7-18.)[2]

41.    The Patents-in-Suit explain that, in order to get the desired film properties, and

hence the desired physical properties of the finished article, the claimed invention requires

monitoring and controlling of the degree of pre-vulcanization and then balancing that with the

level of curing (*i.e.*, post-vulcanization) such that, according to the inventors, the film in the

finished article has uniform balance of pre-vulcanization intra-particle crosslinks with post-

vulcanization inter-particle crosslinks.  (*See e.g., id.*, at Abstract, Col. 4, line 66 to Col. 5, line 2,

Col. 6, lines 9-13, Col. 9, lines 11-30, Col. 12, lines 57-64.)  As another of the named inventors

(Dr. David Lucas) stated ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓ (*See* Lucas Dep. Tr., p. 77, lines 11-15.)[3]

42.    Indeed, as the inventors explained to the European Patent Office in connection

with the prosecution of their counterpart European application, "[a]ccording to the present

invention, the intra-polyisoprene particle crosslinks and the inter-polyisoprene particle crosslinks

are uniform.  This uniformity is achieved by **monitoring and controlling** the pre-vulcanization

and controlling the post-vulcanization," and "[a]pplicants have found out that controlling the pre-

vulcanization as described in the present invention, and controlling the post-vulcanization as

usual, the claimed uniformity between intra-polyisoprene particle crosslinks and inter-particle

crosslinks is obtained.  Due to the uniformity obtained, excellent tensile properties are achieved."

(*See, e.g.*, Office Action Response dated 04/15/2016, pp. 6, 7 (emphasis in original), attached

---

[2] The cited portions of the deposition testimony of Dr. Narasimhan is attached hereto as Ex. B.
[3] The cited portions of the deposition testimony of Dr. Lucas is attached hereto as Ex. C.

hereto as Ex. D.)

43.     The Patents-in-Suit explicitly teach that pre-vulcanization is controlled using time and temperature, whereas it is monitored using something it refers to as the isopropanol index test.

44.     With respect to control, the patent teaches "[t]he pre-vulcanization of the synthetic latex particles in the latex emulsion occurs over a period of time between 9 hours to 2 days depending on the temperature of the latex emulsion which is generally in the range of 20° C. to 30° C," and "increasing the temperature by a few degrees during the pre-vulcanization step increases significantly the pre-vulcanization rate. For example, pre-vulcanization at room temperature requires from about 3-5 days or as much as about 9 days, while pre-vulcanization at an elevated temperature, e.g., about 50-70° C., requires only about 3-7 hours." (*E.g.*, '412 Patent, Col. 6, lines 5-9, Col. 10, lines 57-63.)

45.     As for monitoring (*i.e.*, knowing when sufficient pre-vulcanization has occurred to achieve the desired results), the Patents-in-Suit teach "the **present invention** provides a surfactant-stabilized, pre-vulcanized, synthetic polyisoprene latex composition having a isopropanol index rating of 3.0.  The isopropanol index test measures the extent of pre-vulcanization of synthetic latex particles in an aqueous latex emulsion by combining equal volumes of latex and isopropanol at room temperature and allowing the mixture to stand for 3 min.  The isopropanol coagulates the latex, and the resulting consistency is numerically rated. The consistency of the coagulum indicates the degree of pre-vulcanization of the latex. As the latex becomes more pre-vulcanized, the coagulum loses **more of its tackiness** and becomes **more crumbly**.  A rating of 2.5 indicates that **small lumps form**, whereas a rating of 3.0 indicates that the **lumps are non-tacky**, a rating of 3.5 indicates that, not only are the lumps non-

tacky, the lumps **disintegrate easily**, and a rating of 4.0 indicates that dry crumbs form, evidencing a high degree of pre-vulcanization of the synthetic latex particles. The pre-vulcanization is **monitored** to assure that the synthetic latex emulsion is ready for dipping of polyisoprene condoms." (*E.g.*, *id.*, at Col. 9, lines 11-30 (emphasis added).) As should be apparent, the isopropanol index text is a wholly subjective test that depends on the perception of the person conducting the test as to how tacky or crumbly the material feels, and whether small lumps form and disintegrate easily. This is supported by the testimony of the named inventors in this case. (*See* Lucas Dep. Tr., p. 181, line 9 to p. 186 line 12; Narasimhan Dep. Tr., p. 222, line 18 to p. 223, line 15.) Indeed, when asked if it is a subjective test Dr. Narasimhan said ████████ ████████████ and when asked "[w]hat score on the isopropanol index test will result in substantially uniform cross-links at the end of the process when you have the article," he said

████████████████████████████████████████████████████

██████████████████████████████ (*See* Narasimhan Dep. Tr., p. 223, lines 14-15, p. 221, lines 3-12.)

46.     The result of monitoring and controlling the level of pre-vulcanization, and then balancing that with the level of post-vulcanization (or curing) is, according to the Patents-in-Suit a film structure that, when stained with osmium tetroxide and viewed under high magnification resembles Figure 1, which is shown below. (*See* '412 Patent, Col. 6, lines 55-63, Col. 16, line 43 to Col. 17, line 12.)

## Fig. 1



47.    According to the Patents-in-Suit, Figure 1 "shows a transmission electron micrograph of a pre-vulcanized and post-vulcanized synthetic polyisoprene condom latex taken from the middle portion of the condom thickness. The sample was prepared using the following procedure. Sample regions of the condom sample were taken and extracted in cold acetone overnight to remove any low molecular weight materials that may subsequently interfere with the styrene polymerization process. The samples were then dried for approximately 48 hrs at below 40° C. to remove any solvent traces. The extracted films were then swollen overnight in

styrene solution containing 1 wt % benzoyl peroxide initiator and 2 wt % dibutylphthalate plasticizer to aid sectioning. The swollen films were then placed in capsules with excess styrene solution and heated at 70° C. until the styrene had fully polymerized. The styrene-swollen, polymerized samples were sectioned by ultramicrotomy at room temperature. By leaving some polystyrene attached to the surfaces of each condom, it was possible to prepare ultra-thin sections that contained the entire width of each condom. The sections were carefully relaxed by exposure to low levels of xylene vapor and transferred to Transmission Electron Microscopy (TEM) grids. The sections were then stained in osmium tetroxide vapor for one hour and examined by TEM." (*Id.*, at Col. 16, lines 43-64.)

48.     The Patents-in-Suit suggest that Figure 1 evidences a uniform distribution (*i.e.*, the same number) of both intra-particle crosslinks (inside the particle) and inter-particle crosslinks (between the particles) because the degree of dark staining is substantially uniform throughout the figure. (*Id.*, at Col. 6, lines 55-63, Col. 16, line 43 to Col. 17, line 12.)   That is, as explained in the Patents-in-Suit, "[o]smium tetroxide reacts with carbon-carbon double bonds and, therefore, it imparts a dark stain to polymers containing unsaturated groups, while leaving the polystyrene unstained. The figure shows at 10 the original synthetic polyisoprene particles showing uniform distribution of cross-link networks. The intersection of these particles is shown at 11, and it shows a similar distribution of cross-link networks indicated by uniformity of dark stains, indicating that the synthetic polyisoprene latex film is cross-linked at the synthetic polyisoprene particle level and at intersections. The polystyrene remnants are seen at 13." (Id., at Col. 16, line 64 to Col. 17, line 9.)   The Patents-in-Suit also suggest that "[t]he article has intra-particle and inter-particle crosslinking and under transmission electron microscopy (TEM) a uniform distribution of dark stains with a deviation of less than about 5% from one location to

other within the TEM micrograph." (*Id.*, at Col. 17, lines 18-22.)

49.     It is important to note that the authors of the original papers in the art that described the TEM/osmium tetroxide staining technique described in Paragraph 47 did not rely on the degree of staining to assess crosslink density.[4]   Instead they used higher magnification TEMs to resolve the mesh structures formed within the rubber as the polyisoprene phase separated from the rubber phase.   They suggested an approximated correlation between the average mesh size and average crosslink density of the rubber measured by swelling.   There is no literature justification, nor is the any justification in the Patents-in-Suit for using the degree of staining as a measure of crosslink density.   Relying on the degree of staining has no scientific foundation and the results of doing so may be affected by a number of potential artifacts related to sample preparation and the TEM settings used, none of which are disclosed or even suggested in the Patents-in-Suit.

50.     As such, I offer a couple of observations about the Patents-in-Suit assertions concerning Figure 1 and similar images.

51.     First, the image in Figure 1 is of an incredibly small section of the film measuring roughly 3 microns by 5 microns.   By way of comparison, the thickness of a human hair is about 50 microns.   It is hard to understand what the inventors believe can be determined objectively about the overall film structure and/or the uniformity of crosslinks by looking at such an incredibly small area within the overall film.

52.     Second, crosslinks are not visible in Figure 1.   They are simply too small to be seen even under high magnification, and the dark staining in the image is not of the crosslinks,

---

[4] *See* T. Shiibashi, Int. Polym. Sci. Technol. 14(12), T/33 (1987); A. J. Tinker, et al, Paper No 3 presented at a meeting of the Rubber Division. American Chemical Society, Nashville, Tennessee, November 3 – 6, 1992;  S. Cook *et al.*, Rubber Chemistry and Technology. 70(4), pp. 549-559, (1997).

but rather the carbon-carbon double bonds within the polyisoprene chains.  This was confirmed

by Dr. Narasimhan, the named inventor who ███████████████████████████████████████████

████████████████████████████████ as well as Dr. Lucas.  (*See* Narasimhan Dep. Tr., p.

47, line 21 to p. 48, line 8, p. 154, lines 3-22; Lucas Dep. Tr., p. 112, line 20 to p. 113, line 7, p.

129, lines 17-24.)  And, as acknowledged by Dr. Lucas, ██████████████████████████████████

██████████████████████████████████████████████ (*See* Lucas Dep. Tr., p. 130,

lines 1-12.)  This too begs the question as how and why the inventors of the Patents-in-Suit think

that any objective observations about crosslink uniformity can be made using Figure 1, which as

noted does not show or stain the crosslinks.

53.    Third, while the Patents-in-Suit suggest a deviation of less than about 5% from

one location to other within the TEM micrograph as a possible objective guideline to using

Figure 1 to evaluate uniformity, the use of the "about" makes it only a undefined approximation,

and Dr. Narasimhan ████████████████████████████████████████████████████ (*See*

*id.*, at p. 211, line 17 to p. 213, line 17.)  Further evidence that using Figure 1 to try to evaluate

the level of uniformity is a wholly subjective exercise, ██████████████████████████████████

███████████████████████████████████ (*See id.*, at p. 183, line 18 to p. 184, line 1; *see also* p.

209, lines 9-16 ████████████████████████████████████████████████████████████

██████████████████████████████████ In fact, I observed that Dr. Narasimhan ██████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

██ (*See id.*, at p. 186, lines 5-24, p. 209, line 20 to p. 210, line 18.)

54.    Fourth, Figure 1 shows a number of what I call "white blobs" of voids, an

example of which is identified as item 13.  These white blobs are areas in the inter-particle

region of very low crosslinks density through which the polystyrene was able to push through during production of the sample. (*See* Lucas Dep. Tr., p. 118, line 8 to p. 120, line 6.) There are at least 15 white blobs visible in Figure 1, and each of them represents an area in which the number of crosslinks in the inter-particle region is significantly lower than within the intra-particle regions inside the individual particles. (*See id.*) And, as Dr. Lucas ████████████████ ██████████████████████████████ (*See id.*, at p. 124, lines 14-16.) In other words, the white blobs or voids are areas in which the number of crosslinks within the inter-particle region are **not** uniform with the number of crosslink within the intra-particle region, further begging the question as to how and why the inventors think that Figure 1 and similar images could possibly evidence (objectively or otherwise) substantially uniform inter-particle and intra-particle crosslinks.

55.     Fifth, as can be seen from the figure below, the uniformity of even the dark staining that is visible within Figure 1 varies depending on the contrast and brightness levels used in the image. That is, the darker the overall image appears the more uniform the staining appears.



56.     Yet, the Patent-in-Suit do not disclose what level of contrast or brightness should

be used (*see* Narasimhan Dep. Tr., p. 215, lines 11-19), and this particular issue is of significant

concern because, as I understand it, below is the image in Figure 1 as it was originally provided

to the named inventors by their testing lab.  As can be seen, the image is significantly lighter in

contrast and brightness levels, making it appear very different in terms of the uniformity of

shading (*i.e.*, less uniform) from the version of the image that was actually filed with the Patents-

in-Suit (which I understand is shown in the upper right hand corner of the image array above).

████████████████████████████████████  (*See* Lucas

Dep. Tr., p. 138, line 5 to p. 147, line 2.)  The reference to Exhibit 11 in the transcript is to the

figure above showing the six different versions of Figure 1, and the reference to Exhibit 12 is to

- 21 -

document containing the original version of Figure 1 shown below.



57.     The Patents-in-Suit also suggest that by controlling and monitoring the degree of

pre-vulcanization, and then balancing that with the degree of post-vulcanization the resulting

film will have substantially conchoidal (or shell-like) fracture surface when it is fractured at

liquid nitrogen temperature and a fracture surface that will not show individual particle features

when fractured at room temperature. (*See* '412 Patent, Col. 6, line 64 to Col. 7, line (discussing

Figure 2 and conchoidal fracture) and Col. 7, lines 40-61 (discussing Figure 5 and the absence of

individual particle features).)

58.     Figure 2 (conchoidal fractures at liquid nitrogen temperature) and Figure 5

(absence of particle features at room temperature) are reproduced below.

**Fig. 2**



**Fig. 5**



59.     The Patents-in-Suit do not indicate that these figures show "substantially uniform" crosslinks, or that crosslinks can even been seen in the images. Rather, the discussion about Figure 2 fails to mention crosslinks, whereas the discussion of Figure 5 asserts that the supposed lack of particle features visible in the image means that the inter and intra particle

regions were either "approximately equal strength **or** were crosslinked nearly equally." (*See* '412 Patent, Col. 6, line 64 to Col. 7, line 9; Col. 7, lines 40 to 61 (emphasis added).)  Like with Figure 1, using these types of figures to **objectively** determine anything about the film structure is **not** possible.  With respect to Figure 5, the most the Patents-in-Suit suggests is that the explanation for the purported lack of visible particle features can narrowed down to one of two possibilities, either "approximately equal strength" inter and intra particle regions, "**or**" "nearly" equal crosslinking in those regions.  Even if "nearly" equal crosslinking was somehow the same thing as "substantially uniform" crosslinking, which is far from clear from the inventors' description in the specification, and even it were clear where "nearly" begins and ends, the fact that it is described in the specification as an "either or" explanation means that nothing certain about the uniformity of the crosslinking can be determined from looking at these types of figures.  Further, with respect to both types of figures, as Dr. Narasimhan ███████████ ████████████████████████████████████████████ ██████████████████ (*See* Narasimhan Dep. Tr., p. 270, line 1 to p. 271, line 11.)  And with respect to conchoidal fractures, as Dr. Narasimhan acknowledged, ████████████████ ████████████████████████████████████████ (*See id.*, at p. 234, lines 15-19.)

60.     Finally, the Patents-in-Suit suggest that by controlling and monitoring the degree of pre-vulcanization, and then balancing that with the degree of post-vulcanization, the resulting film structure will have a relatively low molecular weight between crosslinks, which roughly equates to a relatively high crosslink density within the film.  (*See* '412 Patent, Col. 15, line 21 to Col. 16, line 41.)  Yet, as Dr. Lucas acknowledged, ████████████████████████████ ████████████████████████████████████████████

- 24 -

████████████████████████████████████ (*See* Lucas Dep. Tr., p. 186, line 13 to p.

187, line 6; p. 195, line 20 to p. 198, line 19.)

### Person of Ordinary Skill in the Art

61.     In my opinion, a person of ordinary skill in the art of the Patents-in-Suit (*i.e.*, the

production of synthetic polyisoprene articles such as condoms or gloves) in the relevant time

frame as of the filing dates of the Patents-in-Suit (2008-2014) would have a bachelor's degree or

an equivalent degree in chemistry, or a related field, (2) a master's degree in polymer science and

technology, or a related field, and (3) at least five years of experience in the area of latex

technology, and, in particular, the production of polyisoprene (natural rubber) and synthetic

polyisoprene articles.

### Claim Limitations at Issue

#### *"synthetic polyisoprene particles that are pre-vulcanized"*

62.     Claim 1 in the '412 Patent and Claim 1 in the '719 Patent explicitly require that

the synthetic polyisoprene particles used to make the claims article be pre-vulcanized.  However,

it is clear from reading the specification of the Patents-in-Suit that not just any degree of pre-

vulcanization will satisfy the claim limitation.

63.     As I explained in detail above (*see* Paragraphs 40 to 46), the claimed invention

requires **monitoring and controlling** of the degree of pre-vulcanization and then balancing that

with the level of curing (*i.e.*, post-vulcanization) in order to get the desired film properties.  (*See*

*e.g., id.*, at Abstract, Col. 4, line 66 to Col. 5, line 2, Col. 6, lines 9-13, Col. 9, lines 11-30, Col.

12, lines 57-64; *see also* European Office Action Response dated 04/15/2016, pp. 6, 7 (emphasis

in original), attached hereto as Ex. D.)  Indeed, Dr. Lucas testified ████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████████ (*See* Lucas Dep. Tr., p. 77, lines 11-15.)

64.     Controlling the degree of pre-vulcanization is a function of time and temperature, whereas monitoring the degree of pre-vulcanization is done using the highly subjective isopropanol index test. (*See* '412 Patent, Col. 6, lines 5-9, Col. 10, lines 57-63; Col. 9, lines 11-30; *see also* Lucas Dep. Tr., p. 181, line 9 to p. 186 line 12; Narasimhan Dep. Tr., p. 222, line 18 to p. 223, line 15.)

65.     Further, the inventors of the Patents-in-Suit went out of their way to disclaim the level of pre-vulcanization required for their invention with the relatively lower level of pre-vulcanization disclosed and claimed in the GB Patent, which was incorporated by reference into the specification of the Patents-in-Suit. (*See* '412 Patent, Col. 4, lines 11-24; Col. 17, lines 24-28.) The GB Patent teaches minimizing, but not eliminating altogether, pre-vulcanization by using a "low temperature", which is defined "several degrees °C below ambient or room temperature (25°C)," which I understand to be about 22°C. (*See* GB Patent, Ex. A, Claim 1 and p. 5, lines 14-21.)

66.     So this all begs the question, how much pre-vulcanization is required in order to satisfy the claim limitations in the Patents-in-Suit? Clearly the degree of pre-vulcanization in the GB Patent is not enough. It has to be more than that. And, because the degree of pre-vulcanization has to be balanced with the degree of post-vulcanization or curing (*i.e.*, you have to have just the right amount of both types of vulcanization to get the desired results), there must be some upper limit of pre-vulcanization after which there is too much pre-vulcanization.

67.     However, the claims at issue in the Patents-in-Suit do not specify any upper or lower limits of the degree of pre-vulcanization to be used, which renders the scope of the claims uncertain. Moreover, because the claims also do not disclose the degree of post-vulcanization or

curing, it is impossible to determine how to balance the two types of pre-vulcanization as taught

in the Patents-in-Suit.  This is made all the more problematic by the fact that the only method

disclosed in the Patents-in-Suit to monitor the degree of pre-vulcanization is the isopropanol

index test, which as discussed above is a subjective test.  While there are other ways to monitor

the degree of pre-vulcanization known in the art, none of them are taught to be used in the

Patents-in-Suit, and even if they were, I know from my personal experience that the results

would depend entirely on which method was used.

68.     As such, when read in view of the specification as well as the prosecution history,

the claims at issue in the Patents-in-Suit leave open to subjective interpretation what would and

would not constitute pre-vulcanized particles within the meaning of the claims.  Thus, this claim

limitation does not inform, with reasonable certainty, those skilled in the art about the scope of

the invention.

*"the intra-polyisoprene particle crosslinks and inter-polyisoprene
particle crosslinks are substantially uniform"*

*"wherein the intra-polyisoprene particle crosslinks
and the inter-polyisoprene particle crosslinks are
substantially uniformly distributed among and
between the synthetic polyisoprene particles"*

69.     Claim 1 in the '412 Patent and Claim 1 in the '719 Patent require that "the intra-

polyisoprene particle crosslinks and inter-polyisoprene particle crosslinks are substantially

uniform."  Claim 1 in the '029 Patent similarly requires that "the intra-polyisoprene particle

crosslinks and the inter-polyisoprene particle crosslinks are substantially uniformly distributed

among and between the synthetic polyisoprene particles."

70.     As noted above, crosslinks cannot be seen no matter how powerful a microscope

is used.  They are simply too small.  That being the case there is no way to count the number of

crosslinks from one location to the next in a polyisoprene film.  That is likely why the Patents-in-

Suit rely on osmium tetroxide stained samples (such as the one shown in Figure 1) as the way to determine whether or not the crosslinks are "substantially uniform" or "substantially uniformly distributed" in the film.

71.    However, as discussed in detail above in Paragraphs 46 to 56, using an osmium tetroxide stained sample (such as the one shown in Figure 1) is a wholly subjective exercise without any objective guideposts.

72.    For one thing, the osmium tetroxide does not stain the crosslinks.   Instead, it stains the carbon-carbon double bonds in the polyisoprene chains.  The Patents-in-Suit use this as some undefined proxy for the level of crosslinking in the film, but it is unclear from the specification in the Patents-in-Suit what the relationship is or why it is believed to represent the degree of crosslinking.

73.    Moreover, as shown in Figure 1, an osmium tetroxide stained sample will have many polystyrene white blobs that represent areas of low crosslink density in the inter-particle region, which necessarily means that the crosslinking in those area is not uniform with other areas in the film.  This leaves open the question, how many such areas are allowed before the crosslinks are no longer considered to be uniform.  The Patents-in-Suit do not say.

74.    But most importantly, looking at a magnified image of an osmium tetroxide stained sample (such as Figure 1) to determine if the staining appears uniform from one location to the next requires the person looking to make an entirely subjective judgment based on the image, which could look different depending on the brightness and contrast levels used.   The Patents-in-Suit offer no guideposts that would allow that determination to be made objectively, which means that there is no way to make an objective determination as to claim scope. (*See* Narasimhan Dep. Tr., p. 183, line 18 to p. 184, line 1 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

██████████████████████ *see also* p. 209, lines 9-16 ███████████████████████████

███████████████████████████████████████████████████████████████████████████████

In fact, Dr. Narasimhan ████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

████████████████████████████████ (*See id.*, at p. 186, lines 5-24, p. 209, line 20 to p.

210, line 18.)  And, as Dr. Lucas acknowledged, ███████████████████████████████

███████████████████████████████████████████ (*See* Lucas Dep. Tr., p.

129, lines 8-14.)

75.    In addition, the use of the term "substantially" adds a further degree of subjectivity to the claims.  How uniform does something have to be to be "substantially" uniform?  While the Patents-in-Suit indicate that "under transmission electron microscopy (TEM) [the claimed article has] a uniform distribution of dark stains with a deviation of less than about 5% difference from one location to another within the TEM micrograph" (*see* '412 Patent, Col. 17, lines 20-22), the inventors ███████████████████████████████████ it (*see* Narasimhan Dep. Tr., p. 211, line 17 to p. 213, line 17), and the 5% indicated only what was uniform, not what would be considered "substantially" uniform.  Thus, even if the percentage were anything more than a guesstimate, it still is unclear what would and would not be "substantially" uniform.  Would a 5.5% variation be substantially uniform?  What about 6%, or 7%.  The Patents-in-Suit do not say, and thus the scope of the claims at issue is left open to subjective interpretation.  Indeed, as Dr. Narasimhan ██████████████████████████████

████████████████████████████████████████████████ (*See id.*, at p. 215, line 20 to p. 216, line 5.)

76.    Indeed, it is noteworthy that during the prosecution of the European counterpart to

the Patents-in-Suit, the European patent office rejected the claims that included the term "substantially uniform" as lacking clarity (which is analogous to indefiniteness under U.S. patent law), and the inventors attempted to overcome the rejection by deleting the term "substantially" from the claims. (*See* EU Office Action dated 10/07/2011, p. 3, attached hereto as Ex. E; EU Office Action Response dated 02/22/2012, p. 1-2, attached hereto as Ex. F.)

77.     To the extent it is suggested that this limitation can be alternatively determined by looking at the fracture surfaces of articles broken/burst at liquid nitrogen temperature or room temperature (such as in Figures 2 and 5), as discussed above in Paragraphs 57 to 59, those too would be entirely subjective exercises. With respect to Figure 5, the most the Patents-in-Suit suggests is that the explanation for the purported lack of visible particle features can narrowed down to one of two possibilities, either "approximately equal strength" inter and intra particle regions, "**or**" "nearly" equal crosslinking in those regions. Even if "nearly" equal crosslinking was somehow the same thing as "substantially uniform" crosslinking, which is far from clear from the inventors description in the specification, and even it were clear where "nearly" begins and ends, the fact that it is described in the specification as an either or explanation means that nothing certain can be determined from looking at those types of figure. Further, with respect to both types of figures, as Dr. Narasimhan ███████████████████████████████ ███████████████████████████████████████████████████████████████ (*See* Narasimhan Dep. Tr., p. 270, line 1 to p. 271, line 11.) And, as I noted above, with respect to conchoidal fractures, as Dr. Narasimhan acknowledged, ████████████████████ ██████████████████████████████ (*See id.*, at p. 234, lines 15-19.) Thus, to the extent these fracture surfaces are suggested as alternatives to using Figure 1, they too lack any guideposts that would allow a person of ordinary skill in the art to make an

objective determination as to claim scope.

78.     Further, the fact that there could be multiple ways to test for substantial uniformity is another reason why the scope of the claims at issue is unclear because using the different tests could lead to inconsistent results. For example, given my experience with these techniques, I would fully expect that it would often be the case that a SEM of a fracture surface of an synthetic polyisoprene article fractured at liquid nitrogen temperature (such as in Figure 2) could exhibit a conchoidal or shell-like shape while at the same time a TEM of an osmium tetroxide stained sample of the same article (such as in Figure 1) would **not** have uniform staining throughout the image. Indeed, Dr. Narasimhan seems to think that ████████████ ████████████████████████████████████████████████████████████████ ████████████ (*See* Narasimhan Dep. Tr., p. 234, line 1 to p. 235, line 3.) This would mean that there is no correlation between a conchoidal fracture and substantial uniformity such that they would be seen even where a TEM of an osmium tetroxide stained sample of the same article (such as in Figure 1) did **not** have uniform staining. In other words, there would be **inconsistent** results if one were to follow the teachings in the Patents-in-Suit, which means the scope of the claims is unclear.

79.     For these reasons, these claim limitations do not inform, with reasonable certainty, those skilled in the art about the scope of the invention.

### *"uniformity of isoprene double bonds"*

80.     Claim 8 in the '412 Patent and Claim 16 in the '719 Patent require that a TEM of an osmium tetroxide treated sample (such as Figure 1) show a "uniformity of double bonds" in the claimed article.

81.     For all the reasons stated above, there simply is no way to objectively determine

whether this limitation is met.  It requires a visual inspection of an osmium tetroxide treated sample (such as Figure 1) and the subjective determination as to whether the staining in the sample is uniform from one location to the next.  Yet, the Patents-in-Suit offer no objective guideposts for making this determination, and thus the scope of the claims at issue is left entirely to the subjective judgment of the person looking at the TEM.

82.     For these reasons, this claim limitation does not inform, with reasonable certainty, those skilled in the art about the scope of the invention.

### *"osmium tetroxide staining"*

83.     Claim 2 in the '029 Patent explicitly provides that the "substantial uniformity" can be determined using "osmium tetroxide staining" such as is shown in Figure 1.  For all the reasons stated above in connection with the subjective nature of that evaluation, this claim limitation does not inform, with reasonable certainty, those skilled in the art about the scope of the invention.

### *"substantially conchoidal fracture"*

84.     Claim 3 in the '412 Patent, Claims 1 and 8 in the '719 Patent, and Claims 2 and 8 in the '029 Patent require that the claimed article exhibits a "substantially conchoidal facture when fractured at liquid nitrogen temperature."

85.     This scope of this claim limitation is unclear for at least two reasons.

86.     First, the inclusion of the word substantially introduces a level of degree in the claim that makes it impossible for a person of ordinary skill in the art to understand the bounds of the claim.  How conchoidal does the fracture have to be in order for it to be substantially conchoidal?  The patent does not explain this and offers no objective guideposts to make that determination on an objective basis.

87.    Second, a person of ordinary skill in the art reading this limitation in the context

of the disclosure in the specification would understand it to be referring to a fracture surface that

looks similar to the fracture surface in Figure 2 shown below.

**Fig. 2**



88.    But determining whether or not such an image evidences a fracture surface that is

substantially conchoidal depends solely on the unrestrained subjective opinion of the person

evaluating the figure.  For example, the figure below is from Ansell's infringement contentions

in this case.



An SEM micrograph of a sample of the Accused Condom when fractured at liquid nitrogen temperature shows a substantially conchoidal fracture:

20 µm

EHT = 5.00 kV
WD = 10.0 mm

Signal A = HE-SE2
Column Mode = Depth of Field

The conchoidal features (characterized by shell-like convexities and concavities) are illustrated by the dotted line in the inset portion of the image.

89.     This figure looks nothing like Figure 2, which has clean fracture surface that exhibits smooth curved cleaves in the material.  Moreover, the surface that is identified as being conchoidal in shape only extends over a small portion of the fracture surface.  So the question is, does this figure show a substantially conchoidal fracture surface?  Ansell seems to think so. Whereas, I don't think this figure looks anything like a conchoidal fracture surface.  But, what is clear is that my view of this figure and Ansell's view is based entirely on our own subjective review of the figure.  And that's the problem with the limitation.  It is entirely subjective, there are no objective guideposts, and a person of ordinary skill in the art could not possibly know the objective limits of the claim.

90.     For these reasons, this claim limitation does not inform, with reasonable certainty, those skilled in the art about the scope of the invention.

- 34 -

*"wherein the intra-polyisoprene particle crosslinks*
*and inter-polyisoprene particle crosslinks*
*are such that the molecular weight is less*
*than about [X] g/mol between the crosslinks"*

91.     This limitation is present in Claims 1 and 5 of the '027 Patent.  A person of ordinary skill in the art reading these claims in view of the disclosure in the specification would understand that the this claim limitation is directed to the molecular weight calculation disclosed in the '412 Patent at Col. 15, line 21 to Col. 16, line 41.

92.     Despite this, the scope of this limitation (and hence the claims within which it appears) is unclear.  As Dr. Lucas acknowledged, ██████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████  (*See* Lucas Dep. Tr., p. 186, line 13 to p. 187, line 6; p. 195, line 20 to p. 198, line 19.)  This lack of disclosure and inaccuracy is exacerbated by the fact that the claim limitation modifies the stated molecular weight with the term "about", which as a term of approximation that blurs the metes and bounds of the claim.

93.     For example, Claim 1 of the '027 Patent requires that "the intra-polyisoprene particle crosslinks and inter-polyisoprene particle crosslinks are such that the molecular weight is less than about 8000 g/mol between the crosslinks."  Since the test in the specification has an undisclosed margin of error and is not "super accurate," the claim limitation's use of the terms "about" begs the question, how far above 8000 g/mol can the molecular weight be before it is too high to meet the claim limitation?  Table 7 in the specification and the accompanying discussion both appear to suggest that the 8955 g/mol calculated for the Durex product made in accordance with the GB Patent is too high.  But, what about 8100, would that still be less than about 8000 g/mol?  What about 8200 g/mol.  The patent simply offers no guidance or objective guideposts to answer these questions in order to determine what is and is not less than about 8000 g/mol. (*See*

*also* Lucas Dep. Tr., p. 201, lines 15-22 ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████ And

because there is no accepted definition of "about" in this context in the art, the claim scope is not

defined in a way to allow a person of ordinary skill in the art to be able to determine what is

within the claims and what is not within the claims.

94.     For these reasons, this claim limitation does not inform, with reasonable certainty,

those skilled in the art about the scope of the invention.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of

the United States of America that the foregoing is true and correct.


Executed on December 30, 2016

_____

William D. Potter

- 36 -

# EXHIBIT B

HIGHLY CONFIDENTIAL

Page 1

1           UNITED STATES DISTRICT COURT
                 DISTRICT OF DELAWARE
2         CIVIL ACTION NO. 1:15-cv-00915-RGA

3

4

5    ANSELL HEALTHCARE PRODUCTS,:
     LLC,
6                              :      VIDEOTAPED
               Plaintiff,         DEPOSITION OF:
7                              :
          v.                      DAVE NARASIMHAN,
8                              :          PH.D.
     RECKITT BENCKISER LLC,
9                              :

               Defendants.
10   _____X
11
12           HIGHLY CONFIDENTIAL
13
14
15
16           TRANSCRIPT of testimony as taken by
17   and before SEVA FLICSTEIN, Certified Court
18   Reporter, Registered Merit Reporter,
19   Certified Realtime Reporter, at the offices
20   of Veritext Legal Solutions, located at
21   290 West Mount Pleasant Avenue, Livingston,
22   New Jersey, on Thursday, October 13, 2016,
23   commencing at 9:47 in the forenoon.
24

Cited pages

"Filed Under Seal"

# EXHIBIT C

## In The Matter Of:

*Ansell Healthcare Products, LLC v.*
*Reckitt Benckiser, LLC*

---

*David M. Lucas, Ph.D.*
*November 9, 2016*
*Highly Confidential - For Attorneys Eyes Only*

---

*Wilcox & Fetzer, Ltd.*
*1330 King Street*
*Wilmington, DE   19801*
*email: depos@wilfet.com, web: www.wilfet.com*
*phone:  302-655-0477, fax:  302-655-0497*



**WILCOX & FETZER LTD.**

Original File Ansell v. Reckitt Benckiser 11-09-16 depo of David Lucas, Ph.D HighlyConfidential..txt

Min-U-Script® with Word Index

Cited pages

"Filed Under Seal"

*Appendix VI*

# In The Matter Of:

*Ansell Healthcare Products, LLC v.*
*Reckitt Benckiser, LLC*

---

*David M. Lucas, Ph.D.*
*November 9, 2016*
*Highly Confidential - For Attorneys Eyes Only*

---

*Wilcox & Fetzer, Ltd.*
*1330 King Street*
*Wilmington, DE   19801*
*email: depos@wilfet.com, web: www.wilfet.com*
*phone:  302-655-0477, fax:  302-655-0497*



**WILCOX & FETZER LTD.**

Original File Ansell v. Reckitt Benckiser 11-09-16 depo of David Lucas, Ph.D HighlyConfidential..txt

Min-U-Script® with Word Index

Cited pages

"Filed Under Seal"