```
 1                  UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF DELAWARE

 3

 4      ANSELL HEALTHCARE PRODUCTS,  :   CA NO. 15-915-RGA

 5      LLC,                         :

 6                                   :

 7                 Plaintiff,        :

 8                                   :

 9           v.                      :   April 6, 2017

10                                   :

11      RECKITT BENCKISER, LLC,      :

12                                   :

13                 Defendant,        :   3:02 o'clock p.m.

14      .............................

15

16

17              TRANSCRIPT OF DISCOVERY DISPUTE

18          BEFORE THE HONORABLE RICHARD G. ANDREWS

19              UNITED STATES DISTRICT JUDGE

20

21

22      APPEARANCES:

23

24      For Plaintiff:     MORGAN, LEWIS & BOCKIUS

25                         BY:  COLM F. CONNOLLY, ESQ
```

1                           BY:  THOMAS B. KENWORTHY, ESQ

2

3

4    For Defendant:        YOUNG, CONAWAY, STARGATT & TAYLOR

5                           BY:  PILAR G. KRAMAN, ESQ

6                                   -and-

7                           BARCLAY DAMAN LLP

8                           BY:  DOUGLAS J. NASH, ESQ

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24   Court Reporter:        LEONARD A. DIBBS

25                           Official Court Reporter

P R O C E E D I N G S

(The proceedings occurred at 3:02 o'clock p.m. as follows:)

:02:21       THE COURT:  Good afternoon.  Please be seated.

This is <u>Ansell Healthcare Products v. Reckitt Benckiser</u>, Civil Action No. 16-915.

It seems like I know Ms. Kraman and Mr. Connolly all too well.  You all, all too well.

:02:42       So I read the letters, and I guess on the Interrogatory 1.  Let me just think about this for a second.  You're the defendant and you're the plaintiff?

MR. NASH:  Correct.

MR. KENWORTHY:  Correct.

:02:57       THE COURT:  And, so, on the interrogatories, the defendant has asked the plaintiff more or less, what do you see in these pictures, right?

MR. NASH:  Correct.

MR. KENWORTHY:  Yes.

:03:11       THE COURT:  Okay.  So you then give a bunch of answers in the interrogatories, or non-answers, then in your letter you had a bunch of explanations.

And I don't honestly I understand your explanations.

Hold on a minute.

:04:03       (Pause)

1    So your first answer, the question is, quote, "If you

2 contend that the image on Page 2 of Appendix C" blah, blah, blah

3 -- does not evidence, quote, "substantially uniform," unquote,

4 and/or, quote, "substantially uniform or distributed" unquote,

:04:20    5 inter-particle and intra-particle crosslinks," blah, blah, blah,

6 "explain why?"

7    And in your letter to me, the first thing you say, "The

8 predicate 'if' contentions are not ones that Ansell has made."

9    Are you saying, therefore, you do not contend that the

:04:38    10 image does not evidence substantially uniform or substantially

11 uniformly distributed inter-particle or intra-particle

12 crosslinks?

13    MR. KENWORTHY:  That's never been a contention we've

14 made.

:04:53    15    THE COURT:  Well, is it a contention that you do not

16 make?

17    MR. KENWORTHY:  We're not agreeing that it does, if we

18 put it the other way.

19    THE COURT:  Yeah, I wish you wouldn't do that.

:05:04    20    MR. KENWORTHY:  I'm sorry.

21    THE COURT:  It's just a question of me following when

22 we go from negative to double negative, et cetera.

23    MR. KENWORTHY:  We don't dispute that.  We're not

24 agreeing that we -- we're not agreeing with it, I guess, is

:05:17    25 certainly the case.

1    THE COURT:  Well, are you arguing that the picture, or,

2  I guess, it's a photograph -- hold on a second.

3    Let me ask the RB side here.

4    THE COURT:  The image on Page 2 of Appendix C, just

:05:49   5  remind me, what is that?

6    MR. NASH:  It's an osmium stained TEM image of one of

7  the prior art patents.

8    So what we did is, we followed the recipe in the prior

9  art patent.  We made a sample.  And then we prepared this image,

:06:05  10  which is a TEM image just like Figure 1 in the patent.

11    THE COURT:  And, so, that image, that's part of your

12  invalidity contentions or?

13    MR. NASH:  Correct.

14    THE COURT:  And just explain to me how it's part of

:06:17  15  your invalidity contentions?

16    MR. NASH:  It's our contention that the image shows

17  substantially uniform intra or inter-particle crosslinks.  And

18  specifically, what we said, is the crosslinks, the inside and

19  between the particle crosslinks are at least uniform as --

:06:37  20    THE COURT:  And you said that in your contentions?

21    MR. NASH:  We did.

22    THE COURT:  What you just told me?

23    Did he say that, what he just told me in the

24  contentions?

:06:45  25    MR. KENWORTHY:  Yes.

1          THE COURT:  And, so, do you disagree with that?

2          MR. KENWORTHY:  A couple of things, your Honor.

3          First of all, before we even got those -- the TEM.

4          When they indicated they intended to do, to recreate

:07:01    5  the product -- your Honor may recall back when we first had

6  challenges to each others preliminary contentions --

7          THE COURT:  Only vaguely.

8          MR. KENWORTHY:  Well, in any event, we had a period of

9  time that they extended out to amend their contentions three

:07:16   10  months to do this testing.

11          When we were aware of the testing was going to happen,

12  obviously, to make judgments about the testing, it's not just

13  what you see in a picture.

14          We asked for all of the documents -- for the documents

:07:31   15  that showed how this recreation was made.

16          THE COURT:  Well, and so, that kind of gets to your

17  second point.

18          You could answer, we can't tell from looking at the

19  picture whether it does or does not show this.

:07:44   20          MR. KENWORTHY:  Yes, we could say that.

21          THE COURT:  Okay.  Well, why don't you say that?

22  Doesn't that resolve the matter?

23          MR. KENWORTHY:  I guess it's a function -- I guess

24  where our peak came a little bit is, this is not as if -- when

:07:59   25  we asked for the stuff, not only didn't we get it, they

1    reasonably didn't get it.

2          They said, that's work product.  We may not even rely

3    on this.

4          THE COURT:  Well, right, but now they've shown you a

:08:11    5    picture which they're saying shows something, and they're

6    asking, do you agree that it shows something?

7          And you're saying, we can't tell.

8          So why don't you just answer, we can't tell?

9          MR. KENWORTHY:  I could do that.

:08:23    10          THE COURT:  Would that satisfy you?

11          MR. NASH:  I would like to know why.  I would like to

12    know what's deficient about it.

13          THE COURT:  Well --

14          MR. NASH:  It's the why.

:08:29    15          THE COURT:  -- is that what you asked in the --

16          MR. KENWORTHY:  There is a why part.

17          MR. NASH:  The why is the main part of the

18    interrogatory, your Honor.

19          And here's the issue.  The issue is from our

:08:36    20    perspective, the reason we asked the question.

21          THE COURT:  I think I can guess, but go ahead and tell

22    me.

23          MR. NASH:  That's dangerous, but I'll try.

24          THE COURT:  No, no, I'm sorry.  It's more dangerous for

:08:46    25    me, because I'll probably guess wrong.

1    So, you go ahead and I'll just smile yes, that's what I

2    am.

3    MR. NASH:  Well, it goes back to one of the points that

4    was a big topic of discussion at the Markman.  You know, what is

:08:57    5    and is not substantially uniform is a big issue in this case.

6    It was basis of our indefinite argument, which your Honor

7    declined to decide at this point in the case.

8    So understanding what is and is not substantially

9    uniform is important, because we're trying to figure out is this

:09:15    10    claim definite or not. And, so, if he says, I can't tell, I

11    guess I'd like to know why he can't tell.  That's all.

12    THE COURT:  Right.

13    Why can't you tell?

14    MR. KENWORTHY:  It's not just based on looking at a

:09:31    15    picture.  They say it's an osmium stain.  We have nothing that

16    says that.

17    THE COURT:  So that's why, we can't tell looking at the

18    picture that it's not an osmium stain.

19    MR. KENWORTHY:  We can give a lot of reasons.

:09:43    20    THE COURT:  Okay.  So why don't you do that?

21    You give -- I guess it says why, so I guess you should

22    give all the reasons you have.

23    Doesn't that resolve that issue?

24    MR. NASH:  I think so.  I would like to see what the

:09:58    25    response is, of course, your Honor, but that doesn't -- I mean,

1    I think that's a lot of progress on this issue.  Hopefully it

2    resolves it entirely.

3              THE COURT:  Okay.  Well, in any event, how long would

4    you like to amend your answer?

:10:10    5              MR. KENWORTHY:  A couple of weeks.

6              THE COURT:  Two weeks?

7              MR. KENWORTHY:  We can do that.

8              THE COURT:  Okay.

9              MR. KENWORTHY:  Just very briefly.  Part of my concern

:10:17   10    is, this is an expert issue.  And more concerning is, they

11    haven't committed to this picture.

12              In other words --

13              THE COURT:  Well, they've got a contention that says

14    this picture shows something about the prior art, right?

:10:32   15              MR. KENWORTHY:  Correct.

16              THE COURT:  What exactly is the commitment do they need

17    to make?

18              MR. KENWORTHY:  Well, it seems to me that if we have

19    asked -- well, and I can put this in my responses -- but we've

:10:43   20    gotten no information about this product, how it was made,

21    anything about it.  And I can put that in my answer, but we

22    asked for that well before they ever made these contentions.

23              THE COURT:  Well, and that may be a separate thing, but

24    --

:10:55   25              MR. KENWORTHY:  I'll put it in.  I understand, your

1    Honor.

2            THE COURT:  Give me the thing that -- you know, it just

3    seems to me that my understanding of it is, the picture they say

4    it shows something, and your response is, no, it doesn't,

:11:23   5    because of X, Y, Z, whatever X, Y, Z might be.

6            MR. KENWORTHY:  Fine.

7            THE COURT:  And if you want to throw in some other

8    stuff, sure.

9            MR. KENWORTHY:  Sure.  It's always difficult to say,

:11:33   10   prove a negative.  But I can say why we don't have enough

11   information.  And I'll deal with it the best I can, and respond.

12   If they don't like it I'm sure they'll --

13           THE COURT:  Yeah, I'm sure they will, too.

14           MR. KENWORTHY:  -- get back in touch with us.

:11:43   15   THE COURT:  Okay.  So let's turn to --

16           MS. KRAMAN:  Your Honor --

17           MR. CONNOLLY:   Your Honor said that they are

18   contending it shows that.

19           And I just -- is that -- could we ask the defendant to

:11:55   20   confirm that they are saying that, as opposed to conditionally

21   if -- if our side contends it?

22           MR. NASH:  What the actual contention is, and it's in

23   Exhibit A.  It says, the staining of inter and intra-particle

24   regions show at least as much uniformity as does the TEM

:12:14   25   micrograph of the accused product that appears in Ansell's

1    fourth amended initial claim charted and/or the TEM micrograph

2    that appears as Figure 1 in the asserted patents.

3         So what we're saying is, that the staining, which is

4    what the patent says, represents the uniformity of the

:12:32   5    crosslinking, is as least as uniform as the figure in your

6    contentions that you say shows substantially uniform

7    crosslinking, and the figure in the patent, which discusses

8    substantially uniform crosslinking.

9         So it's a long answer.  But, I mean, that's what we

:12:48   10   said, and it's not at all ambiguous as to what our contention

11   is.

12        MR. KENWORTHY:  That's not what your interrogatory

13   asked, though.

14        MR. NASH:  Our interrogatory asked essentially what's

:12:56   15   your contention?  What do you think it shows?

16        I mean, the Judge started out the discussion correctly

17   stating essentially what we're asking is, what do you think it

18   shows, and if you disagree with us, state why?

19        MR. KENWORTHY:  It didn't say what it shows.

:13:09   20        You said, do you contend X?

21        You know, if not, why?

22        MR. NASH:  Okay.

23        MR. KENWORTHY:  We'll respond.

24        THE COURT:  Okay.  All right.

:13:17   25        So let's go to the Request for Admission, which seem to

1    me to be slightly more difficult to resolve.

2           So RB --

3           MR. NASH:  Yes.

4           THE COURT:  -- so you answered to this interrogatory

:13:38    5    about intra-particle and inter-particle crosslinks 11 months ago

6    or a year ago, or a long time ago, yes.

7           And it is the exact same language that appears in Claim

8    1 of at least one of the patents, and maybe for all I know, all

9    of the patents.

:14:00    10          Now, way later, we said yes and we meant no.

11          Actually, that's not fair, because you're not saying,

12   we meant no.  You don't actually say why.  You said yes before,

13   other than your expert now says no?

14          MR. NASH:  Well, I can answer the question as to why --

:14:24    15   what we thought we were admitting.

16          It was in February of 2016, very early in the case, and

17   the case was filed in October, that discovery had just kicked

18   off.  Our understanding of the patents was pretty new.

19          What we thought we were admitting was that in the

:14:45    20   accused product both inter and intra-particle crosslinks were

21   present.  That's what we thought we were admitting.

22          What we've learned very recently is that that -- that

23   we actually by saying admitted, we actually admitted more than

24   that.  What we admitted, because the way --

:15:04    25          THE COURT:  Because it says the word "bonded."

1          MR. NASH:  Bonded.  And that's the problem that our

2    expert pointed out to us when we were talking to them very --we

3    learned of this issue in talking with our expert on March 21st.

4          We raised it with Ansell on March 23rd.

:15:24    5          And we met and conferred on it a week later, and we

6    raised it with the Court the same day.

7          So, as soon as we learned of the issue, we raised it,

8    and the issue is, as articulated in the papers, what was wrong

9    about our admission is that it's not just that they're both

:15:41   10    present, it's that the individual particles are bonded by both.

11          THE COURT:  Right.  I looked at, I guess, Dr. Potter's

12    -- he's your expert?

13          MR. NASH:  No, he's our expert.

14          THE COURT:  He's your guy, yes.

:15:57   15          I looked at his Declaration, and I saw him saying not

16    scientifically possible.  That's his opinion.

17          And I'm just kind of wondering, are you telling me he's

18    the first one to read the admission or the claim, and to notice

19    that the word "bonded" was there?

:16:23   20          MR. NASH:  No, I think what happened is that, these

21    admissions get served in February.  We admit what we thought we

22    admitted.  And, quite frankly, I never thought again about these

23    admissions until the Markman Hearing when Mr. Kenworthy

24    referenced them in his portion of the briefing.

:16:43   25          And it's partly that that provoked me to go back and

1    take a look at this, because what's happened in the interim is

2    that I've learned a lot more about the bonding issue, and the

3    role of the two different types of crosslinks.

4         And it was because of that, you know, in preparing for

:17:02    5    expert discovery, we're talking with Dr. Potter, and he says

6    that's not possible, because the intra can't bond one particle

7    to the next, because it's entirely inside the particle, because

8    the way it's written, is not technically possible.

9         I had an oh, my gosh moment at that point.  I had

:17:27   10    remembered that this admission from the Markman briefing, which

11    was in December, and that's when we raised the issue, is that we

12    admitted more back in February of '16 than we thought we were

13    admitting.

14         And, as it turns out, if you apply the full scope of

:17:42   15    what we admitted, according to Dr. Potter at least, it's

16    factually inaccurate, and we just learned that.

17         THE COURT:  Even though one would think, though, Ansell

18    did not provide any Declaration or Affidavit, and, of course,

19    they only had 24 hours after you filed your letter, although, I

:18:09   20    suppose you've been talking about it a for a week, and I don't

21    fault them for that.  And, of course, to some extent, I didn't

22    really go back and look at it, but since that is the way the

23    claims are drawn, presumably, Ansell's people, or whoever

24    invented the patents, didn't think it was scientifically

:18:25   25    impossible, or they wouldn't have been claiming it, right?

1         MR. NASH:  I assume they have an argument as to why Dr.

2    Potter is wrong.  I don't know what that is.  They didn't

3    mention it when we met and conferred.

4         That's fine.  I don't fault them either.  I understand

:18:38   5    it was a short period of time, but I'm assume that they're going

6    to come up with an argument.

7         It's just that the evidence of the record at the

8    moment, at the moment, understanding that it can change when

9    they put in their expert, the evidence of record conflicts with

:18:51  10    what we admitted.

11         And that is a basis under the first prong of Rule 36 to

12    withdraw the admission.  The other prong is prejudice.

13         But where the evidence of record conflicts with the

14    admission, it promotes the interest of getting to the facts, of

:19:10  15    getting to the truth, to allow the admission to be withdrawn,

16    and force them to prove it.

17         I assume they're going to come up with something.  I

18    do.

19         THE COURT:  All right.

:19:24  20         I'll give you a little more chance to talk down the

21    road.

22         Mr. Kenworthy, do you have anything to say about what

23    Mr. Nash has said so far?

24         MR. KENWORTHY:  I sure do.

:19:36  25         For one, we've gotten no evidence about any of this, of

1    why they've -- no evidence whatsoever about what they were

2    thinking back in January, whatsoever.

3         What we do know, though, of record is that when we

4    served these admissions on the 26th of January, the next

:19:57    5    day-and-a-half, they have the exact same claim terms in

6    Australia.  They write to Ansell asking to withdraw a number of

7    admissions that were part of the set of admissions.

8         And we've attached the letter of their counsel --

9         THE COURT:  Yeah, I saw it.

:20:16    10        MR. KENWORTHY:  -- where they pointed out that they had

11   discussed those issues extensively with the very same Dr.

12   Potter.

13        And having discussed extensively the admissions that

14   they've admitted in Australia, which included this very same

:20:31    15   admission, they then sought leave to withdraw a number of

16   admissions.

17        One of the ones they sought to withdraw wasn't this

18   one.

19        This claim term is not hard to understand.  It says

:20:48    20   they're bonded, that the particles are bonded through intra and

21   inter-particles.

22        It's very, very clear.  It's not ambiguous.

23        At one stage they claim -- they ultimately agreed when

24   we briefed it, it didn't require claim construction.  They

:21:03    25   ultimately agreed it wasn't indefinite.  And that was the only

17

| | |
|---|---|
| 1 | qualifier to their admission was, if it is broad enough, if it's |
| 2 | construed broad enough.  Ultimately, they said it doesn't even |
| 3 | need to be construed. |
| 4 | We've been dealing with this -- with that admission, |
| 5 | and in the face of them talking with Dr. Potter. |
| 6 | THE COURT:  I'm sorry, can I say something? |
| 7 | MR. KENWORTHY:  Sure. |
| 8 | THE COURT:  There seemed to be some reference to Dr. |
| 9 | Potter being deposed in the future, but there also seems to be |
| 10 | some reference to Dr. Potter having already been deposed. |
| 11 | MR. KENWORTHY:  He was already deposed, yes. |
| 12 | THE COURT:  Was he scheduled just in the normal course |
| 13 | of events for a second deposition? |
| 14 | MR. KENWORTHY:  He was deposed, because he gave an |
| 15 | Affidavit in support of claim construction. |
| 16 | THE COURT:  Oh, oh, oh, okay. |
| 17 | MR. NASH:  Well, we're using him again in connection |
| 18 | with a couple issues, including this one in terms enablement. |
| 19 | So Dr. Potter is going to issue a report in this case |
| 20 | that addresses not the infringement issue, which is what the |
| 21 | admission deals with, but the issue of the impossibility of how |
| 22 | that affects enablement.  And he's going to be produced for |
| 23 | deposition on that. |
| 24 | They're going to be able to ask him whatever they want. |
| 25 | THE COURT:  Okay.  I hadn't understood why the person |

:21:19  (line 5)
:21:34  (line 10)
:21:45  (line 15)
:22:03  (line 20)
:22:18  (line 25)

1    was having two depositions, and now I do.

2           So, Mr. Kenworthy, I'm sorry I interrupted.

3           MR. KENWORTHY:  No problem.

4           But, as far as whether or not these features are found

5    in their product, as I say, not only is there no evidence of

6    what their thinking was at all, or why they did it.  They did it

7    not only here, they did it in Australia.  They talked with Dr.

8    Potter about withdrawing admissions.  They dealt with this issue

9    in claim construction for months.

10          Not until after the close of discovery, after the

11   Court's claim construction ruling, did they even raise any of

12   this.

13          THE COURT:  And I went back to look -- and maybe what

14   Mr. Nash says is the explanation.  I looked, because there

15   didn't seem to be anything that I did in claim construction that

16   would have triggered this.

17          MR. NASH:  What triggered it, your Honor, was, what you

18   did in claim construction did cause us to amend a different

19   portion of our invalidity contentions.  And it was in the

20   context of doing that that I noted I needed to talk to Dr.

21   Potter about this.

22          And that's why, you see what -- the schedule of events

23   of what happened in the chronology was, we served our amended

24   contentions on the 20th.  On the 21st I spoke to Potter.  Then I

25   talked to him again on the 22nd.  And on the 23rd we raised the

1    issue with Ansell.

2          So, you know, there is a chain of events here that does

3    start with the Markman, that brought the issue to the fore, at

4    least in my mind, and caused me to get some advice from my

5    expert.

6          I think your Honor is right.  There is nothing in your

7    decision that directly impacts this issue.

8          MR. KENWORTHY:  Let me put it a little differently.

9          THE COURT:  So, Mr. Kenworthy, you have more?

10         MR. KENWORTHY:  Yes, there is much more to this story

11   than just that.

12         As we went through claim construction on this very

13   term -- and your Honor may recall at the Markman Hearing I

14   started -- I wanted to start off with this term to address that,

15   and your Honor said, well, Mr. Kenworthy isn't the last thing in

16   the brief their statement that they don't believe it needs to be

17   construed, and they're not now claiming that it's indefinite.

18         And that was conceded.  And it took us through all the

19   briefing to ever get there until the Markman Hearing.

20         So the Markman Hearing comes.  It's established that

21   they aren't contending it needs construction, and they aren't

22   contending it's indefinite.

23         Two days after the Court's Claim Construction Order,

24   they served the third amended invalidity contentions, which now

25   again say that this term is indefinite.

1    The very one that we went through a hearing, briefing,

2    and a concession.  We met and -- I had to meet-and-confer on

3    that, because they wouldn't withdraw it.  So we still have them

4    contending that it's indefinite.

:25:32    5    THE COURT:  Wait a second.

6    It seems like you're bringing up -- I'm not sure why

7    you're telling me this, because this isn't part of what -- is

8    this part of what we're here to talk about today?

9    MR. KENWORTHY:  It's this term, which they -- they

:25:47    10    brought up the whole issue of claim construction with respect to

11    this term.

12    We've been dealing with this term and what it was that

13    caused them to change positions.  And it was only after, only

14    after we raised the issue with them now reasserting

:26:03    15    indefiniteness, only after that, that they then say, oh, now we

16    want to withdraw that admission that we had relied on in

17    opposing their indefiniteness.

18    That was for the very first time.

19    This they consulted on.  For 13 months throughout

:26:21    20    discovery, when all the depositions, they had been counseled.

21    They had counseled decision not only through lawyers, but with

22    consultation with Dr. Potter, who was available to them with

23    respect to this.

24    And I think -- you know, obviously we can't -- but I

:26:37    25    think it's important to look to how the Third Circuit talks

1    about Rule 36 admissions.

2        And Judge Schwartz quoted that in the <u>Coca-Cola</u> case

3    that we cited.

4        I'll just read a portion.  I think it's important.

5        "A judicial admission deliberately crafted by counsel

6    for the expressed purpose of limiting and defining the facts in

7    issue.  This is traditionally regarded as conclusive, and an

8    admission under Rule 36 falls in this category.

9        "Further, an admission is a, quote, 'studied response'

10   made under sanctions against easy denial.  It is made under the

11   direction and supervision of counsel who has full professional

12   realization of their significance.

13       Thus, an admission is not merely another layer of

14   evidence upon which the District Court can superimpose its own

15   assessment of weight and validity, but rather an unassailable

16   statement of facts that that narrows the triable issues."

17       When we served that admission, they had an obligation

18   to fully consider it, what it meant, and make a judgment,

19   whether they were going to admit it or deny it.

20       They have given us no rationale by evidence as to

21   what --

22       THE COURT:  Well, I think the rationale they've given,

23   and, Mr. Nash, you tell me if you're -- if I've got it wrong is,

24   error?

25       MR. KENWORTHY:  They say error that we didn't

1    understand what bonded meant?

2              THE COURT:  What I gathered from him is, because I

3    don't think he'd say he doesn't understand what bonded meant.

4    What he actually did say was, I didn't understand the

5    significance of the whole.

6              MR. KENWORTHY:  Well, I don't know.  I don't accept it.

7    He's the only one.  His client is the one that is making the

8    judgment.

9              We haven't gotten anything from Dr. Potter about what

10   he consulted with on this subject.  We have got nothing of that.

11   We have sat here for 13 months with this established fact.

12             THE COURT:  Right.  No, that much I get.

13             MR. KENWORTHY:  And not to belabor it --

14             THE COURT:  Well, no, no, no.  I mean, don't --

15   sometimes I may appear as I'm running out of patience, but

16   notwithstanding that, I do have patience for this, okay?

17             MR. KENWORTHY:  I get that part.  I think the other

18   part, though, that is particularly important is what's the

19   standard of the first prong is.

20             THE COURT:  Yeah.

21             MR. KENWORTHY:  That to me is a very important one and

22   we pointed that out.  And I do want to apologize for an error in

23   our brief.  I did bring it to the attention of counsel.

24             We substituted out a case when we were doing it.  And

25   we had Id.  The very first Id is at the top of Page 3.

:28:21
:28:38
:28:53
:29:05
:29:24

23

 1          THE COURT:  Let me just -- yeah, I see the Id.

 2          MR. KENWORTHY:  And it should have been, because it

 3     goes back to the - a case that we substituted in from the

 4     District of Columbia.

 5          It actually should have been Baker v. Potter.  And I

 6     actually, as I've said, I've given copies earlier.

 7          But it's very significant to this standard.  And we set

 8     forth the standard from both the Ninth Circuit and the Third

 9     Circuit has applied Ninth Circuit Rule 36 law in the Gwynn case.

10          But it makes clear that it's not -- to satisfy the

11     first element, the admissions must practically eliminate the

12     presentation of the merits, because --

13          THE COURT:  And, I'm sorry, where are you reading from?

14          MR. KENWORTHY:  I think we've cited that in this case.

15          THE COURT:  Baker v. Potter.

16          MR. KENWORTHY:  Oh, Baker v. Potter.

17          If you look, your Honor, at Page 5 of the Westlaw pages

18     --

19          THE COURT:  Yeah, yeah, it's just easier for me to

20     follow along if I'm listening while you're talking or reading.

21          MR. KENWORTHY:  It's 13, but it's 13 of the FRD page.

22          THE COURT:  Okay.  And what are you saying that you

23     were about to -- I see the start --

24          MR. KENWORTHY:  In the right column.

25          THE COURT:  Thank you.

:29:46 (line 5)
:30:07 (line 10)
:30:30 (line 15)
:30:42 (line 20)
:30:54 (line 25)

MR. KENWORTHY:   In applying the first prong of the
36(b) test, "The Court concludes that withdrawal of the
admissions would not subserve the presentation of the merits of
this case.   Courts' specific have interpreted this prong as
satisfied if the admission effectively would not bar the parties
from presenting its case on the merits."

And then, turning to the next page, right after where
the second paragraph at Headnote 5 it says, "with these" -- it
talks about the admission going to establishing one element.

And it says, "With these admissions in hand, the
plaintiff need not prove the first element of a prima facie
case, but as the defendant itself notes, these admissions do not
mean that the plaintiff is a qualified individual with
disability."

And starting in the next paragraph, "Given the
remaining hurdles faced by Ms. Baker, the postal service cannot
demonstrate that defendant's admissions effectively bar, negate,
or practically eliminate its case on the merits."

This particular element, which would have to approve,
is one element.   They still -- we have other elements that we
have to prove, which they contest.   It does not satisfy.   The
test, the first prong of 36(b), because it doesn't bar them from
defending infringement.

And every case that they cite, the three cases they
cite, for one, the nature of those admissions were substantially

1    different.  They weren't admitting to a fact that is

2    ascertainable, that 13 months later they're now trying to

3    change.

4        Those three cases dealt with circumstances where they

:32:40      5    admitted they didn't have any evidence to prove something, or we

6    didn't have documents to prove something.

7        Not a fact, but as something that particularly in the

8    Altman case they highlighted was conditional, but given time

9    they didn't have facts.  It was not calculated, counseled,

:33:02     10    considered decision that a particular fact was true.  And more

11    importantly, in all of those cases, if those admissions were not

12    withdrawn, and in Altman case they denied the motion, because it

13    was moot, but if they weren't, they wouldn't be able to present

14    their defense.

:33:21     15        That's the standard.  And they haven't cited a case

16    that the situation here, where even if the admission is not

17    allowed to be withdrawn, we still have hurdles to overcome to

18    prove the case.

19        And, as I say, beyond that they haven't done anything

:33:40     20    to explain why they haven't been diligently looking at this over

21    13 months.

22        THE COURT:  All right.

23        So why don't you address the prejudice thing, too.  I

24    saw your Declaration with a list of about five things that you

:33:51     25    didn't do, because there was no reason to do them.

1          Just for the sake of argument, let's say that I let

2     them go the other way, what would you need to do in terms of

3     fact discovery?

4          MR. KENWORTHY:  Well, we would want to know from what

:34:19     5     their fact people know about the characteristics of their

6     product, and that's the manufacturers in Thailand.

7          THE COURT:  And I think I saw in your Affidavit, or

8     possibly in your letter, that there was no reason, other than

9     that, to depose people in Thailand, or to try to get foreign

:34:45    10     judicial assistance, so you haven't done any Thai things, right?

11          MR. KENWORTHY:  The only person -- we did Dr. Arnold.

12          THE COURT:  Wasn't he like in Singapore or someplace?

13          MR. NASH:  He's in Thailand.

14          MR. KENWORTHY:  He's in Thailand.

:35:02    15          When he came this issue wasn't, so we didn't ask him

16     anything about any of this.

17          THE COURT:  Is he one of the inventors?

18          MR. KENWORTHY:  No, no, he's on the other side.

19          MR. NASH:  He runs the R&D lab at the manufacturer.

:35:13    20          THE COURT:  Oh, so he's not a -- so he's not exactly a

21     disinterested third party, or, I mean, he's somebody that's

22     under contract for you?

23          MR. NASH:  He worked -- you know, without being overly

24     particular --

:35:24    25          THE COURT:  Yes.

1      MR. NASH:  -- yes, without waiving any corporate

2  informality.

3      THE COURT:  Yes, yes, yes.

4      MR. KENWORTHY:  But where I'm coming from, this is --

:35:31    5  the admission is admitting what their product for which he's the

6  R&D hat, the characteristics of their product.

7      THE COURT:  All right.

8      So you have Dr. Arnold in Thailand.

9      What else?

:35:43    10     MR. KENWORTHY:  We don't know.  We don't have any

11  document discovery with respect to that.  We didn't actually ask

12  interrogatories going to the -- to get sworn statements of all

13  the things that have been given -- told us today about why they

14  admitted.

:35:58    15     I think we would be entitled -- I mean, it's still

16  going to be an evidentiary admission.  I think we're entitled to

17  know all the factors that they considered in making the

18  admission.

19     THE COURT:  Yeah, I don't know.  I mean, I think if I

:36:10    20  let them withdraw it, I tend to think that wipes the slate clean

21  on that point, but I could be wrong.

22     MR. KENWORTHY:  I think what it does is it wipes what I

23  described from the Coca-Cola case, the inability contested, but

24  it doesn't wipe away an admission that somebody has made.

:36:30    25     THE COURT:  And you may be right about that.

1    Certainly, I think that's something for another day.

2            So, documents.  What kind of documents would you be

3    asking for?

4            MR. KENWORTHY:  We'd be looking for documents that

:36:48    5    related to the feature of their products and whatever, and what

6    testing may have been done.

7            THE COURT:  You haven't already asked for, I don't

8    know, the complete explanation?

9            MR. KENWORTHY:  We haven't -- I'm sorry.

:37:03    10           THE COURT:  I mean, regardless of this limitation,

11   wouldn't you be -- haven't you already asked for -- I don't know

12   -- all the technical details of their products?

13           MR. KENWORTHY:  We have, but I don't think we've gotten

14   anything that has gone to this, to this feature.

:37:18    15           THE COURT:  Okay.  So documents about the products.

16           What else?

17           MR. KENWORTHY:  We'd want to probe the rationale for

18   both here and in Australia as to why the manufacturer, when this

19   issue is out there as to both, had admitted these facts.  What

:37:39    20   factors they considered when they made the admissions.

21           MR. NASH:  I have to interrupt on this.

22           The manufacturer was not a party in Australia and

23   didn't make any admissions.  There's been a lot of talk about

24   them.

:37:55    25           The manufacturer of this product was not a party in

1    Australia and did make any admissions.

2         MR. KENWORTHY:  Your Honor, these people are all

3    affiliates.  They referred to -- the U.S counsel for their

4    client, they treat them all the same.

:38:09    5         And the party in Australia admitted in pleadings that

6    it was the manufacturer.  If they want to say that's not true

7    and that was never withdrawn.

8         THE COURT:  I'm sorry.  The party in Australia, and

9    let's just assume that's some RB affiliate.

:38:21   10         MR. KENWORTHY:  Yes.

11         THE COURT:  They admitted what?

12         MR. KENWORTHY:  They were alleged to be the

13   manufacturer and they admitted they were the manufacturer.

14         THE COURT:  Okay.  But what is --

:38:31   15         MR. KENWORTHY:  Well, he's talking about --

16         THE COURT:  All right.  All right.

17         Let's stop talking about that.

18         MR. KENWORTHY:  Who the manufacturer is.  That's what

19   they admitted.

:38:37   20         THE COURT:  So you have some fact type discovery things

21   you've asked for, or that you've listed here.

22         I take it in terms of experts -- I printed out the

23   Order, but I guess I forgot what I was looking for.

24         When are your expert reports due?

:39:08   25         MR. KENWORTHY:  The reports are due on the 26th of May

1    to prove the fact that they now seek to withdraw.

2                THE COURT:  All right.

3                And is there anything else that you want to say, Mr.

4    Kenworthy, otherwise I --

:39:19    5                MR. KENWORTHY:  I would.

6                THE COURT:  Okay.

7                MR. KENWORTHY:  Again, dealing with the factual record,

8    these same elements, obviously they're contending there's

9    anticipation.

:39:32    10                THE COURT:  Right, I saw that in your letter.

11                MR. KENWORTHY:  If it's scientifically not true,

12    possible, how can they continue as of May -- March --

13                THE COURT:  Oh, yeah, yeah.  This was in your letter.

14    You referred me to some exhibit and it was 11 pages long, and I

:39:49    15    was not inclined to look through the 11 pages to find out where

16    it was.

17                MR. KENWORTHY:  It's the places where this element is

18    present.  They contend it's present in the prior art.

19                Now, how can you contend that and continue to contend

:40:02    20    that?

21                THE COURT:  Okay.  So I understand that point.  It

22    would be more helpful for me to hear from them on that now.

23                MR. KENWORTHY:  Okay.

24                THE COURT:  Is there anything else?

:40:09    25                MR. KENWORTHY:  I think that probably covers it, your

Honor.

THE COURT:  So, Mr. Nash, why don't you start where Mr. Kenworthy left off, because it's something I remember.

MR. NASH:  Yes.  Well, as in any patent case, you sometimes argue in the alternative, and that's really all we're doing.

In those 11 pages what you'll see is that we conditioned the assertion based on to the extent we can understand it.  And then in one instance to the extent that the feature is found in the accused product, that it would be present in the prior art.

This goes back to the point, your Honor, I made, and you asked about.

I suspect they're going to come forward with somebody that says Dr. Potter's wrong.

I don't think Dr. Potter's wrong, but you haven't determined it, there has been no adjudication of that.  We're simply arguing in the alternative that if it is scientifically possible, despite what Dr. Potter says, then that could be found in the prior art.

THE COURT:  Okay.

What do you think about the discovery, the fact-type discovery that Mr. Kenworthy has said -- well, has said that needs to be done?

MR. NASH:  We're more than happy to have him send us

1    document requests and interrogatories, and we'll answer them on

2    an expedited basis.

3           With respect to taking testimony, they have not yet --

4    they've only taken two depositions in this case thus far -- I'm

5    sorry -- three.  They took Potter's depositions on his

6    Declaration, but they've only taken two fact depositions.

7           One very early on on a narrow issue, and they took Dr.

8    Arnold's deposition.  The big deposition, as it were, is the

9    30(b)(6) deposition with multiple categories.  That has not yet

10   happened.  We're presently trying to work out a schedule on

11   that.  If they want to amend the 30(b)(6) Notice, and add a

12   topic for this, then we'll produce a witness.

13          And I'm also happy -- you know, Dr. Arnold lives in

14   Thailand.  It's sort of a big deal to fly him over here.  We

15   would produce him for a video deposition if they wanted to

16   follow up with questions of Dr. Arnold on this very narrow

17   issue.

18          THE COURT:  And Dr. Arnold, he's somebody of

19   significance in the manufacturing operation?

20          MR. NASH:  He's the head of Research and Development

21   for the manufacturer.

22          THE COURT:  All right.  Okay.

23          So, in the Australian proceedings, understanding that

24   some other company that has some interest, it's probably not too

25   different than yours, they've admitted -- whoever they are --

1    they submitted the same thing that you admitted in this case?

2           MR. NASH:  They did.

3           THE COURT:  And the Australian proceeding is going

4    forward with the Australian judge, or tribunal, or whoever is in

:43:06    5    charge, is making them stick to that admission?

6           MR. NASH:  They never sought to withdraw the admission

7    and I think that's significant.  No, but it's significant, your

8    Honor.

9           There's a -- there's a lot of pointing to the

:43:23    10   Australian and the talk with Dr. Potter that occurred.  As best

11   I can tell, and I'm not a lawyer in those proceedings, I wasn't

12   privy to the conversations, but as best I can tell, your Honor,

13   this issue never came up with Dr. Potter.  If it had, I presume

14   they would have sought to withdraw this admission at the time,

:43:41    15   and they didn't.

16          THE COURT:  But I guess, maybe to Mr. Kenworthy's first

17   point a while ago, which seemed to be, you have plenty of other

18   arguments, whether or not you have this particular argument.

19          MR. NASH:  It's -- let me go back.

:43:58    20          I'll make two points on that, maybe three.

21          The Conlon case, your Honor -- I don't need you to look

22   it up.  The Conlon case that we cited, the Ninth Circuit case

23   that the Third Circuit cited in their decision, it talks about

24   the purpose of the rule, Rule 36.

:44:13    25          And it says -- it cites the Advisory Committee notes --

1    and it says, Rather, the rule seeks to serve two important

2    goals; truth-seeking in litigation and efficiency in dispensing

3    justice."

4         You know, where the goal is truth-seeking, and we think

5    that the admission has been made in error, that's incorrect, and

6    not actually a fact, and it's supported by an expert who thinks

7    it was wrong, incorrect, and not correct, the point of -- the

8    purpose of the rule in truth-seeking is undermined.

9         So, you know, I guess that's my first point, just from

10   a policy perspective.

11        The record, as it exists now -- and I understand they

12   may try to controvert it later -- the record, as it exists now,

13   we've admitted something and the admission is factually

14   incorrect.

15        We thought we were admitting one thing, and what it

16   turns out as once we learned more, and we talked to Dr. Potter,

17   when you start factoring in what the various crosslinks do and

18   what they don't do, turns out we admitted more than we should

19   have.

20        That's the one point.

21        So, in the interest of trying to get to the truth and

22   have the Court decide the issue on the merits, we think that it

23   should be withdrawn.

24        The other point that I'd like to make is that this

25   issue is not going away in terms of the scientific impossibility

1    of this, because that also comes up in the enablement context.

2         And unless your Honor decides enablement on Summary

3    Judgment, one way or the other, we're going to be in a situation

4    where, if the admission isn't withdrawn, we're going to go to

:45:53   5    trial, and enablement and infringement will be tried

6    side-by-side.  And the jury is going to hear that we admitted

7    something that we're saying in the context of enablement is

8    scientifically impossible.  And that creates a very untenable

9    situation for us and it greatly hinders our case.

:46:18   10        And, so, I don't think the rule is as extreme as Mr.

11   Kenworthy suggests, that unless the admission completely

12   undercuts our case entirely, and we've got no other arguments

13   and it can't be withdrawn, that is certainly not what the cases

14   that we cited suggest.

:46:34   15        Those cases all talk about when -- when the admission

16   is inconsistent with the evidence of record, or has been

17   contradicted by an expert.  That's at least grounds -- that's

18   ground under the first prong of the test to allow the admission

19   to be withdrawn.

:46:52   20        THE COURT:  So I understand there's four patents, I

21   think, being asserted here.

22        Do you have multiple non-infringement defenses against

23   all the asserted claims in these four patents?

24        MR. NASH:  Yes.

:47:17   25        THE COURT:  And do you have, besides for enablement,

1    you know, obviousness, or anticipation, or indefiniteness, or

2    some other collection of defenses, or counterclaims I guess,

3    against all of the asserted claims in the patents?

4         MR. NASH:  Yes.  I'll take back what I said.

:47:34    5    I thought more about your question.  I think that with

6    respect to one of the patents, the '027 patent, I think we only

7    have one non-infringement argument.  This would -- this would

8    give us another one.

9         This issue with respect to non-infringement is --

:47:54    10    THE COURT:  Oh, right, right.

11    Of course, unless you have -- right, of course you have

12    other non-infringement defenses on all the asserted claims, or

13    otherwise, somebody would be asking for Summary Judgment or

14    something.

:48:05    15    Okay.  I'm sorry.

16    You were saying?

17         MR. NASH:  This issue relates to three of the four

18    patents.  This limitation is not in the fourth patent in order,

19    the '029 patent, but it's in the other three.  It's in all of

:48:19    20    the claims.

21         THE COURT:  Can we just go off the record for a second?

22         (A discussion was held off the record.)

23         THE COURT:  All right.

24         Let's go back on the record.

:50:13    25    I'm sorry, Mr. Nash, is there anything else you want to

1    say in response to what Mr. Kenworthy had to say?

2          MR. NASH:  I think we've addressed the prejudice

3    issues, your Honor.

4          He's identified five things, but I think they've all

:50:32    5    been addressed here.  They're going to get Dr. Potter during

6    expert testimony.  They can ask him all about this declaration

7    and they can ask him all about this issue.

8          They're going to need to, because he's going to address

9    this issue in the context of enablement, in any event.

:50:47   10          THE COURT:  Do you have an opinion -- and I don't know

11    why I asked, because I'm not going to resolve it.  Let's assume

12    that I let you take the admission back.  Does that mean the jury

13    will never hear, or is it basically a statement of a party that

14    even if it's not now a binding statement, it's still a

:51:09   15    statement?

16          MR. NASH:  I honestly don't know the answer to that.

17          Mr. Kenworthy could be right, he could be wrong.

18          I don't know.  You certainly could condition your Order

19    on that.

:51:23   20          THE COURT:  That's not what I was thinking about, but

21    that's an idea.

22          All right.

23          Is there anything else you would like to say?

24          MR. NASH:  No.

:51:33   25          THE COURT:  Mr. Kenworthy?

1          MR. KENWORTHY:  A couple of things.

2          One, with respect to the record -- of what's of record.

3          What is of record is, their statement that this element

4     that they're now claiming is impossible is found in three pieces

:51:47   5     of prior art are.

6          The qualification that Mr. Nash gave is not the

7     qualification that's in their infringement --

8          THE COURT:  Wait.  Say that again, because I didn't

9     quite get that.

:51:59  10          MR. KENWORTHY:  Yes.

11          THE COURT:  Your characterization of what he said, I

12     missed when he was saying it.

13          MR. KENWORTHY:  Okay.  I'll read what it is their

14     response was in their invalidity contentions as to the presence

:52:11  15     of this element.

16          THE COURT:  You're talking now about your argument of,

17     they've alleged it in the prior art, so how can it not be?

18          MR. KENWORTHY:  Yes.

19          THE COURT:  Okay.  I understand now.  Go ahead.

:52:24  20          MR. KENWORTHY:  And this wasn't conditional.  It was

21     conditional on two things.

22          To the extent this claim limitation can be understood

23     and is not indefinite.  That's it.

24          Now, understood and indefinite were what we already had

:52:39  25     on this very limitation.  We met and conferred with, went

1    through claim construction, had to write a brief, and they then

2    withdrew any claim of need for construction or indefiniteness.

3           So there is -- once that's been withdrawn, what they

4    have in there is that this feature with no limitations is found

:52:59    5    in the prior art.  It's not conditional on anything.  It's a

6    statement made by them, consistent with Rule 11, that it's

7    found, unconditional statement.  And that's been in the record

8    for like ten months since their very first invalidity contention

9    back in May.

:53:21    10           So they've made that statement.

11           To the extent they claim that the same issue arises

12    from their enablement argument, they've been making enablement.

13           If that's what gave rise -- they've asserted enablement

14    with respect to this limitation.  And they've been asserting

:53:41    15    that for nine or ten months.

16           So how can they contend that for the first time this

17    issue came up, now when they're trying to prepare their witness,

18    when they had a duty to insure that there was a legitimate basis

19    to make the claims that they've made?

:53:56    20           That's not the case.

21           THE COURT:  All right.

22           Anything from you?

23           MR. NASH:  No.

24           THE COURT:  Okay.

:54:08    25           MR. NASH:  No, we were arguing the alternative, and if

1    we need to further amend the charts to make that clear, I'm

2    happy to do that.

3           THE COURT:  Yeah, I have to say, I'm -- yeah, I'm not

4    too worried about that particular thing.

:54:27    5           All right.

6           I don't really like to do this, but I think I'm going

7    to take this under advisement, and the basic reason was because

8    I looked at the Third Circuit case, which one of the parties

9    cited when -- and essentially that was it.

:55:14   10           I think the language of the rule about that you should

11   permit withdrawal or amendment if it would promote the

12   presentation of the merits of the action, that's a pretty vague

13   way of saying something.

14           So I'd kind of like to think about that some more,

:55:42   15   because that really gets down to this issue.

16           It seems clear RB is going to have, you know, as is

17   usually the case in patent infringement litigation, they have a

18   briefcase full of arguments and, you know, this is one of them.

19           So to the extent that this D.C. District Court is onto

:56:16   20   something, certainly favors Ansell here.

21           I do think that if we get to the prejudice, that sounds

22   to me like that that is something that could be resolved.

23           You said something that if I did resolve it, that I

24   could direct RB to pay Ansell a certain amount of money to --

:56:49   25   for the expenses, and I don't know, other costs involved here?

1          MR. NASH:  Well, it's certainly your discretion to do

2     that, your Honor.

3          What costs did you have in mind?

4          THE COURT:  Here's the thing, the Third Circuit case,

:57:08    5     this was something where I think it was, you know, a civil

6     rights violation.  The defendant served a Request for Admission,

7     and, so, the plaintiffs, who I think had an attorney, just

8     didn't answer it.

9          And then within a month of not answering it, because

:57:32   10    after all if you don't answer it, it's deemed to be the same

11    thing as admitting it, they're busy trying to withdraw.

12         And, so, that's, in many ways, a much more favorable

13    situation for the party that's analogous to RB here.

14         So I'd kind of like to get a sense of what other judges

:57:58   15    have done, because it does trouble me that we could have

16    something where I know there is a team of lawyers and probably a

17    team of -- and there is some technical expert somewhere lurking

18    in the background, which may easily be Dr. Potter.

19         So it does trouble me that -- that -- particularly when

:58:33   20    we know he's been available to RB from the beginning, because of

21    the Australia litigation.  It troubles me that you have an

22    answer that says admitted, and then you go through fact

23    discovery, we're very close to the end of it, we're certainly

24    past what the initial cutoff was, but I guess the other parties

:59:07   25    have agreed to some extension.  I probably signed it, but I

1    guess I didn't notice it.

2          But, I mean, it's very late in the case, so that

3    troubles me.

4          And, I guess, the other thing is, which I often mention

5    in other kinds of discovery disputes -- I'm sure Ms. Kraman has

6    heard it more times than she cares to admit.

7          The Third Circuit really does prefer decisions on the

8    merits.

9          And, so, the Requests for Admission is a rule, and it

10   does -- you know, they're sometimes where the merits are not

11   going to happen.  And in other contexts to me, the Third Circuit

12   test often boils down to just the question of prejudice.

13         And, as I said, I think RB is in better shape on the

14   prejudice issue here.

15         So, in any event, I want to think about it some more.

16         I guess I'll write some Order.  I do realize time is

17   marching on here, so I can't give you a decision today.

18         Anything else that anybody wants to say?

19         MR. NASH:  I just want to respond to one of the things

20   you mentioned, your Honor.

21         The availability of Dr. Potter to us.  And here I'm

22   using "us" very specifically as sort of me and my team.

23         And I'm not an expert in any of this stuff, but the

24   rules in Australia are such that you can't prejudice the expert

25   by giving them too much information.  It's sort of a very staged

1   process.

2           Because of that, the lawyers in Australia, specifically

3   asked me to refrain from showing much of anything of

4   significance to Dr. Potter until after he testified in the trial

5   in December.

6           THE COURT:  December of last year?

7           MR. NASH:  Correct.  December 2016.

8           So while it's true, I could pick up the phone and call

9   Dr. Potter, I knew who Dr. Potter was, I was constrained to a

10  certain respect were out of the just honoring the request made

11  of me by Australian counsel not to interfere with their process,

12  where they are spoon-feeding him information according to their

13  rules at certain points.

14          So, you know, we did consult with Dr. Potter from

15  time-to-time, starting in the fall in particular, but we didn't

16  show him anything or give him anything.  It wasn't really until

17  we started working on the claim construction that we really

18  started working with Dr. Potter with any great significance in

19  this case, so much so I happen to -- I flew to Australia to

20  watch the trial.  I didn't meet with Dr. Potter on this case

21  until after he testified for that exact reason.

22          So the same day he finished testifying, I had a meeting

23  with Dr. Potter in Australia about this case.  It was the first

24  time that I was able to really talk to him about stuff freely,

25  because he was done with his obligations there.

:01:13
:01:26
:01:44
:02:03
:02:20

1          THE COURT:  So did you have some other technical expert

2     advising you back when you answered this Request for Admission?

3          MR. NASH:  No.

4          MR. KENWORTHY:  He had Dr. Arnold.

:02:31          5          MR. NASH:  Did I -- did I have them or did I consult

6     them?  I mean, could I have called Dr. Arnold?

7          Yes.

8          Did I?

9          No.

:02:44          10          Would I have thought to when I thought I understood

11    what it was asking?

12          It was asking me -- what I thought it was asking is,

13    are both present?

14          That's what I thought I was admitting.

:02:55          15          THE COURT:  Can we go off the record here, again, for a

16    second?

17          (A discussion was held off the record.)

18          THE COURT:  All right.

19          Let's go back on the record.

:03:51          20          All right.

21          Mr. Kenworthy?

22          MR. KENWORTHY:  Just one thing for your Honor.

23          I read part of the Third Circuit's Airco decision that

24    Judge Schwartz had quoted in Coca-Cola, which we cited.  I

:04:10          25    didn't give that cite.

1          If your Honor wants it, it is in the <u>Coca-Cola</u>, but

2     it's 850 Fed 2nd 1028.

3          THE COURT:  All right.

4          MR. KENWORTHY:  And the pages I think, were at --

:04:23     5     pinpointed at 1036.

6          THE COURT:  All right.

7          MS. KRAMAN:  I would like to correct one thing in our

8     letter.

9          THE COURT:  Okay.

:04:32    10          MS. KRAMAN:  So I made a mistake in one of the

11     parentheticals for the <u>Altman</u> case.  I think I --

12          THE COURT:  Hold on a minute.

13          MS. KRAMAN:  It's Page 2 in the bound version.

14          THE COURT:  Yes.  <u>Altman</u>.

:04:49    15          MS. KRAMAN:  So in <u>Altman</u> the -- 2008 Westlaw 596066.

16     In that case the Court found both prongs satisfied for a 36(b)

17     to allow plaintiff to withdraw the admission that was later

18     contradicted by the plaintiff's expert.

19          In that case, the Request for Admission was qualified,

:05:12    20     and I think it was admitted based on what we know now, something

21     of that nature.

22          And, so, the Court denied the request to withdraw as

23     moot, because the Court didn't think withdrawal was necessary,

24     because the plaintiff had contradicted it -- could contradict

:05:26    25     the admission.

1          I just wanted to make that clear.

2          THE COURT:  Okay.

3          MS. KRAMAN:  The case is instructive and interesting.

4          MR. KENWORTHY:  The correction on that is the Western

:05:40  5  District of Pennsylvania, if you care?

6          MR. NASH:  Yes, I saw that, too.

7          THE COURT:  All right.

8          Well, I'm sorry I can't resolve this right now.

9          All right.

:05:48  10         I'll do something.  Thank you very much.

11         MR. KENWORTHY:  Thank you, your Honor.

12         MR. NASH:  Thank you, your Honor.

13         MS. KRAMAN:  Thank you.

14         (The proceedings adjourned at 4:05 o'clock p.m.)

:05:54  15                    *  *  *  *  *

16

17

18

19

20

21

22

23

24

25