IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ANSELL HEALTHCARE PRODUCTS LLC,

    Plaintiff,

v.

RECKITT BENCKISER LLC,

    Defendant.

Civil Action No. 15-cv-915-RGA

## MEMORANDUM OPINION

Colm F. Connolly, David W. Marston Jr., Jody C. Barillare, John V. Goodman, MORGAN LEWIS & BOCKIUS LLP, Wilmington, DE; Thomas B. Kenworthy (argued), Julie S. Goldemberg, MORGAN LEWIS & BOCKIUS LLP, Philadelphia, PA; Raymond R. Moser, Jr., MOSER TABOADA, Shrewsbury, NJ.

Attorneys for Plaintiff.

Adam W. Poff, Pilar G. Kraman, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, DE; Douglas J. Nash (argued), John D. Cook (argued), Kathryn D. Cornish, BARCLAY DAMON, LLP, Syracuse, NY.

Attorneys for Defendant.

January 30, 2018

**ANDREWS, U.S. DISTRICT JUDGE:**

Presently before the Court are Plaintiff Ansell Healthcare Products LLC's Motion for Summary Judgment of Non-Invalidity Under 35 U.S.C. Sections 102 and 103 (D.I. 189) and related briefing (D.I. 190, 206, 218); Ansell's Motion for Summary Judgment of Infringement of Claims 1 and 5 of U.S. Patent No. 9,074,027 (D.I. 192) and related briefing (D.I. 193, 208, 220); Defendant Reckitt Benckiser's Motion for Summary Judgment of Invalidity (D.I. 201) and related briefing (D.I. 202, 223, 234); RB's Motion for Partial Summary Judgment of Non-Infringement (D.I. 203) and related briefing (D.I. 204, 224, 231); and RB's Motion for Summary Judgment of No Willful Infringement and No Enhanced Damages (D.I. 198) and related briefing (D.I. 199, 222, 233). I held oral argument on January 22, 2018. (D.I. 262 ("Tr.")).

As stated at oral argument, the Court will **DENY** the parties' summary judgment motions related to infringement and validity (D.I. 189, 192, 201, 203), insofar as they relate to non-claim construction issues. (Tr. at 106:19-108:20). For the reasons that follow, the Court will also **DENY** the remainder of the parties' summary judgment motions related to infringement and validity (D.I. 189, 192, 201, 203), and will **GRANT** RB's Motion for Summary Judgment of No Willful Infringement and No Enhanced Damages (D.I. 198).

**I.    BACKGROUND**

Ansell brought this patent infringement suit against RB on October 13, 2015, alleging that RB infringes United States Patent Nos. 8,087,412 ("the '412 patent"), 8,464,719 ("the '719 patent"), 9,074,027 ("the '027 patent), and 9,074,029 ("the '029 patent") by importing, selling, or offering for sale the accused Durex RealFeel®

2

condoms. (D.I. 1). Ansell has asserted claims 1, 2, 3, 4, 8, and 9 of the '412 patent; claims 1, 8, 10, 11, 16, and 17 of the '719 patent; claims 1 and 5 of the '027 patent; and claims 1, 2, 3, 7, 8, 11, 16, and 17 of the '029 patent. (D.I. 202 at 1).

All asserted claims require "synthetic polyisoprene particles bonded to each other through intra-polyisoprene particle crosslinks and inter-polyisoprene particle crosslinks." (D.I. 202 at 2). Claims 1 and 5 of the '027 patent require that "the intra-polyisoprene particle crosslinks and the inter-polyisoprene particle crosslinks are such that the molecular weight is less than about [X] g/mol between the crosslinks." (D.I. 202 at 3). Claim 1 of the '027 patent reads as follows:

1. A synthetic, dip-formed polyisoprene elastomeric condom comprising:

> synthetic polyisoprene particles, said synthetic polyisoprene particles bonded to each other through intra-polyisoprene particle crosslinks and inter-polyisoprene particle crosslinks;
>
> wherein the intra-polyisoprene particle crosslinks and the inter-polyisoprene particle crosslinks are such that the molecular weight is less than about 8000 g/mol between the crosslinks.

(D.I. 1-3 ("the '027 patent"), claim 1).

## II. LEGAL STANDARD

### A. Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of proving the absence of a genuinely disputed material fact relative to the claims in question. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). Material facts are those "that could affect the outcome" of the proceeding, and "a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party." *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir.

3

2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007).

## B. Claim Construction

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (internal quotation marks omitted). "'[T]here is no magic formula or catechism for conducting claim construction.' Instead, the court is free to attach the appropriate weight to appropriate sources 'in light of the statutes and policies that inform patent law.'" *SoftView LLC v. Apple Inc.*, 2013 WL 4758195, at *1 (D. Del. Sept. 4, 2013) (quoting *Phillips*, 415 F.3d at 1324) (alteration in original). When construing patent claims, a court considers the literal language of the claim, the patent specification, and the prosecution history. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 977–80 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). Of these sources, "the specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315 (internal quotation marks omitted).

"[T]he words of a claim are generally given their ordinary and customary meaning. . . . [Which is] the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1312–13 (citations and internal quotation marks omitted). "[T]he ordinary meaning of a claim term is its meaning to [an] ordinary artisan after reading the entire patent." *Id.* at 1321 (internal quotation marks omitted). "In some cases, the ordinary meaning of claim language as

4

understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314.

When a court relies solely upon the intrinsic evidence—the patent claims, the specification, and the prosecution history—the court's construction is a determination of law. *See Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015). The court may also make factual findings based upon consideration of extrinsic evidence, which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317–19. Extrinsic evidence may assist the court in understanding the underlying technology, the meaning of terms to one skilled in the art, and how the invention works. *Id.* Extrinsic evidence, however, is less reliable and less useful in claim construction than the patent and its prosecution history. *Id.*

"A claim construction is persuasive, not because it follows a certain rule, but because it defines terms in the context of the whole patent." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998). It follows that "a claim interpretation that would exclude the inventor's device is rarely the correct interpretation." *Osram GMBH v. Int'l Trade Comm'n*, 505 F.3d 1351, 1358 (Fed. Cir. 2007) (citation omitted).

### III. DISCUSSION

1. *Claim Construction*

    a. "synthetic polyisoprene particles, said synthetic polyisoprene particles bonded to each other through intra-polyisoprene particle crosslinks and inter-polyisoprene particle crosslinks"

        i. *Ansell's proposed construction*: The claims do not require intra-polyisoprene particle crosslinks to cross the boundaries between particles to bond one particle to another. (D.I. 223 at 9-10).

5

ii. *RB's proposed construction*: The claims require that intra-polyisoprene particle crosslinks and inter-polyisoprene particle crosslinks each cross the boundaries between particles to bond one particle to another. (D.I. 202 at 13-14).

iii. *Court's construction*: The claims do not require intra-polyisoprene particle crosslinks to cross the boundaries between particles to bond one particle to another.

This limitation appears in all of the asserted claims of the '412, '719, and '027 patents. (D.I. 202 at 2).

RB argues that the claim language requires that both intra-polyisoprene particle crosslinks and inter-polyisoprene particle crosslinks "cross the boundaries between the particles, to bond the particles to each other." (D.I. 202 at 13-14).

Ansell, on the other hand, argues that the claims do not require intra-particle crosslinks to cross the boundaries between particles to bond one particle to another. (D.I. 223 at 9-10). Rather, Ansell argues that the claims mean both types of crosslinks are necessary for bonding, and "without the intra-particle crosslinks, it would not be possible to have discrete latex particles in a finished latex article to be bonded together." (*Id.*). Ansell analogizes the bonding to handcuffs, arguing that just as cuffs and a chain work together to bind two wrists, both intra-polyisoprene particle crosslinks and inter-polyisoprene particle crosslinks work together to bind particles. (Tr. at 15:24-16:7).

This claim language is subject to more than one interpretation, including the interpretations of the parties. "If, after applying all other available tools of claim construction, a claim is ambiguous, it should be construed to preserve its validity." *Ruckus Wireless, Inc. v. Innovative Wireless Sols., LLC*, 824 F.3d 999, 1004 (Fed. Cir. 2016) (citing *Phillips*, 415 F.3d at 1327).

The parties agree that it is scientifically impossible for intra-polyisoprene particle crosslinks to bond particles by themselves. (Tr. at 63:8-12, 64:7-20, 66:12-13, 66:24-67:2; D.I. 202 at 13; D.I. 223 at 10). Thus, to construe the term so as to require both types of crosslinks to independently bond particles would likely render the claims invalid for lack of utility or enablement. *See EMI Group N. Am. v. Cypress Semiconductor Corp.*, 268 F.3d 1342, 1348-49 (Fed. Cir. 2001) ("A claimed invention having an inoperable or impossible claim limitation may lack utility under 35 U.S.C. § 101 and certainly lacks an enabling disclosure under 35 U.S.C. § 112 . . . . When a claim itself recites incorrect science in one limitation, the entire claim is invalid. . . .").

The canon favoring constructions that preserve claim validity therefore counsels against construing the term so as to require both types of crosslinks to independently bond particles. Furthermore, given the scientific impossibility of intra-polyisoprene particle crosslinks bonding particles by themselves, a person of ordinary skill in the art would read the claim language to mean that intra-polyisoprene particle crosslinks and inter-polyisoprene particle crosslinks work together to bind particles.

Accordingly, I am going to deny RB's Motion for Summary Judgment of Invalidity, as to lack of utility and/or enablement. (D.I. 201; D.I. 202 at 12-15).

- b. "wherein the intra-polyisoprene particle crosslinks and the inter-polyisoprene particle crosslinks are such that the molecular weight is less than about [X] g/mol between the crosslinks"

    i. *Ansell's proposed construction*: Intra-polyisoprene particle crosslinks and inter-polyisoprene particle crosslinks must together have the asserted molecular weight. (D.I. 224 at 3-4).

    ii. *RB's proposed construction*: Both intra-polyisoprene particle crosslinks and inter-polyisoprene particle crosslinks must have the asserted molecular weight. (D.I. 204 at 4).

7

iii. *Court's construction*: Intra-polyisoprene particle crosslinks and inter-polyisoprene particle crosslinks must together meet the asserted molecular weight limitation.

This limitation appears in claims 1 and 5 of the '027 patent. (D.I. 204 at 1).

RB argues that "both types of crosslinks [must] have the asserted molecular weight." (D.I. 204 at 4). As evidence, RB points to the claim language, which it says follows a logical pattern of "A and B are such that C," which requires as a matter of grammar that "both conditions [are] met in order to infringe." (*Id.*).

Ansell, on the other hand, argues that the crosslinks must *together* have the asserted molecular weight. (D.I. 224 at 3-4). In support of its position, Ansell argues that the antecedent for the term "crosslinks" is "the intra-polyisoprene particle crosslinks and the inter-polyisoprene particle crosslinks," and that the term "molecular weight" is "singular, not plural." (*Id.*).

The specification provides just one example of measuring molecular weight between crosslinks, found in Table 7. ('027 patent at 15:55-67). The measurements provide one value per condom, and do not distinguish between intra-polyisoprene particle crosslinks and inter-polyisoprene particle crosslinks.

RB argues that the "whole point of the invention" is to balance molecular weight of the intra-polyisoprene particle crosslinks and the inter-polyisoprene particle crosslinks. (Tr. at 37:5-6; D.I. 204 at 4-5). The patent specification states that there "is a delicate balance in selecting the size and size range distribution of the polyisoprene particles to produce optimal strength properties that balance pre-vulcanization intra-particle cross-linking with post-vulcanization inter-particle cross-linking." ('027 patent at 10:55-59). Additionally, the specification states that "[t]he composition should achieve substantial intra-particle and inter-particle crosslinking in the final product," and that "both inter and intra particle regions were approximately equal strength

8

or were crosslinked nearly equally." ('027 patent at 4:33-35, 7:59-61). However, as Ansell notes, the patent specification never expressly teaches that the intra-polyisoprene particle crosslinks and the inter-polyisoprene particle crosslinks must have the same molecular weight. (Tr. at 43:3-4).

The claim language is subject to more than one interpretation, but the specification shows that molecular weight can be measured across both types of crosslinks, and does not show molecular weight measured for each type of crosslink. Accordingly, I construe the limitation to mean that the crosslinks must together meet the asserted molecular weight limitation.

I will deny RB's Motion for Partial Summary Judgment of Non-Infringement, because the fact that Ansell's expert took a single molecular weight measurement across both types of crosslinks does not alone render this limitation missing from the accused product. (D.I. 203).

    c. "the molecular weight is less than about [X] g/mol between the crosslinks"

        i. *Ansell's proposed construction*: Molecular weight must be calculated using the Florey-Rehner equation, and the value of the toluene-cis polyisoprene interaction parameter ($\chi$) must be 0.39. (D.I. 193 at 7).

        ii. *RB's proposed construction*: Molecular weight may not be calculated using the Flory-Rehner equation, and even if the Flory-Rehner equation is used, the value of the toluene-cis polyisoprene interaction parameter ($\chi$) need not be 0.39. (D.I 208 at 2, 10-11).

        iii. *Court's construction*: Molecular weight need not be calculated using the Flory-Rehner equation, and the value of the toluene-cis polyisoprene interaction parameter ($\chi$) need not be 0.39.

The parties dispute whether I must construe the "molecular weight" limitation to require calculation using the Florey-Rehner equation, with the value of the toluene-cis polyisoprene

interaction parameter ($\chi$) being equal to 0.39.[1] This limitation appears in claims 1 and 5 of the '027 patent. (D.I. 193 at 2).

In *Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.*, the Federal Circuit held the term "molecular weight" invalid for indefiniteness. 789 F.3d 1335 (Fed. Cir. 2015). There, the parties agreed that "molecular weight" could refer to any of peak average molecular weight ($M_p$), weight average molecular weight ($M_w$), or number average molecular weight ($M_n$). *Id.* at 1344. "Molecular weight" did not have a plain meaning to one of skill in the art, and neither the claims nor specification indicated which measure of "molecular weight" to use. *Id.* at 1344-45. Ultimately, the Federal Circuit invalidated the claim because there was "not reasonable certainty that molecular weight should be measured using $M_p$." *Id.* at 1345.

Here, by contrast, the patent makes clear what it means by "molecular weight" by providing an equation for molecular weight, $M_c = \frac{P_r}{n}$, where $P_r$ is the density of rubber, and $n$ is crosslink density. ('027 patent at 15:32-37). This disclosure ensures that the patent is not indefinite.

However, the patent's disclosure of the Florey-Rehner equation to calculate crosslink density $n$ does not mean that I must construe "molecular weight" such that crosslink density can only be calculated using that equation.

The claim language at issue is broad. It requires only that "the intra-polyisoprene particle crosslinks and the inter-polyisoprene particle crosslinks are such that the molecular weight is less than about 8000 g/mol between the crosslinks." ('027 patent, claim 1). It does not require that a specific equation be used to calculate crosslink density.

---

[1] RB argues that "[a]mong the errors [in the specification] is the application of the Florey-Rehner equation." (D.I. 208 at 2). However, this is not a claim construction argument, as it hinges on the equation being "subject to significant uncertainty." (*Id.* at 10).

10

"Absent disclaimer or lexicography, the plain meaning of the claim controls." *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1369 (Fed. Cir. 2012). Ansell argues that the specification's provision of the Florey-Rehner equation and the value of the toluene-cis polyisoprene interaction parameter, 0.39, is lexicography. (Tr. at 26:7-10). But it is not lexicography. The patent specification never defines the Florey-Rehner equation as being required to calculate crosslink density. Rather, its only reference to the Florey-Rehner equation is that the "volume fraction *was used* in the Florey-Rehner equation to calculate the crosslink density." ('027 patent at 15:18-19) (emphasis added). Thus, the claim limitation's plain meaning controls, and the patent leaves open the possibility that some other equation could be used to calculate crosslink density and thus to meet the "molecular weight" limitation. *See Phillips*, 415 F.3d at 1323 (warning of "the danger of reading limitations from the specification into the claim").

As a result, the Florey-Rehner equation is not required, and I do not construe this limitation to require a $\chi$ value of 0.39.

Because, at a minimum, there is a genuine dispute of material fact as to whether $\chi$ must equal 0.39, I will deny Ansell's Plaintiff's Motion for Summary Judgment of Infringement of Claims 1 and 5 of U.S. Patent No. 9,074,027. (D.I. 192).

2. *Willfull Infringement and Enhanced Damages*

Enhanced damages are provided for under 35 U.S.C. § 284, which specifies that "the court may increase the damages up to three times the amount found or assessed." According to the Supreme Court, enhanced damages "are not to be meted out in a typical infringement case, but are instead designed as a 'punitive' or 'vindictive' sanction for egregious infringement behavior." *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1932 (2016). Examples of

egregious behavior include behavior that is "willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a pirate." *Id.* "The subjective willfulness of a patent infringer, intentional or knowing, may warrant enhanced damages, without regard to whether his infringement was objectively reckless." *Id.* at 1933. Under *Halo*, therefore, before the Court can consider whether to award enhanced damages, the fact-finder must first determine that the defendant's behavior was subjectively willful under a preponderance of the evidence standard. *Id.* at 1934. Subjective willfulness is found when "the risk of infringement 'was either known or so obvious that it should have been known to the accused infringer.'" *Id.* at 1930 (quoting *In re Seagate Technology, LLC*, 497 F.3d 1360, 1371 (2007) (en banc)).

"Knowledge of the patent alleged to be willfully infringed continues to be a prerequisite to enhanced damages" after *Halo*. *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1341 (Fed. Cir. 2016). Thus, to establish RB's knowledge of the patents-in-suit, Ansell alleges both willful blindness and actual knowledge. (D.I. 222 at 6-7).

However, a party's pre-suit knowledge of the patent is not by itself sufficient to find "willful misconduct" such that the Court can award enhanced damages. *See Halo*, 136 S. Ct. at 1936 (Breyer, J., concurring). Rather, the patentee must identify evidence beyond pre-suit knowledge of the patent to show that the accused infringer's infringement is "egregious," "deliberate," or "wanton."

Willful blindness has two requirements: "(1) the defendant must subjectively believe that there is as high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of a fact." *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011). It is not clear whether the doctrine of "willful blindness" as articulated in *Global-Tech*, an

12

induced infringement case, extends to willful infringement in a direct infringement context. However, I believe it is likely that willful blindness could apply in willful infringement cases, substituting for actual knowledge. As the Supreme Court explained in *Global-Tech*, there is a "long history" and "wide acceptance" of willful blindness "in the Federal Judiciary," giving "no reason why the doctrine should not apply in civil lawsuits for induced patent infringement . . . ." *Global-Tech*, 563 U.S. at 768. In an induced infringement case, willful blindness demonstrates that a defendant "willfully blinded itself to the infringing nature of . . . sales it encouraged [an induced party] to make." *Id.* at 770. Willful blindness thus substitutes for the induced infringement statute's requirement of knowledge that the sales infringed a patent. *See* 35 U.S.C. § 271(b). The Supreme Court allowed this substitution on the "rationale . . . that defendants who behave in this manner are just as culpable as those who have actual knowledge." *Global-Tech*, 563 U.S. at 766.

In an induced infringement case, willful blindness stands in for a defendant's knowledge that the products sold by an induced party infringe a patent. In a willful infringement case, I believe willful blindness could similarly stand in to satisfy the defendant's knowledge requirement, but its application may be more limited than in an inducement case. For example, a defendant's willful blindness to a patent covering a product that it copies and then sells could satisfy the knowledge requirement for willful infringement, because the defendant's willful blindness demonstrates the same level of culpability as if the defendant copied the product with actual knowledge of the patent covering that product. However, a defendant's willful blindness to all of the patents in an entire field might not necessarily demonstrate culpability tantamount to the culpability demonstrated by a defendant's knowledge of a particular patent covering the product being sold, as is required for willful infringement. *WBIP*, 829 F.3d at 1341 (holding that

13

"[k]nowledge of the patent alleged to be willfully infringed continues to be a prerequisite to enhanced damages" after *Halo*).

Ansell puts forth three primary factual bases for its allegation of willfulness: (1) "Reckitt was aware of the four patents-in-issue from, *inter alia*, the fact that there was pending patent infringement litigation in Australia against affiliates of Reckitt involving an Australian counterpart of the patents-in-suit;" (2) "Reckitt was aware of the admission by its affiliate . . . that certain elements of the asserted claims of the patents-in-suit were found in the accused RealFeel® condoms;" and (3) "Reckitt made the conscious decision to nevertheless sell the accused condoms in the United States without any legitimate basis to believe that it had the right to do so." (D.I. 200, Exh. 6 at 11-12).

More specifically, to demonstrate pre-suit[2] knowledge of the patents-in-suit under both actual knowledge and willful blindness theories, Ansell points to a November 19, 2014 press release identifying the Australian lawsuit, which was filed on November 14, 2014. (D.I. 222 at 3-4). Then, argues Ansell, knowing of the Australian patent litigation, RB could have learned via an inquiry that its affiliate Reckitt Benckiser Healthcare (UK) Limited made judicial admissions that certain elements of the asserted claims were found in the accused condoms. (*Id.* at 4).

To demonstrate the required "egregious," "deliberate," or "wanton" infringement beyond mere pre-suit knowledge of the patents-in-suit, Ansell points in its briefing to RB's willful blindness, to RB's post-complaint conduct, and to RB's violation of its patent clearance policy. (D.I. 222 at 7-8).

---

[2] This case was filed on October 13, 2015. (D.I. 1).

14

However, at oral argument, Ansell agreed that willful blindness at most establishes "knowledge," rather than egregious behavior. (Tr. at 88:11-15). As explained above, insofar as willful blindness does apply in willful infringement cases, it only substitutes for actual knowledge, as opposed to egregious behavior. *See Global-Tech*, 563 U.S. at 766 ("We nevertheless affirm the judgment of the Court of Appeals because the evidence in this case was plainly sufficient to support a finding of Pentalpha's knowledge under the doctrine of willful blindness."). Because a party's pre-suit knowledge of a patent is not by itself sufficient to show egregious behavior, willful blindness is also not sufficient.

As for RB's post-complaint conduct, which constitutes continued sales of the accused Durex RealFeel® condoms, Ansell argues in conclusory fashion that because "a finding of willfulness *can* be based exclusively on post-complaint conduct . . . RB's motion for summary judgment of no willful infringement and no enhanced damages must be denied," citing a string of district court cases at the motion to dismiss stage. (D.I. 222 at 7). However, this argument falls short, because Ansell does not point to any "egregious" post-complaint "infringement behavior." *See Halo*, 136 S. Ct. at 1932.

RB's patent clearance policy establishes that RB's "Patent Group" will "undertake a patent clearance" either "at the request of R&D/Category" or "at the Category Patent Attorney's discretion for a product which" meets one of several criteria, including being "a completely new product" or being "believed to be in a technology area in which a major competitor is active in terms of patenting or products." (D.I. 258-1). The policy applies "pre-launch," and provides that a "minimum of 3 months is required to give a patent clearance." (*Id.*).

RB re-launched the accused product and re-branded it Durex® RealFeel™ in January 2014. (D.I. 199 at 2-3; D.I. 200-1, Exh. 1 at 25:5-21). Thus, if RB had a duty to clear its product

15

at all, that duty applied in the three months before launch, from October 2013 to January 2014. But Ansell's willfulness theory begins, at the earliest, in November 2014, since that is the earliest date for which it has any evidence that RB knew of the existence of any of Ansell's patents.[3]

As a result, Ansell does not allege that RB engaged in any sort of "egregious" behavior while knowing or being willfully blind to the patents-in-suit. Rather, RB's would-be "egregious" behavior pre-dates RB's alleged knowledge of, or willful blindness to, the patents-in-suit by roughly 11 months.

"Knowledge of the patent alleged to be willfully infringed continues to be a prerequisite to enhanced damages" after *Halo*. *WBIP*, 829 F.3d at 1341; *see also Halo*, 136 S. Ct. at 1933 ("culpability is generally measured against the knowledge of the actor at the time of the challenge conducted.").

Ansell does not allege that RB had knowledge of, or was willfully blind to, the patents-in-suit at the time Ansell alleges RB failed to comply with RB's internal policy. This is the only conduct which could conceivably raise a disputed issue of material fact about RB's willfulness. Therefore, Ansell's allegations of willful infringement rely on actions taken when the prerequisite of knowledge is missing. Accordingly, RB's Motion for Summary Judgment of No Willful Infringement and No Enhanced Damages is granted.

## IV. CONCLUSION

A separate order will be entered.

---

[3] The '027 and '029 patents were not issued until July 7, 2015.